UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. _____

**02-23474**

**CIV-GRAHAM**

MB REDEVELOPMENT, INC.,           )
a Florida corporation,            )
                                  )
          Plaintiff,              )
                                  )
v.                                )
                                  )
BOVIS LEND LEASE LMB, INC.        )
f/k/a Lehrer McGovern Bovis, Inc.,)
a New York corporation,           )
                                  )
          Defendant.              )
                                  )
                                  )
_____ /

**MAGISTRATE JUDGE**
**GARBER**

## COMPLAINT

Plaintiff MB Redevelopment, Inc. ("MBRI"), by its attorneys, for its complaint against defendant Bovis Lend Lease LMB, Inc. f/k/a Lehrer McGovern Bovis, Inc. ("Bovis") alleges as follows:

### NATURE OF ACTION

1.      MBRI brings this action to recover damages caused by defects in the construction of the Loews Miami Beach Hotel. As a direct result of these defects, water has penetrated into the Hotel, causing damage and requiring MBRI to incur substantial expenses to remediate these defects. Bovis is directly responsible for these defects and the resulting damages because it built the Hotel for MBRI.

HUGHES HUBBARD & REED LLP  201 South Biscayne Boulevard, Suite 2500, Miami, Florida 33131  Telephone: (305) 358-1666

MI 529090_1.DOC

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

3.      This Court has personal jurisdiction over defendant Bovis because Bovis, at all relevant times, (i) was qualified and authorized to do business in the State of Florida, and (ii) in fact transacted business within the State of Florida, including without limitation, providing general contracting, construction management, and other services in connection with the construction of the Loews Miami Beach Hotel.

4.      Venue lies in this district pursuant to 28 U.S.C. § 1391(a).

## PARTIES

5.      Plaintiff MBRI is a corporation organized under the laws of the State of Florida, with its principal place of business in Miami Beach, Florida.  MBRI owns, and does business as, the Loews Miami Beach Hotel, an 800-room convention hotel located at 1601 Collins Avenue, Miami Beach, Florida (the "Hotel").

6.      Defendant Bovis is a corporation organized under the laws of the State of New York, with its principal place of business in New York, New York.  Bovis is engaged in the business of providing, inter alia, general contracting and construction management services.

## COMMON FACTS

7.      On or about September 20, 1996, Bovis and MBRI entered into the following agreements (hereinafter collectively, the "Agreement") with respect to the construction of the Hotel: (i) a "Standard Form of Agreement between Owner and Construction Manager where the Construction Manager is also the Constructor" (AIA Document A121/CMc (1991 ed.))

2

("Standard Form"); (ii) Rider to Standard Agreement ("Rider"); (iii) "General Conditions of the Contract for Construction" (AIA Document A201 (1987 ed.)) ("General Conditions"); (iv) Supplementary Conditions ("Supplementary Conditions"); and (v) Amendment No. 1 re: Guaranteed Maximum Price ("Amendment")   (A copy of the Agreement is attached hereto as composite Exhibit 1.)

8.     The Agreement requires Bovis to perform certain pre-construction, construction, and construction management services (defined in the Agreement as the "Work") in connection with the construction of the Hotel.  In particular, the Agreement requires Bovis, among other things, to: (i) perform the Work in accordance with the contract documents and submittals approved (General Conditions at subparagraph 3.2.3); (ii) perform its services under the Agreement in accordance with the highest professional standards recognized and adhered to by construction managers and contractors rendering services in the State of Florida (Rider at subparagraph 3.2); (iii) supervise and direct the Work, using its best skill and attention, and be solely responsible for construction means, methods, techniques, sequences and procedures, and for coordinating all portions of the Work under the Agreement (General Conditions at subparagraph 3.3.1); and (iv) be responsible to MBRI for any and all acts and omissions of Bovis' agents, employees, and subcontractors performing or supplying work in connection with the project (Rider at subparagraph 2.3.2.8).

9.     Construction of the Hotel commenced in or around December 1996.  After several delays in the construction of the Hotel, a temporary certificate of occupancy was issued on or about December 23, 1998, and the Hotel opened to the public the next day, on or about December 24, 1998.  A final certificate of occupancy, however, was not issued until in or around February 2000.

3

10.     In early 2002, MBRI discovered certain defects in the construction of the exterior walls of the Hotel.

11.     MBRI discovered that plastic reveals (i.e., PVC plastic accessories for exterior stucco systems) had been improperly installed and, as a result, water has seeped into the building through open corners and laps.  For instance, MBRI discovered the following failures: (i) no caulking was used at "ends, butts and intersections," as required by the submittals from Bovis, which were approved by the architect and included the reveals manufacturer's specifications; (ii) reveals were not properly cut and installed to avoid gaps at the corners; (iii) reveals were not properly fastened; and (iv) masonry substrate behind the reveals was not properly cleaned prior to installation of the reveals.   As a result of these and other failures, the Work concerning the installation of the plastic reveals was (i) defective, (ii) not performed in accordance with plans and specifications and approved submittals, and (iii) not performed in accordance with the highest professional standards recognized and adhered to by construction managers and contractors rendering services in the State of Florida, as required under the Agreement.

12.     MBRI also discovered that stucco on the exterior walls of the Hotel has cracked and delaminated due to other defects in construction.  Among other things, MBRI discovered the following failures: (i) there were gaps and voids in the masonry substrate; (ii) the masonry substrate was not clean; (iii) the bonding agent was not properly applied, and (iv) the stucco was not properly damp cured.   As a result of these and other failures, the Work concerning the installation of masonry and application of stucco was (i) defective, (ii) not performed in accordance with plans and specifications and approved submittals, and (iii) not performed in accordance with the highest professional standards recognized and adhered to by construction

4

managers and contractors rendering services in the State of Florida, as required under the Agreement.

13.     MBRI requested Bovis to correct the defects that MBRI had discovered, offering Bovis full access to the Hotel to observe and test these defects.  Bovis failed to correct the defects.  Accordingly, MBRI, in an effort to mitigate any further damage to the Hotel, retained another contractor to commence remediation efforts to correct these defects.

14.     Since the commencement of the corrective work, MBRI has discovered additional defects.  Among other things, MBRI discovered the following failures: (i) a topping on balconies was not properly applied, and (ii) caulking was not properly applied in areas around metal window frames.  As a result of these and other failures, this Work was (i) defective, (ii) not performed in accordance with plans and specifications and approved submittals, and (iii) not performed in accordance with the highest professional standards recognized and adhered to by construction managers and contractors rendering services in the State of Florida, as required under the Agreement.

15.     All conditions precedent to this action have occurred, been performed, and/or been waived.

## COUNT I
## (BREACH OF CONTRACT)

16.     MBRI repeats and realleges each of the allegations contained in paragraphs 1 through 15 as if fully set forth herein.

17.     Bovis materially breached the Agreement for the reasons set forth in paragraphs 11, 12 and 14 above, including because, among other things:

　　　　　　a.     The Work concerning the installation of the plastic reveals was not performed in accordance with the contract documents and approved

5

submittals because, among other things, (i) no caulking was used at "ends, butts and intersections," as required by the approved submittals (which include the manufacturer's specifications), (ii) the reveals were not properly cut, thus leaving gaps at the corners, (iii) the reveals were not properly fastened, and (iv) the masonry substrate behind the reveals was not properly cleaned prior to installation of the reveals.

b.      The Work concerning the application of the stucco to the exterior walls of the Hotel was not performed in accordance with the contract documents and approved submittals because, among other things, (i) the masonry substrate was not cleaned, (ii) the bonding agent was not properly applied, and (iii) the stucco was not adequately damp cured.

c.      The Work concerning the masonry was not performed in accordance with the contract documents and approved submittals because, among other things, there were gaps and voids in the masonry substrate.

d.      Bovis failed to supervise and direct the Work concerning the stucco trade, using its best skill and attention, resulting in faulty workmanship in the installation of the plastic reveals and the application of stucco.

e.      Bovis failed to supervise and direct the Work concerning the masonry trade, using its best skill and attention, resulting in faulty workmanship (i.e., gaps and voids in the masonry substrate).

f.      The Work concerning the application of a topping on balconies was not performed in accordance with the contract documents and approved submittals.

6

g.    The Work concerning the application of caulking in areas around metal window frames was not performed in accordance with the contract documents and approved submittals.

h.    Bovis failed to perform its services in accordance with the highest professional standards recognized and adhered to by construction managers and contractors rendering services in the State of Florida.

18.    Bovis' breaches of the Agreement have directly and proximately caused MBRI to suffer damages, including without limitation, the costs to correct the defective Work, which damages are at minimum $2 million.

WHEREFORE, plaintiff MBRI demands judgment against Bovis:

(a)    for compensatory damages, including without limitation, the costs to correct the defective work;

(b)    for prejudgment interest;

(c)    for the costs, disbursements and attorneys' fees incurred in this action; and

(d)    for such other, further and different relief as the Court may deem just and proper.

## COUNT II
## (BREACH OF EXPRESS WARRANTY)

19.    MBRI repeats and realleges each of the allegations contained in paragraphs 1 through 15 as if fully set fourth herein.

20.    Bovis expressly warranted in the Agreement that "the Work will be free from defects not inherent in the quality required or permitted, and that the Work will conform with the requirements of the Contract Documents." (General Conditions at subparagraph 3.5.1.)

7

21. Bovis breached its express warranty because, among things, the Work concerning the installation of the plastic reveals, the application of stucco, the masonry work, and the work concerning the balconies and caulking around metal window frames is defective and of inferior quality.

22. Bovis' breach of its express warranty has directly and proximately caused MBRI to suffer damages, including without limitation, the costs to correct the defective Work, which damages are at minimum $2 million.

WHEREFORE, plaintiff MBRI demands judgment against Bovis:

    (a)    for compensatory damages, including without limitation, the costs to correct the defective work;

    (b)    for prejudgment interest;

    (c)    for the costs, disbursements and attorneys' fees incurred in this action; and

    (d)    for such other, further and different relief as the Court may deem just and proper.

## COUNT III
### (VIOLATION OF APPLICABLE BUILDING CODE)

23. MBRI repeats and realleges each of the allegations contained in paragraphs 1 through 15 as if fully set forth herein.

24. Pursuant to Chapter 553 of the Florida Statutes, Bovis, as a licensed contractor, had a duty to build the Hotel in compliance with the state minimum building codes, including the South Florida Building Code, in effect at the time of the construction of the Hotel.

25. Section 553.84 of the Florida Statutes provides a statutory cause of action for violation of the state minimum building codes.

8

26.     Bovis violated its duty to MBRI under Chapter 553 of the Florida Statutes by failing to comply with the specifications (including referenced standards) of the South Florida Building Code, including without limitation, as set forth in paragraphs 11, 12 and 14 above. Moreover, Bovis knew or should have known that such failures, including without limitation, the gaps and voids in the masonry substrate, the failure to clean the masonry substrate, the improper application of bonding agent, and the inadequate damp curing of the stucco, were in violation of the South Florida Building Code.

27.     As a direct and proximate result of such violation of the South Florida Building Code, MBRI has been damaged, including without limitation, the costs to correct the defective Work, which damages are at minimum $2 million.

WHEREFORE, plaintiff MBRI demands judgment against Bovis:

    (a)     for damages, including without limitation, the costs to correct the defective work;

    (b)     for prejudgment interest;

    (c)     for the costs, disbursements and attorneys' fees incurred in this action; and

    (d)     for such other, further and different relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff MBRI demands a trial by jury on all issues so triable.

HUGHES HUBBARD & REED LLP 201 South Biscayne Boulevard, Suite 2500, Miami, Florida 33131 Telephone: (305) 358-1666

MI 529090_1.DOC

Dated: December 4, 2002.　　　　Respectfully submitted,

HUGHES HUBBARD & REED LLP
2500 Miami Center
201 South Biscayne Boulevard
Miami, Florida 33131
Telephone:　(305) 358-1666
Facsimile:　(305) 371-8759

By:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
　　　　　Nicolas Swerdloff
　　　　　Fla. Bar No. 070416
　　　　　swerdlof@hugheshubbard.com
　　　　　Juan J. Farach
　　　　　Fla. Bar No. 957704
　　　　　farach@hugheshubbard.com

Attorneys for plaintiff MB Redevelopment, Inc.

10

MI 529090_1.DOC

# EXHIBIT 1

# Standard Form of Agreement Between Owner and Construction Manager

*where the Construction Manager is also*

*THE CONSTRUCTOR*

## 1991 EDITION

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION.*

*The 198? Edition of AIA Document A201, General Conditions of the Contract for Construction, is referred to herein. This Agreement requires modification if other general conditions are utilized.*

---

## AGREEMENT

made as of the ~2~ th  day of  September  in the year of
*(In words, indicate day, month and year)*
1996

**BETWEEN** the Owner:
*(Name and address)*

MB REDEVELOPMENT, INC., a Florida corporation
407 Lincoln Road
Suite 6-k
Miami Beach, Florida  33139
Attention:  Mr. Eric A. Nesse, Vice President

and the Construction Manager:
*(Name and address)*

LEHRER McGOVERN BOVIS, INC., a New York corporation
200 Park Avenue
New York, New York 10166
Attention:  Mr. Carlos J. Pesant, Vice President

The Project is:
*(Name, address and brief description)*

LOEWS MIAMI BEACH HOTEL, an approximately
800-room convention center hotel, to be located
on "Site 1-A," at Collins Avenue between
15th and 17th Streets, Miami Beach, Florida

The Architect is:
*(Name and address)*

NICHOLS, BROSCH, SANDOVAL & ASSOCIATES, INC.
2600 Douglas Road, Suite 900
Coral Gables, Florida  33134
Attention:  Mr. John R. Nichols, President

The Owner and Construction Manager agree as set forth below.

---

Portions of this document are derived from AIA Document A111, Standard Form of Agreement Between Owner and Contractor where the basis of payment is the Cost of the Work Plus a Fee, copyright 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, ©198? by The American Institute of Architects, other portions are derived from AGC Document 500. ©1980 by The Associated General Contractors of America. Material in this document differing from that found in AIA Document A111 and AGC Document 500 is copyrighted ©1991 by The American Institute of Architects and The Associated General Contractors of America. Reproduction of the material herein or substantial quotation of its provisions without written permission of AIA and AGC violates the copyright laws of the United States and will subject the violator to legal prosecution.



**AIA DOCUMENT A121/CMc and AGC DOCUMENT 565** • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1991 EDITION • AIA® • ©1991 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5209 • AGC® • 1991 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 1957 E STREET, N.W. WASHINGTON D.C. 20006-5209 • WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

**A121/CMc**
**AGC 565 · 1991**   **1**

*AIA Document A121/CMc and AGC Document 565*

# Standard Form of Agreement Between Owner and Construction Manager

*where the Construction Manager is also*

## THE CONSTRUCTOR

### 1991 EDITION

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES; CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION.*

*The 1987 Edition of AIA Document A201, General Conditions of the Contract for Construction, is referred to herein. This Agreement requires modification if other general conditions are utilized.*

## AGREEMENT

made as of the _____ day of _____ in the year of
*(In words, indicate day, month and year)*
1996

**BETWEEN** the Owner:
*(Name and address)*

MB REDEVELOPMENT, INC., a Florida corporation
407 Lincoln Road
Suite 6-k
Miami Beach, Florida  33139
Attention:  Mr. Eric A. Nesse, Vice President

and the Construction Manager:
*(Name and address)*

LEHRER McGOVERN BOVIS, INC., a New York corporation
200 Park Avenue
New York, New York 10166
Attention:  Mr. Carlos J. Pesant, Vice President

The Project is:
*(Name, address and brief description)*

LOEWS MIAMI BEACH HOTEL, an approximately
800-room convention center hotel, to be located
on "Site 1-A," at Collins Avenue between
15th and 17th Streets, Miami Beach, Florida

The Architect is:
*(Name and address)*

NICHOLS, BROSCH, SANDOVAL & ASSOCIATES, INC.
2600 Douglas Road, Suite 900
Coral Gables, Florida  33134
Attention:  Mr. John R. Nichols, President

The Owner and Construction Manager agree as set forth below.

Portions of this document are derived from AIA Document A111, Standard Form of Agreement Between the Owner and Contractor where the basis of payment is the Cost of the Work Plus a Fee, copyright 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, ©1987 by The American Institute of Architects; other portions are derived from AGC Document 500, ©1980 by The Associated General Contractors of America. Material in this document differing from that found in AIA Document A111 and AGC Document 500 is copyrighted ©1991 by The American Institute of Architects and The Associated General Contractors of America. Reproduction of the material herein or substantial quotation of its provisions without written permission of AIA and AGC violates the copyright laws of the United States and will subject the violator to legal prosecution.



**AIA DOCUMENT A121/CMc and AGC DOCUMENT 565** • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1991 EDITION • AIA® • ©1991 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5209 • AGC® • ©1991 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 1957 E STREET, N.W., WASHINGTON, D.C. 20006-5209 • **WARNING:** Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

**A121/CMc**
**AGC 565 - 1991   1**

# TABLE OF CONTENTS

**ARTICLE 1   GENERAL PROVISIONS**

  1.1   Relationship of Parties
  1.2   General Conditions

**ARTICLE 2   CONSTRUCTION MANAGER'S
RESPONSIBILITIES**

  2.1   Preconstruction Phase
  2.2   Guaranteed Maximum Price
        Proposal and Contract Time
  2.3   Construction Phase
  2.4   Professional Services
  2.5   Unsafe Materials

**ARTICLE 3   OWNER'S RESPONSIBILITIES**

  3.1   Information and Services
  3.2   Owner's Designated Representative
  3.3   Architect
  3.4   Legal Requirements

**ARTICLE 4   COMPENSATION AND PAYMENTS
FOR PRECONSTRUCTION PHASE
SERVICES**

  4.1   Compensation
  4.2   Payments

**ARTICLE 5   COMPENSATION FOR
CONSTRUCTION
PHASE SERVICES**

  5.1   Compensation
  5.2   Guaranteed Maximum Price
  5.3   Changes in the Work

**ARTICLE 6   COST OF THE WORK FOR
CONSTRUCTION PHASE**

  6.1   Costs To Be Reimbursed
  6.2   Costs Not To Be Reimbursed
  6.3   Discounts, Rebates and Refunds
  6.4   Accounting Records

**ARTICLE 7   CONSTRUCTION PHASE**

  7.1   Progress Payments
  7.2   Final Payment

**ARTICLE 8   INSURANCE AND BONDS**

  8.1   Insurance Required of the
        Construction Manager
  8.2   Insurance Required of the Owner
  8.3   Performance Bond and
        Payment Bond

**ARTICLE 9   MISCELLANEOUS PROVISIONS**

  9.1   Dispute Resolution for the
        Preconstruction Phase
  9.2   Dispute Resolution for the
        Construction Phase
  9.3   Other Provisions

**ARTICLE 10   TERMINATION OR SUSPENSION**

  10.1   Termination Prior to Establishing
         Guaranteed Maximum Price
  10.2   Termination Subsequent to
         Establishing Guaranteed
         Maximum Price
  10.3   Suspension

**ARTICLE 11   OTHER CONDITIONS
AND SERVICES**

**Attachments   AMENDMENT NO. 1
to Agreement Between Owner
and Construction Manager**

AIA DOCUMENT A121/CMc and AGC DOCUMENT 565 • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1991 EDITION
AIA® • ©1991 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5209
AGC® • ©1991 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 1957 E STREET, N.W., WASHINGTON, D.C.
20006-5209 • WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

STANDARD FORM OF AGREEMENT BETWEEN OWNER AND CONSTRUCTION
MANAGER WHERE THE CONSTRUCTION MANAGER IS ALSO THE CONSTRUCTOR

# ARTICLE 1
## GENERAL PROVISIONS

### 1.1   RELATIONSHIP OF PARTIES

The Construction Manager accepts the relationship of trust
and confidence established with the Owner by this Agree-
ment, and covenants with the Owner to furnish the Construc-
tion Manager's reasonable skill and judgment and to cooperate
with the Architect in furthering the interests of the Owner.
The Construction Manager shall furnish construction admin-
istration and management services and use the Construction
Manager's best efforts to perform the Project in an expedi-
tious and economical manner consistent with the interests of
the Owner. The Owner shall endeavor to promote harmony
and cooperation among the Owner, Architect, Construction
Manager and other persons or entities employed by the Owner
for the Project.

### 1.2   GENERAL CONDITIONS

For the Construction Phase, the General Conditions of the
Contract shall be the 1987 Edition of AIA Document A201,
General Conditions of the Contract for Construction, which
is incorporated herein by reference. For the Preconstruction
Phase, or in the event that the Preconstruction and Construc-
tion Phases proceed concurrently, AIA Document A201 shall
apply to the Construction Phase only as specifically pro-
vided in this Agreement. The term "Contractor" as used in
AIA Document A201 shall mean the Construction Manager.

# ARTICLE 2
## CONSTRUCTION MANAGER'S
## RESPONSIBILITIES

The Construction Manager shall perform the services
described in this Article. The services to be provided under
Paragraphs 2.1 and 2.2 constitute the Preconstruction Phase
services. If the Owner and Construction Manager agree, after
consultation with the Architect, the Construction Phase may
commence before the Preconstruction Phase is completed,
in which case both phases shall proceed concurrently.

### 2.1   PRECONSTRUCTION PHASE

### 2.1.1   PRELIMINARY EVALUATION

The Construction Manager shall provide a preliminary evalua-
tion of the Owner's program and Project budget requirements,
each in terms of the other.

### 2.1.2   CONSULTATION

The Construction Manager with the Architect shall jointly
schedule and attend regular meetings with the Owner and
Architect. The Construction Manager shall consult with the
Owner and Architect regarding site use and improvements,
and the selection of materials, building systems and equip-
ment. The Construction Manager shall provide recommen-

dations on construction feasibility; actions designed to mini-
mize adverse effects of labor or material shortages, time
requirements for procurement, installation and construction
completion; and factors related to construction cost including
estimates of alternative designs or materials, preliminary
budgets and possible economies.

### 2.1.3   PRELIMINARY PROJECT SCHEDULE

When Project requirements described in Subparagraph 3.1.1
have been sufficiently identified, the Construction Manager
shall prepare, and periodically update, a preliminary Project
schedule for the Architect's review and the Owner's approval.
The Construction Manager shall obtain the Architect's approval
of the portion of the preliminary Project schedule relating to
the performance of the Architect's services. The Construction
Manager shall coordinate and integrate the preliminary Proj-
ect schedule with the services and activities of the Owner,
Architect and Construction Manager. As design proceeds, the
preliminary Project schedule shall be updated to indicate pro-
posed activity sequences and durations, milestone dates for
receipt and approval of pertinent information, submittal of
a Guaranteed Maximum Price proposal, preparation and pro-
cessing of shop drawings and samples, delivery of materials
or equipment requiring long-lead time procurement, Owner's
occupancy requirements showing portions of the Project
having occupancy priority, and proposed date of Substantial
Completion. If preliminary Project schedule updates indicate
that previously approved schedules may not be met, the Con-
struction Manager shall make appropriate recommendations
to the Owner and Architect.

### 2.1.4   PHASED CONSTRUCTION

The Construction Manager shall make recommendations to
the Owner and Architect regarding the phased issuance of
Drawings and Specifications to facilitate phased construction
of the Work, if such phased construction is appropriate for
the Project, taking into consideration such factors as econ-
omies, time of performance, availability of labor and mate-
rials, and provisions for temporary facilities.

### 2.1.5   PRELIMINARY COST ESTIMATES

**2.1.5.1** When the Owner has sufficiently identified the Proj-
ect requirements and the Architect has prepared other basic
design criteria, the Construction Manager shall prepare, for
the review of the Architect and approval of the Owner, a
preliminary cost estimate utilizing area, volume or similar
conceptual estimating techniques.

**2.1.5.2** When Schematic Design Documents have been pre-
pared by the Architect and approved by the Owner, the Con-
struction Manager shall prepare for the review of the Archi-
tect and approval of the Owner, a more detailed estimate with
supporting data. During the preparation of the Design Devel-
opment Documents, the Construction Manager shall update
and refine this estimate at appropriate intervals agreed to by
the Owner, Architect and Construction Manager.

**2.1.5.3** When Design Development Documents have been
prepared by the Architect and approved by the Owner, the

AIA DOCUMENT A121/CMc and AGC DOCUMENT 565 • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1991 EDITION
AIA® • ©1991 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5209
AGC® • ©1991 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 1957 E STREET, N.W., WASHINGTON, D.C.
20006-5209 • WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

**A121/CMc**
**AGC 565 - 1991   3**

Construction Manager shall prepare a detailed estimate with supporting data for review by the Architect and approval by the Owner. During the preparation of the Construction Documents, the Construction Manager shall update and refine this estimate at appropriate intervals agreed to by the Owner, Architect and Construction Manager.

**2.1.5.4** If any estimate submitted to the Owner exceeds previously approved estimates or the Owner's budget, the Construction Manager shall make appropriate recommendations to the Owner and Architect.

### 2.1.6   SUBCONTRACTORS AND SUPPLIERS

The Construction Manager shall seek to develop subcontractor interest in the Project and shall furnish to the Owner and Architect for their information a list of possible subcontractors, including suppliers who are to furnish materials or equipment fabricated to a special design, from whom proposals will be requested for each principal portion of the Work. The Architect will promptly reply in writing to the Construction Manager if the Architect or Owner know of any objection to such subcontractor or supplier. The receipt of such list shall not require the Owner or Architect to investigate the qualifications of proposed subcontractors or suppliers, nor shall it waive the right of the Owner or Architect later to object to or reject any proposed subcontractor or supplier.

### 2.1.7   LONG-LEAD TIME ITEMS

The Construction Manager shall recommend to the Owner and Architect a schedule for procurement of long-lead time items which will constitute part of the Work as required to meet the Project schedule. If such long-lead time items are procured by the Owner, they shall be procured on terms and conditions acceptable to the Construction Manager. Upon the Owner's acceptance of the Construction Manager's Guaranteed Maximum Price proposal, all contracts for such items shall be assigned by the Owner to the Construction Manager, who shall accept responsibility for such items as if procured by the Construction Manager. The Construction Manager shall expedite the delivery of long-lead time items.

### 2.1.8   EXTENT OF RESPONSIBILITY

The Construction Manager does not warrant or guarantee estimates and schedules except as may be included as part of the Guaranteed Maximum Price. The recommendations and advice of the Construction Manager concerning design alternatives shall be subject to the review and approval of the Owner and the Owner's professional consultants. It is not the Construction Manager's responsibility to ascertain that the Drawings and Specifications are in accordance with applicable laws, statutes, ordinances, building codes, rules and regulations. However, if the Construction Manager recognizes that portions of the Drawings and Specifications are at variance therewith, the Construction Manager shall promptly notify the Architect and Owner in writing.

### 2.1.9   EQUAL EMPLOYMENT OPPORTUNITY AND AFFIRMATIVE ACTION

The Construction Manager shall comply with applicable laws, regulations and special requirements of the Contract Documents regarding equal employment opportunity and affirmative action programs.

### 2.2   GUARANTEED MAXIMUM PRICE PROPOSAL AND CONTRACT TIME

**2.2.1** When the Drawings and Specifications are sufficiently complete, the Construction Manager shall propose a Guaranteed Maximum Price, which shall be the sum of the estimated Cost of the Work and the Construction Manager's Fee.

**2.2.2** As the Drawings and Specifications may not be finished at the time the Guaranteed Maximum Price proposal is prepared, the Construction Manager shall provide in the Guaranteed Maximum Price for further development of the Drawings and Specifications by the Architect that is consistent with the Contract Documents and reasonably inferable therefrom. Such further development does not include such things as changes in scope, systems, kinds and quality of materials, finishes or equipment, all of which, if required, shall be incorporated by Change Order.

**2.2.3** The estimated Cost of the Work shall include the Construction Manager's contingency, a sum established by the Construction Manager for the Construction Manager's exclusive use to cover costs arising under Subparagraph 2.2.2 and other costs which are properly reimbursable as Cost of the Work but not the basis for a Change Order.

### 2.2.4   BASIS OF GUARANTEED MAXIMUM PRICE

The Construction Manager shall include with the Guaranteed Maximum Price proposal a written statement of its basis, which shall include:

.1 A list of the Drawings and Specifications, including all addenda thereto and the Conditions of the Contract, which were used in preparation of the Guaranteed Maximum Price proposal.

.2 A list of allowances and a statement of their basis.

.3 A list of the clarifications and assumptions made by the Construction Manager in the preparation of the Guaranteed Maximum Price proposal to supplement the information contained in the Drawings and Specifications.

.4 The proposed Guaranteed Maximum Price, including a statement of the estimated cost organized by trade categories, allowances, contingency, and other items and the fee that comprise the Guaranteed Maximum Price.

.5 The Date of Substantial Completion upon which the proposed Guaranteed Maximum Price is based, and a schedule of the Construction Documents issuance dates upon which the date of Substantial Completion is based.

**2.2.5** The Construction Manager shall meet with the Owner and Architect to review the Guaranteed Maximum Price proposal and the written statement of its basis. In the event that the Owner or Architect discovers any inconsistencies or inaccuracies in the information presented, they shall promptly notify the Construction Manager, who shall make appropriate adjustments to the Guaranteed Maximum Price proposal, its basis or both.

**2.2.6** Unless the Owner accepts the Guaranteed Maximum Price proposal in writing on or before the date specified in the proposal for such acceptance and so notifies the Construction Manager, the Guaranteed Maximum Price proposal shall not be effective without written acceptance by the Construction Manager.

**2.2.7** Prior to the Owner's acceptance of the Construction Manager's Guaranteed Maximum Price proposal and issuance of a Notice to Proceed, the Construction Manager shall not incur any cost to be reimbursed as part of the Cost of the Work, except as the Owner may specifically authorize in writing.

---

AIA DOCUMENT A121/CMc and AGC DOCUMENT 565 • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1991 EDITION AIA® • ©1991 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5209 AGC® • ©1991 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 1957 E STREET, N.W., WASHINGTON, D.C. 20006-5209 • WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

**2.2.8** Upon acceptance by the Owner of the Guaranteed Maximum Price proposal, the Guaranteed Maximum Price and its basis shall be set forth in Amendment No. 1. The Guaranteed Maximum Price shall be subject to additions and deductions by a change in the Work as provided in the Contract Documents and the date of Substantial Completion shall be subject to adjustment as provided in the Contract Documents.

**2.2.9** The Owner shall authorize and cause the Architect to revise the Drawings and Specifications to the extent necessary to reflect the agreed-upon assumptions and clarifications contained in Amendment No. 1. Such revised Drawings and Specifications shall be furnished to the Construction Manager in accordance with schedules agreed to by the Owner, Architect and Construction Manager. The Construction Manager shall promptly notify the Architect and Owner if such revised Drawings and Specifications are inconsistent with the agreed-upon assumptions and clarifications.

**2.2.10** The Guaranteed Maximum Price shall include in the Cost of the Work only those taxes which are enacted at the time the Guaranteed Maximum Price is established.

## 2.3    CONSTRUCTION PHASE

### 2.3.1    GENERAL

**2.3.1.1** The Construction Phase shall commence on the earlier of:

(1) the Owner's acceptance of the Construction Manager's Guaranteed Maximum Price proposal and issuance of a Notice to Proceed, or

(2) the Owner's first authorization to the Construction Manager to:

(a) award a subcontract, or

(b) undertake construction Work with the Construction Manager's own forces, or

(c) issue a purchase order for materials or equipment required for the Work.

### 2.3.2    ADMINISTRATION

**2.3.2.1** Those portions of the Work that the Construction Manager does not customarily perform with the Construction Manager's own personnel shall be performed under subcontracts or by other appropriate agreements with the Construction Manager. The Construction Manager shall obtain bids from Subcontractors and from suppliers of materials or equipment fabricated to a special design for the Work from the list previously reviewed and, after analyzing such bids, shall deliver such bids to the Owner and Architect. The Owner shall then determine, with the advice of the Construction Manager and subject to the reasonable objection of the Architect, which bids will be accepted. The Owner may designate specific persons or entities from whom the Construction Manager shall obtain bids; however, if the Guaranteed Maximum Price has been established, the Owner may not prohibit the Construction Manager from obtaining bids from other qualified bidders. The Construction Manager shall not be required to contract with anyone to whom the Construction Manager has reasonable objection.

**2.3.2.2** If the Guaranteed Maximum Price has been established and a specific bidder among those whose bids are delivered by the Construction Manager to the Owner and Architect (1) is recommended to the Owner by the Construction Manager; (2) is qualified to perform that portion of the Work; (3) has submitted a bid which conforms to the require-

ments of the Contract Documents without reservations or exceptions, but the Owner requires that another bid be accepted, then the Construction Manager may require that a change in the Work be issued to adjust the Contract Time and the Guaranteed Maximum Price by the difference between the bid of the person or entity recommended to the Owner by the Construction Manager and the amount of the subcontract or other agreement actually signed with the person or entity designated by the Owner.

**2.3.2.3** Subcontracts and agreements with suppliers furnishing materials or equipment fabricated to a special design shall conform to the payment provisions of Subparagraphs 7.1.8 and 7.1.9 and shall not be awarded on the basis of cost plus a fee without the prior consent of the Owner.

**2.3.2.4** The Construction Manager shall schedule and conduct meetings at which the Owner, Architect, Construction Manager and appropriate Subcontractors can discuss the status of the Work. The Construction Manager shall prepare and promptly distribute meeting minutes.

**2.3.2.5** Promptly after the Owner's acceptance of the Guaranteed Maximum Price proposal, the Construction Manager shall prepare a schedule in accordance with Paragraph 3.10 of AIA Document A201, including the Owner's occupancy requirements.

**2.3.2.6** The Construction Manager shall provide monthly written reports to the Owner and Architect on the progress of the entire Work. The Construction Manager shall maintain a daily log containing a record of weather, Subcontractors working on the site, number of workers, Work accomplished, problems encountered and other similar relevant data as the Owner may reasonably require. The log shall be available to the Owner and Architect.

**2.3.2.7** The Construction Manager shall develop a system of cost control for the Work, including regular monitoring of actual costs for activities in progress and estimates for uncompleted tasks and proposed changes. The Construction Manager shall identify variances between actual and estimated costs and report the variances to the Owner and Architect at regular intervals.

## 2.4    PROFESSIONAL SERVICES

The Construction Manager shall not be required to provide professional services which constitute the practice of architecture or engineering, unless such services are specifically required by the Contract Documents for a portion of the Work or unless the Construction Manager has specifically agreed in writing to provide such services. In such event, the Construction Manager shall cause such services to be performed by appropriately licensed professionals.

## 2.5    UNSAFE MATERIALS

In addition to the provisions of Paragraph 10.1 in AIA Document A201, if reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to persons resulting from a material or substance encountered but not created on the site by the Construction Manager, the Construction Manager shall, upon recognizing the condition, immediately stop Work in the affected area and report the condition to the Owner and Architect in writing. The Owner, Construction Manager and Architect shall then proceed in the same manner described in Subparagraph 10.1.2 of AIA Document A201. The Owner shall be responsible for obtaining the services of a licensed laboratory to verify the presence or absence

AIA DOCUMENT A121/CMc and AGC DOCUMENT 565 • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1991 EDITION
AIA® • ©1991 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5209
AGC® • ©1991 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 1957 E STREET, N.W., WASHINGTON, D.C.
20006-5209 • **WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.**

**A121/CMc**
**AGC 565- 1991   5**

of the material or substance reported by the Construction Manager and, in the event such material or substance is found to be present, to verify that it has been rendered harmless. Unless otherwise required by the Contract Documents, the Owner shall furnish in writing to the Construction Manager and Architect the names and qualifications of persons or entities who are to perform tests verifying the presence or absence of such material or substance or who are to perform the task of removal or safe containment of such material or substance. The Construction Manager and Architect will promptly reply to the Owner in writing stating whether or not either has reasonable objection to the persons or entities proposed by the Owner. If either the Construction Manager or Architect has an objection to a person or entity proposed by the Owner, the Owner shall propose another to whom the Construction Manager and Architect have no reasonable objection.

## ARTICLE 3

## OWNER'S RESPONSIBILITIES

### 3.1   INFORMATION AND SERVICES

**3.1.1** The Owner shall provide full information in a timely manner regarding the requirements of the Project, including a program which sets forth the Owner's objectives, constraints and criteria, including space requirements and relationships, flexibility and expandability requirements, special equipment and systems, and site requirements.

**3.1.2** The Owner, upon written request from the Construction Manager, shall furnish evidence of Project financing prior to the start of the Construction Phase and from time to time thereafter as the Construction Manager may request. Furnishing of such evidence shall be a condition precedent to commencement or continuation of the Work.

**3.1.3** The Owner shall establish and update an overall budget for the Project, based on consultation with the Construction Manager and Architect, which shall include contingencies for changes in the Work and other costs which are the responsibility of the Owner.

### 3.1.4   STRUCTURAL AND ENVIRONMENTAL TESTS, SURVEYS AND REPORTS

In the Preconstruction Phase, the Owner shall furnish the following with reasonable promptness and at the Owner's expense, and the Construction Manager shall be entitled to rely upon the accuracy of any such information, reports, surveys, drawings and tests described in Clauses 3.1.4.1 through 3.1.4.4, except to the extent that the Construction Manager knows of any inaccuracy:

**3.1.4.1** Reports, surveys, drawings and tests concerning the conditions of the site which are required by law.

**3.1.4.2** Surveys describing physical characteristics, legal limitations and utility locations for the site of the Project, and a written legal description of the site. The surveys and legal information shall include, as applicable, grades and lines of streets, alleys, pavements and adjoining property and structures; adjacent drainage; rights-of-way, restrictions, easements, encroachments, zoning, deed restrictions, boundaries and

contours of the site, locations, dimensions and necessary data pertaining to existing buildings, other improvements and trees, and information concerning available utility services and lines both public and private, above and below grade, including inverts and depths. All information on the survey shall be referenced to a project benchmark.

**3.1.4.3** The services of geotechnical engineers when such services are requested by the Construction Manager. Such services may include but are not limited to test borings, test pits, determinations of soil bearing values, percolation tests, evaluations of hazardous materials, ground corrosion and resistivity tests, including necessary operations for anticipating subsoil conditions, with reports and appropriate professional recommendations.

**3.1.4.4** Structural, mechanical, chemical, air and water pollution tests, tests for hazardous materials, and other laboratory and environmental tests, inspections and reports which are required by law.

**3.1.4.5** The services of other consultants when such services are reasonably required by the scope of the Project and are requested by the Construction Manager.

### 3.2   OWNER'S DESIGNATED REPRESENTATIVE

The Owner shall designate in writing a representative who shall have express authority to bind the Owner with respect to all matters requiring the Owner's approval or authorization. This representative shall have the authority to make decisions on behalf of the Owner concerning estimates and schedules, construction budgets, and changes in the Work, and shall render such decisions promptly and furnish information expeditiously, so as to avoid unreasonable delay in the services or Work of the Construction Manager.

### 3.3   ARCHITECT

The Owner shall retain an Architect to provide the Basic Services, including normal structural, mechanical and electrical engineering services, other than cost estimating services, described in the edition of AIA Document B141 current as of the date of this Agreement. The Owner shall authorize and cause the Architect to provide those Additional Services described in AIA Document B141 requested by the Construction Manager which must necessarily be provided by the Architect for the Preconstruction and Construction Phases of the Work. Such services shall be provided in accordance with time schedules agreed to by the Owner, Architect and Construction Manager. Upon request of the Construction Manager, the Owner shall furnish to the Construction Manager a copy of the Owner's Agreement with the Architect, from which compensation provisions may be deleted.

### 3.4   LEGAL REQUIREMENTS

The Owner shall determine and advise the Architect and Construction Manager of any special legal requirements relating specifically to the Project which differ from those generally applicable to construction in the jurisdiction of the Project. The Owner shall furnish such legal services as are necessary to provide the information and services required under Paragraph 3.1.

---

**AIA DOCUMENT A121/CMc and AGC DOCUMENT 565** • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1991 EDITION
AIA® • ©1991 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5289
AGC® • ©1991 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 1957 E STREET, N.W., WASHINGTON, D.C.
20006-5209 • **WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.**

# ARTICLE 4

## COMPENSATION AND PAYMENTS FOR PRECONSTRUCTION PHASE SERVICES

The Owner shall compensate and make payments to the Construction Manager for Preconstruction Phase services as follows

### 4.1   COMPENSATION

**4.1.1** For the services described in Paragraphs 2.1 and 2.2 the Construction Manager's compensation shall be calculated as follows

*(State basis of compensation, whether a stipulated sum, multiple of Direct Personnel Expense, actual cost, etc. Include a statement of reimbursable cost items as applicable.)*

**4.1.2** Compensation for Preconstruction Phase services shall be equitably adjusted if such services extend beyond _____ from the date of this Agreement or if the originally contemplated scope of services is significantly modified.

**4.1.3** If compensation is based on a multiple of Direct Personnel Expense, Direct Personnel Expense is defined as the direct salaries of the Construction Manager's personnel engaged in the Project and the portion of the cost of their mandatory and customary contributions and benefits related thereto, such as employment taxes and other statutory employee benefits, insurance, sick leave, holidays, vacations, pensions and similar contributions and benefits.

### 4.2   PAYMENTS

**4.2.1** Payments shall be made monthly following presentation of the Construction Manager's invoice and, where applicable, shall be in proportion to services performed.

**4.2.2** Payments are due and payable _____ ( _____ ) days from the date the Construction Manager's invoice is received by the Owner. Amounts unpaid after the date on which payment is due shall bear interest at the rate entered below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.

*(Insert rate of interest agreed upon.)*

*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Construction Manager's principal places of business, the location of the Project and elsewhere may affect the validity of this provision. Legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

# ARTICLE 5

## COMPENSATION FOR CONSTRUCTION PHASE SERVICES

The Owner shall compensate the Construction Manager for Construction Phase services as follows:

### 5.1   COMPENSATION

**5.1.1** For the Construction Manager's performance of the Work as described in Paragraph 2.3, the Owner shall pay the Construction Manager in current funds the Contract Sum consisting of the Cost of the Work as defined in Article 7 and the Construction Manager's Fee determined as follows:

*(State a lump sum, percentage of actual Cost of the Work or other provision for determining the Construction Manager's Fee, and explain how the Construction Manager's Fee is to be adjusted for changes in the Work.)*

**AIA DOCUMENT A121/CMc and AGC DOCUMENT 565** • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1991 EDITION
AIA® • ©1991 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5209
AGC® • ©1991 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 1957 E STREET, N.W., WASHINGTON, D.C.
20006-5209 • **WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.**

**A121/CMc**
**AGC 565 - 1991   7**

**5.2    GUARANTEED MAXIMUM PRICE**

**5.2.1** The sum of the Cost of the Work and the Construction Manager's Fee are guaranteed by the Construction Manager not to exceed the amount provided in Amendment No. 1, subject to additions and deductions by changes in the Work as provided in the Contract Documents. Such maximum sum as adjusted by approved changes in the Work is referred to in the Contract Documents as the Guaranteed Maximum Price. Costs which would cause the Guaranteed Maximum Price to be exceeded shall be paid by the Construction Manager without reimbursement by the Owner.

*(Insert specific provisions if the Construction Manager is to participate in any savings.)*

**5.3    CHANGES IN THE WORK**

**5.3.1** Adjustments to the Guaranteed Maximum Price on account of changes in the Work subsequent to the execution of Amendment No. 1 may be determined by any of the methods listed in Subparagraph 7.3.3 of AIA Document A201.

**5.3.2** In calculating adjustments to subcontracts (except those awarded with the Owner's prior consent on the basis of cost plus a fee), the terms "cost" and "fee" as used in Clause 7.3.3.3 of AIA Document A201 and the terms "costs" and "a reasonable allowance for overhead and profit" as used in Subparagraph 7.3.6 of AIA Document A201 shall have the meanings assigned to them in that document and shall not be modified by this Article 5. Adjustments to subcontracts awarded with the Owner's prior consent on the basis of cost plus a fee shall be calculated in accordance with the terms of those subcontracts.

**5.3.3** In calculating adjustments to the Contract, the terms "cost" and "costs" as used in the above-referenced provisions of AIA Document A201 shall mean the Cost of the Work as defined in Article 6 of this Agreement and the terms "and a reasonable allowance for overhead and profit" shall mean the Construction Manager's Fee as defined in Subparagraph 5.1.1 of this Agreement.

**5.3.4** If no specific provision is made in Subparagraph 5.1.1 for adjustment of the Construction Manager's Fee in the case of changes in the Work, or if the extent of such changes is such, in the aggregate, that application of the adjustment provisions of Subparagraph 5.1.1 will cause substantial inequity to the Owner or Construction Manager, the Construction Manager's Fee shall be equitably adjusted on the basis of the fee established for the original Work.

## ARTICLE 6
## COST OF THE WORK FOR CONSTRUCTION PHASE

**6.1    COSTS TO BE REIMBURSED**

**6.1.1** The term "Cost of the Work" shall mean costs necessarily incurred by the Construction Manager in the proper performance of the Work. Such costs shall be at rates not higher than those customarily paid at the place of the Project except with prior consent of the Owner. The Cost of the Work shall include only the items set forth in this Article 6.

**6.1.2    LABOR COSTS**

.1  Wages of construction workers directly employed by the Construction Manager to perform the construction of the Work at the site or, with the Owner's agreement, at off-site workshops.

.2  Wages or salaries of the Construction Manager's supervisory and administrative personnel when stationed at the site with the Owner's agreement.

*(If it is intended that the wages or salaries of certain personnel stationed at the Construction Manager's principal office or offices other than the site office shall be included in the Cost of the Work, such personnel shall be identified below.)*

.3  Wages and salaries of the Construction Manager's supervisory or administrative personnel engaged, at factories, workshops or on the road, in expediting the production or transportation of materials or equipment required for the Work, but only for that portion of their time required for the Work.

.4  Costs paid or incurred by the Construction Manager for taxes, insurance, contributions, assessments and benefits required by law or collective bargaining agreements, and, for personnel not covered by such agreements, customary benefits such as sick leave, medical and health benefits, holidays, vacations and pensions, provided that such costs are based on wages and salaries included in the Cost of the Work under Clauses 6.1.2.1 through 6.1.2.3.

**6.1.3    SUBCONTRACT COSTS**

Payments made by the Construction Manager to Subcontractors in accordance with the requirements of the subcontracts.

**AIA DOCUMENT A121/CMc and AGC DOCUMENT 565** • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1991 EDITION
AIA® • ©1991 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5209
AGC® • ©1991 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 1957 E STREET, N.W., WASHINGTON, D.C.
20006-5209 • **WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.**

**A121/CMc
AGC 565- 1991    8**

**6.1.4    COSTS OF MATERIALS AND EQUIPMENT INCORPORATED IN THE COMPLETED CONSTRUCTION**

.1 Costs, including transportation, of materials and equipment incorporated or to be incorporated in the completed construction.

.2 Costs of materials described in the preceding Clause 6.1.4.1 in excess of those actually installed but required to provide reasonable allowance for waste and for spoilage. Unused excess materials, if any, shall be handed over to the Owner at the completion of the Work or, at the Owner's option, shall be sold by the Construction Manager; amounts realized, if any, from such sales shall be credited to the Owner as a deduction from the Cost of the Work.

**6.1.5    COSTS OF OTHER MATERIALS AND EQUIPMENT, TEMPORARY FACILITIES AND RELATED ITEMS**

.1 Costs, including transportation, installation, maintenance, dismantling and removal of materials, supplies, temporary facilities, machinery, equipment, and hand tools not customarily owned by the construction workers, which are provided by the Construction Manager at the site and fully consumed in the performance of the Work; and cost less salvage value on such items if not fully consumed, whether sold to others or retained by the Construction Manager. Cost for items previously used by the Construction Manager shall mean fair market value.

.2 Rental charges for temporary facilities, machinery, equipment, and hand tools not customarily owned by the construction workers, which are provided by the Construction Manager at the site, whether rented from the Construction Manager or others, and costs of transportation, installation, minor repairs and replacements, dismantling and removal thereof. Rates and quantities of equipment rented shall be subject to the Owner's prior approval.

.3 Costs of removal of debris from the site.

.4 Reproduction costs, costs of telegrams, facsimile transmissions and long-distance telephone calls, postage and express delivery charges, telephone service at the site and reasonable petty cash expenses of the site office.

.5 That portion of the reasonable travel and subsistence expenses of the Construction Manager's personnel incurred while traveling in discharge of duties connected with the Work.

**6.1.6    MISCELLANEOUS COSTS**

.1 That portion directly attributable to this Contract of premiums for insurance and bonds.

*(If charges for self insurance are to be included, specify the basis of reimbursement.)*

.2 Sales, use or similar taxes imposed by a governmental authority which are related to the Work and for which the Construction Manager is liable.

.3 Fees and assessments for the building permit and for other permits, licenses and inspections for which the Construction Manager is required by the Contract Documents to pay.

.4 Fees of testing laboratories for tests required by the Contract Documents, except those related to nonconforming Work other than that for which payment is permitted by Clause 6.1.8.2.

.5 Royalties and license fees paid for the use of a particular design, process or product required by the Contract Documents; the cost of defending suits or claims for infringement of patent or other intellectual property rights arising from such requirement by the Contract Documents; payments made in accordance with legal judgments against the Construction Manager resulting from such suits or claims and payments of settlements made with the Owner's consent; provided, however, that such costs of legal defenses, judgments and settlements shall not be included in the calculation of the Construction Manager's Fee or the Guaranteed Maximum Price and provided that such royalties, fees and costs are not excluded by the last sentence of Subparagraph 3.17.1 of AIA Document A201 or other provisions of the Contract Documents.

.6 Data processing costs related to the Work.

.7 Deposits lost for causes other than the Construction Manager's negligence or failure to fulfill a specific responsibility to the Owner set forth in this Agreement.

.8 Legal, mediation and arbitration costs, other than those arising from disputes between the Owner and Construction Manager, reasonably incurred by the Construction Manager in the performance of the Work and with the Owner's written permission, which permission shall not be unreasonably withheld.

.9 Expenses incurred in accordance with the Construction Manager's standard personnel policy for relocation and temporary living allowances of personnel required for the Work, in case it is necessary to relocate such personnel from distant locations.

**6.1.7    OTHER COSTS**

.1 Other costs incurred in the performance of the Work if and to the extent approved in advance in writing by the Owner.

**6.1.8    EMERGENCIES AND REPAIRS TO DAMAGED OR NONCONFORMING WORK**

The Cost of the Work shall also include costs described in Subparagraph 6.1.1 which are incurred by the Construction Manager:

.1 In taking action to prevent threatened damage, injury or loss in case of an emergency affecting the safety of persons and property, as provided in Paragraph 10.3 of AIA Document A201.

.2 In repairing or correcting damaged or nonconforming Work executed by the Construction Manager or the Construction Manager's Subcontractors or suppliers, provided that such damaged or nonconforming Work was not caused by the negligence or failure to fulfill a specific responsibility to the Owner set forth in this Agreement of the Construction

**AIA DOCUMENT A121/CMc and AGC DOCUMENT 565** • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1991 EDITION
AIA® • ©1991 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5209
AGC® • ©1991 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 1957 E STREET, N.W., WASHINGTON, D.C.
20006-5209 • **WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.**

**A121/CMc**
AGC 565 - 1991   **9**

Manager or the Construction Manager's foremen, engineers or superintendents, or other supervisory, administrative or managerial personnel of the Construction Manager, or the failure of the Construction Manager's personnel to supervise adequately the Work of the Subcontractors or suppliers, and only to the extent that the cost of repair or correction is not recoverable by the Construction Manager from insurance, Subcontractors or suppliers.

**6.1.9** The costs described in Subparagraphs 6.1.1 through 6.1.8 shall be included in the Cost of the Work notwithstanding any provision of AIA Document A201 or other Conditions of the Contract which may require the Construction Manager to pay such costs, unless such costs are excluded by the provisions of Paragraph 6.2.

**6.2      COSTS NOT TO BE REIMBURSED**

**6.2.1** The Cost of the Work shall not include:

.1  Salaries and other compensation of the Construction Manager's personnel stationed at the Construction Manager's principal office or offices other than the site office, except as specifically provided in Clauses 6.1.2.2 and 6.1.2.3.

.2  Expenses of the Construction Manager's principal office and offices other than the site office except as specifically provided in Paragraph 6.1.

.3  Overhead and general expenses, except as may be expressly included in Paragraph 6.1.

.4  The Construction Manager's capital expenses, including interest on the Construction Manager's capital employed for the Work.

.5  Rental costs of machinery and equipment, except as specifically provided in Subparagraph 6.1.5.2.

.6  Except as provided in Clause 6.1.8.2, costs due to the negligence of the Construction Manager or to the failure of the Construction Manager to fulfill a specific responsibility to the Owner set forth in this Agreement.

.7  Costs incurred in the performance of Preconstruction Phase Services.

.8  Except as provided in Clause 6.1.7.1, any cost not specifically and expressly described in Paragraph 6.1.

.9  Costs which would cause the Guaranteed Maximum Price to be exceeded.

**6.3      DISCOUNTS, REBATES AND REFUNDS**

**6.3.1** Cash discounts obtained on payments made by the Construction Manager shall accrue to the Owner if (1) before making the payment, the Construction Manager included them in an Application for Payment and received payment therefor from the Owner, or (2) the Owner has deposited funds with the Construction Manager with which to make payments; otherwise, cash discounts shall accrue to the Construction Manager. Trade discounts, rebates, refunds and amounts received from sales of surplus materials and equipment shall accrue to the Owner, and the Construction Manager shall make provisions so that they can be secured.

**6.3.2** Amounts which accrue to the Owner in accordance with the provisions of Subparagraph 6.3.1 shall be credited to the Owner as a deduction from the Cost of the Work.

**6.4      ACCOUNTING RECORDS**

**6.4.1** The Construction Manager shall keep full and detailed accounts and exercise such controls as may be necessary for proper financial management under this Contract; the accounting and control systems shall be satisfactory to the Owner. The Owner and the Owner's accountants shall be afforded access to the Construction Manager's records, books, correspondence, instructions, drawings, receipts, subcontracts, purchase orders, vouchers, memoranda and other data relating to this Project, and the Construction Manager shall preserve these for a period of three years after final payment, or for such longer period as may be required by law.

## ARTICLE 7
### CONSTRUCTION PHASE

**7.1      PROGRESS PAYMENTS**

**7.1.1** Based upon Applications for Payment submitted to the Architect by the Construction Manager and Certificates for Payment issued by the Architect, the Owner shall make progress payments on account of the Contract Sum to the Construction Manager as provided below and elsewhere in the Contract Documents.

**7.1.2** The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:

**7.1.3** Provided an Application for Payment is received by the Architect not later than the    fifth (5th)         day of a month, the Owner shall make payment to the Construction Manager not later than the    fifteenth (15th)     day of the    following     month. If an Application for Payment is received by the Architect after the application date fixed above, payment shall be made by the Owner not later than    forty-five (45)           days after the Architect receives the Application for Payment.

**AIA DOCUMENT A121/CMc and AGC DOCUMENT 565** • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1991 EDITION
AIA® • ©1991 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5209
AGC® • ©1991 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 1957 E STREET, N.W., WASHINGTON, D.C.
20006-5209 • **WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.**

**A121/CMc**
**AGC 565 - 1991    10**

**7.1.4** With each Application for Payment, the Construction Manager shall submit payrolls, petty cash accounts, receipted invoices or invoices with check vouchers attached, and any other evidence required by the Owner or Architect to demonstrate that cash disbursements already made by the Construction Manager on account of the Cost of the Work equal or exceed (1) progress payments already received by the Construction Manager; less (2) that portion of those payments attributable to the Construction Manager's Fee; plus (3) payrolls for the period covered by the present Application for Payment.

**7.1.5** Each Application for Payment shall be based upon the most recent schedule of values submitted by the Construction Manager in accordance with the Contract Documents. The schedule of values shall allocate the entire Guaranteed Maximum Price among the various portions of the Work, except that the Construction Manager's Fee shall be shown as a single separate item. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy as the Architect may require. This schedule, unless objected to by the Architect, shall be used as a basis for reviewing the Construction Manager's Applications for Payment.

**7.1.6** Applications for Payment shall show the percentage completion of each portion of the Work as of the end of the period covered by the Application for Payment. The percentage completion shall be the lesser of (1) the percentage of that portion of the Work which has actually been completed or (2) the percentage obtained by dividing (a) the expense which has actually been incurred by the Construction Manager on account of that portion of the Work for which the Construction Manager has made or intends to make actual payment prior to the next Application for Payment by (b) the share of the Guaranteed Maximum Price allocated to that portion of the Work in the schedule of values.

**7.1.7** Subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

**.1** Take that portion of the Guaranteed Maximum Price properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Work by the share of the Guaranteed Maximum Price allocated to that portion of the Work in the schedule of values. Pending final determination of cost to the Owner of changes in the Work, amounts not in dispute may be included as provided in Subparagraph 7.3.7 of AIA Document A201, even though the Guaranteed Maximum Price has not yet been adjusted by Change Order.

**.2** Add that portion of the Guaranteed Maximum Price properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work or, if approved in advance by the Owner, suitably stored off the site at a location agreed upon in writing.

**.3** Add the Construction Manager's Fee, less retainage of            **ten**            percent ( **10**      %). The Construction Manager's Fee shall be computed upon the Cost of the Work described in the two preceding Clauses at the rate stated in Subparagraph 5.1.1 or, if the Construction Manager's Fee is stated as a fixed sum in that Subparagraph, shall be an amount which bears the same ratio to that fixed-sum Fee as the Cost of the Work in the two preceding Clauses bears to a reasonable estimate of the probable Cost of the Work upon its completion.

**.4** Subtract the aggregate of previous payments made by the Owner.

**.5** Subtract the shortfall, if any, indicated by the Construction Manager in the documentation required by Subparagraph 7.1.4 to substantiate prior Applications for Payment, or resulting from errors subsequently discovered by the Owner's accountants in such documentation.

**.6** Subtract amounts, if any, for which the Architect has withheld or nullified a Certificate for Payment as provided in Paragraph 9.5 of AIA Document A201.

**7.1.8** Except with the Owner's prior approval, payments to Subcontractors shall be subject to retention of not less than            **ten**            percent (    **10**       %). The Owner and the Construction Manager shall agree upon a mutually acceptable procedure for review and approval of payments and retention for subcontracts.

**7.1.9** Except with the Owner's prior approval, the Construction Manager shall not make advance payments to suppliers for materials or equipment which have not been delivered and stored at the site.

**7.1.10** In taking action on the Construction Manager's Applications for Payment, the Architect shall be entitled to rely on the accuracy and completeness of the information furnished by the Construction Manager and shall not be deemed to represent that the Architect has made a detailed examination, audit or arithmetic verification of the documentation submitted in accordance with Subparagraph 7.1.4 or other supporting data; that the Architect has made exhaustive or continuous on-site inspections or that the Architect has made examinations to ascertain how or for what purposes the Construction Manager has used amounts previously paid on account of the Contract. Such examinations, audits and verifications, if required by the Owner, will be performed by the Owner's accountants acting in the sole interest of the Owner.

## 7.2   FINAL PAYMENT

**7.2.1** Final payment shall be made by the Owner to the Construction Manager when (1) the Contract has been fully performed by the Construction Manager except for the Construction Manager's responsibility to correct nonconforming Work, as provided in Subparagraph 12.2.2 of AIA Document A201, and to satisfy other requirements, if any, which necessarily survive final payment; (2) a final Application for Payment and a final accounting for the Cost of the Work have been submitted by the Construction Manager and reviewed by the Owner's accountants; and (3) a final Certificate for Payment has then been issued by the Architect; such final payment shall be made by the Owner not more than 30 days after the issuance of the Architect's final Certificate for Payment, or as follows:

**AIA DOCUMENT A121/CMc and AGC DOCUMENT 565** • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1991 EDITION
AIA® • ©1991 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5209
AGC® • ©1991 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 1957 E STREET, N.W., WASHINGTON, D.C.
20006-5209 • **WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.**

**A121/CMc
AGC 565 - 1991   11**

**7.2.2** The amount of the final payment shall be calculated as follows

   **.1** Take the sum of the Cost of the Work substantiated by the Construction Manager's final accounting and the Construction Manager's Fee; but not more than the Guaranteed Maximum Price.

   **.2** Subtract amounts, if any, for which the Architect withholds, in whole or in part, a final Certificate for Payment as provided in Subparagraph 9.5.1 of AIA Document A201 or other provisions of the Contract Documents.

   **.3** Subtract the aggregate of previous payments made by the Owner.

If the aggregate of previous payments made by the Owner exceeds the amount due the Construction Manager, the Construction Manager shall reimburse the difference to the Owner.

**7.2.3** The Owner's accountants will review and report in writing on the Construction Manager's final accounting within 30 days after delivery of the final accounting to the Architect by the Construction Manager. Based upon such Cost of the Work as the Owner's accountants report to be substantiated by the Construction Manager's final accounting, and provided the other conditions of Subparagraph 7.2.1 have been met, the Architect will, within seven days after receipt of the written report of the Owner's accountants, either issue to the Owner a final Certificate for Payment with a copy to the Construction Manager, or notify the Construction Manager and Owner in writing of the Architect's reasons for withholding a certificate as provided in Subparagraph 9.5.1 of AIA Document A201. The time periods stated in this Paragraph 7.2 supersede those stated in Subparagraph 9.4.1 of AIA Document A201.

**7.2.4** If the Owner's accountants report the Cost of the Work as substantiated by the Construction Manager's final accounting to be less than claimed by the Construction Manager, the Construction Manager shall be entitled to proceed in accordance with Article 9 without a further decision of the Architect. Unless agreed to otherwise, a demand for mediation or arbitration of the disputed amount shall be made by the Construction Manager within 60 days after the Construction Manager's receipt of a copy of the Architect's final Certificate for Payment. Failure to make such demand within this 60-day period shall result in the substantiated amount reported by the Owner's accountants becoming binding on the Construction Manager. Pending a final resolution of the disputed amount, the Owner shall pay the Construction Manager the amount certified in the Architect's final Certificate for Payment.

**7.2.5** If, subsequent to final payment and at the Owner's request, the Construction Manager incurs costs described in Paragraph 6.1 and not excluded by Paragraph 6.2 (1) to correct nonconforming Work, or (2) arising from the resolution of disputes, the Owner shall reimburse the Construction Manager such costs and the Construction Manager's Fee, if any, related thereto on the same basis as if such costs had been incurred prior to final payment, but not in excess of the Guaranteed Maximum Price. If the Construction Manager has participated in savings, the amount of such savings shall be recalculated and appropriate credit given to the Owner in determining the net amount to be paid by the Owner to the Construction Manager.

## ARTICLE 8

## INSURANCE AND BONDS

**8.1**   **INSURANCE REQUIRED OF THE CONSTRUCTION MANAGER**

During both phases of the Project, the Construction Manager shall purchase and maintain insurance as set forth in Paragraph 11.1 of AIA Document A201. Such insurance shall be written for not less than the following limits, or greater if required by law:

**8.1.1** Workers' Compensation and Employers' Liability meeting statutory limits mandated by State and Federal laws. If (1) limits in excess of those required by statute are to be provided or (2) the employer is not statutorily bound to obtain such insurance coverage or (3) additional coverages are required, additional coverages and limits for such insurance shall be as follows:

**8.1.2** Commercial General Liability including coverage for Premises-Operations, Independent Contractors' Protective, Products-Completed Operations, Contractual Liability, Personal Injury, and Broad Form Property Damage (including coverage for Explosion, Collapse and Underground hazards):

   $ _____ Each Occurrence

   $ _____ General Aggregate

   $ _____ Personal and
                                    Advertising Injury

   $ _____ Products-Completed
                                      Operations Aggregate

  **.1** The policy shall be endorsed to have the General Aggregate apply to this Project only.

  **.2** Products and Completed Operations insurance shall be maintained for a minimum period of at least

    (          ) year(s) after either 90 days following Substantial Completion or final payment, whichever is earlier.

  **.3** The Contractual Liability insurance shall include coverage sufficient to meet the obligations in AIA Document A201 under Paragraph 3.18.

**AIA DOCUMENT A121/CMc and AGC DOCUMENT 565** • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1991 EDITION
AIA® • ©1991 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5209
AGC® • ©1991 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 1957 E STREET, N.W., WASHINGTON, D.C.
20006-5209 • **WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.**

**A121/CMc**
**AGC 565 - 1991**  **12**

**8.1.3** Automobile Liability (owned, non-owned and hired vehicles) for bodily injury and property damage

. S _____ Each Accident

**8.1.4** Other coverage:

*(If Umbrella Excess Liability coverage is required over the primary insurance or retention, insert the coverage limits. Commercial General Liability and Automobile Liability limits may be attained by individual policies or by a combination of primary policies and Umbrella and/or Excess Liability policies.)*

## 8.2   INSURANCE REQUIRED OF THE OWNER

During both phases of the Project, the Owner shall purchase and maintain liability and property insurance, including waivers of subrogation, as set forth in Paragraphs 11.2 and 11.3 of AIA Document A201. Such insurance shall be written for not less than the following limits, or greater if required by law:

**8.2.1** Property Insurance:

$ _____ Deductible Per Occurrence

$ _____ Aggregate Deductible

**8.2.2** Boiler and Machinery insurance with a limit of:

$ _____

*(If not a blanket policy, list the objects to be insured.)*

## 8.3   PERFORMANCE BOND AND PAYMENT BOND

**8.3.1** The Construction Manager *(Insert "shall" or "shall not")* furnish bonds covering faithful performance of the Contract and payment of obligations arising thereunder. Bonds may be obtained through the Construction Manager's usual source and the cost thereof shall be included in the Cost of the Work. The amount of each bond shall be equal to _____ percent ( %) of the Contract Sum.

**8.3.2** The Construction Manager shall deliver the required bonds to the Owner at least three days before the commencement of any Work at the Project site.

## ARTICLE 9
## MISCELLANEOUS PROVISIONS

### 9.1   DISPUTE RESOLUTION FOR THE PRECONSTRUCTION PHASE

**9.1.1** Claims, disputes or other matters in question between the parties to this Agreement which arise prior to the commencement of the Construction Phase or which relate solely to the Preconstruction Phase services of the Construction Manager or to the Owner's obligations to the Construction Manager during the Preconstruction Phase, shall be resolved by mediation or by arbitration.

**9.1.2** Any mediation conducted pursuant to this Paragraph 9.1 shall be held in accordance with the Construction Industry Mediation Rules of the American Arbitration Association currently in effect, unless the parties mutually agree otherwise. Demand for mediation shall be filed in writing with the other party to this Agreement and with the American Arbitration Association. Any demand for mediation shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for mediation be made after the date when institution of legal or equitable proceedings based upon such claim, dispute or other matter in question would be barred by the applicable statute of limitations.

**9.1.3** Any claim, dispute or other matter in question not resolved by mediation shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect unless the parties mutually agree otherwise.

**9.1.4** Demand for arbitration shall be filed in writing with the other party to this Agreement and with the American Arbitration Association. A demand for arbitration may be made concurrently with a demand for mediation and shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based upon such claim, dispute or other matter in question would be barred by the applicable statute of limitations.

**9.1.5** No arbitration arising out of or relating to the Contract Documents shall include, by consolidation or joinder or in any other manner, the Architect, the Architect's employees or consultants, except by written consent containing specific reference to the Agreement and signed by the Architect, Owner, Construction Manager and any other person or entity sought to be joined. No arbitration shall include, by consolidation or joinder or in any other manner, parties other than the Owner, Construction Manager, a separate contractor as described in Article 6 of AIA Document A201 and other persons substantially involved in a common question of fact or law whose presence is required if complete relief is to be accorded in arbitration. No person or entity other than the Owner or Construction Manager or a separate contractor as described in Article 6 of AIA Document A201 shall be included as an original third party or additional third party to an arbitration whose interest or responsibility is insubstantial. Consent to arbitration involving an additional person or entity shall not constitute agreement to arbitration of a dispute not described in such consent or with a person or entity not named or described therein. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional per-

**AIA DOCUMENT A121/CMc and AGC DOCUMENT 565** • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1991 EDITION
AIA® • © 1991 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, DC. 20006-5209
AGC® • © 1991 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 1957 E STREET, N.W., WASHINGTON, DC.
20006-5209 • **WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.**

**A121/CMc**
**AGC 565 - 1991   13**

son or entity duly consented to by parties to this Agreement shall be specifically enforceable under applicable law in any court having jurisdiction thereof.

**9.1.6** The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

**9.2   DISPUTE RESOLUTION FOR THE CONSTRUCTION PHASE**

**9.2.1** Any other claim, dispute or other matter in question arising out of or related to this Agreement or breach thereof shall be settled in accordance with Article 4 of AIA Document A201, except that in addition to and prior to arbitration, the parties shall endeavor to settle disputes by mediation in accordance with the Construction Industry Mediation Rules of the American Arbitration Association currently in effect unless the parties mutually agree otherwise. Any mediation arising under this Paragraph shall be conducted in accordance with the provisions of Subparagraphs 9.1.2 and 9.1.3.

**9.3   OTHER PROVISIONS**

**9.3.1** Unless otherwise noted, the terms used in this Agreement shall have the same meaning as those in the 1987 Edition of AIA Document A201, General Conditions of the Contract for Construction.

**9.3.2   EXTENT OF CONTRACT**

This Contract, which includes this Agreement and the other documents incorporated herein by reference, represents the entire and integrated agreement between the Owner and Construction Manager and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both the Owner and Construction Manager. If anything in any document incorporated into this Agreement is inconsistent with this Agreement, this Agreement shall govern.

**9.3.3   OWNERSHIP AND USE OF DOCUMENTS**

The Drawings, Specifications and other documents prepared by the Architect, and copies thereof furnished to the Construction Manager, are for use solely with respect to this Project. They are not to be used by the Construction Manager, Subcontractors, Sub-subcontractors or suppliers on other projects, or for additions to this Project outside the scope of the Work, without the specific written consent of the Owner and Architect. The Construction Manager, Subcontractors, Sub-subcontractors and suppliers are granted a limited license to use and reproduce applicable portions of the Drawings, Specifications and other documents prepared by the Architect appropriate to and for use in the execution of their Work under the Contract Documents.

**9.3.4   GOVERNING LAW**

The Contract shall be governed by the law of the place where the Project is located.

**9.3.5   ASSIGNMENT**

The Owner and Construction Manager respectively bind themselves, their partners, successors, assigns and legal representatives to the other party hereto and to partners, successors, assigns and legal representatives of such other party in respect to covenants, agreements and obligations contained in the Contract Documents. Neither party to the Contract shall assign the Contract as a whole without written consent of the other. If either party attempts to make such an assignment without such consent, that party shall nevertheless remain legally responsible for all obligations under the Contract.

## ARTICLE 10
## TERMINATION OR SUSPENSION

**10.1   TERMINATION PRIOR TO ESTABLISHING GUARANTEED MAXIMUM PRICE**

**10.1.1** Prior to execution by both parties of Amendment No. 1 establishing the Guaranteed Maximum Price, the Owner may terminate this Contract at any time without cause, and the Construction Manager may terminate this Contract for any of the reasons described in Subparagraph 14.1.1 of AIA Document A201.

**10.1.2** If the Owner or Construction Manager terminates this Contract pursuant to this Paragraph 10.1 prior to commencement of the Construction Phase, the Construction Manager shall be equitably compensated for Preconstruction Phase services performed prior to receipt of notice of termination; provided, however, that the compensation for such services shall not exceed the compensation set forth in Subparagraph 4.1.1.

**10.1.3** If the Owner or Construction Manager terminates this Contract pursuant to this Paragraph 10.1 after commencement of the Construction Phase, the Construction Manager shall, in addition to the compensation provided in Subparagraph 10.1.2, be paid an amount calculated as follows:

.1   Take the Cost of the Work incurred by the Construction Manager.

.2   Add the Construction Manager's Fee computed upon the Cost of the Work to the date of termination at the rate stated in Paragraph 5.1 or, if the Construction Manager's Fee is stated as a fixed sum in that Paragraph, an amount which bears the same ratio to that fixed-sum Fee as the Cost of Work at the time of termination bears to a reasonable estimate of the probable Cost of the Work upon its completion.

.3   Subtract the aggregate of previous payments made by the Owner on account of the Construction Phase.

The Owner shall also pay the Construction Manager fair compensation, either by purchase or rental at the election of the Owner, for any equipment owned by the Construction Manager which the Owner elects to retain and which is not otherwise included in the Cost of the Work under Clause 10.1.3.1. To the extent that the Owner elects to take legal assignment of subcontracts and purchase orders (including rental agreements), the Construction Manager shall, as a condition of receiving the payments referred to in this Article 10, execute and deliver all such papers and take all such steps, including the legal assignment of such subcontracts and other contractual rights of the Construction Manager, as the Owner may require for the purpose of fully vesting in the Owner the rights and benefits of the Construction Manager under such subcontracts or purchase orders.

Subcontracts, purchase orders and rental agreements entered into by the Construction Manager with the Owner's written approval prior to the execution of Amendment No. 1 shall contain provisions permitting assignment to the Owner as described above. If the Owner accepts such assignment, the Owner shall reimburse or indemnify the Construction Manager with respect to all costs arising under the subcontract, purchase order or rental agreement except those which would not have been reimbursable as Cost of the Work if the contract had not been terminated. If the Owner elects not to accept the assignment of any subcontract, purchase order or rental agreement which would have constituted a Cost of the Work had this agreement not been terminated, the Con-

struction Manager shall terminate such subcontract, purchase order or rental agreement and the Owner shall pay the Construction Manager the costs necessarily incurred by the Construction Manager by reason of such termination.

#### 10.2 TERMINATION SUBSEQUENT TO ESTABLISHING GUARANTEED MAXIMUM PRICE

Subsequent to execution by both parties of Amendment No. 1, the Contract may be terminated as provided in Article 14 of AIA Document A201.

**10.2.1** In the event of such termination by the Owner, the amount payable to the Construction Manager pursuant to Subparagraph 14.1.2 of AIA Document A201 shall not exceed the amount the Construction Manager would have been entitled to receive pursuant to Subparagraphs 10.1.2 and 10.1.3 of this Agreement.

**10.2.2** In the event of such termination by the Construction Manager, the amount to be paid to the Construction Manager

under Subparagraph 14.1.2 of AIA Document A201 shall not exceed the amount the Construction Manager would be entitled to receive under Subparagraphs 10.1.2 or 10.1.3 above, except that the Construction Manager's Fee shall be calculated as if the Work had been fully completed by the Construction Manager, including a reasonable estimate of the Cost of the Work for Work not actually completed.

#### 10.3 SUSPENSION

The Work may be suspended by the Owner as provided in Article 14 of AIA Document A201; in such case, the Guaranteed Maximum Price, if established, shall be increased as provided in Subparagraph 14.3.2 of AIA Document A201 except that the term "cost of performance of the Contract" in that Subparagraph shall be understood to mean the Cost of the Work and the term "profit" shall be understood to mean the Construction Manager's Fee as described in Subparagraphs 5.1.1 and 5.3.4 of this Agreement.

### ARTICLE 11
### OTHER CONDITIONS AND SERVICES

This Agreement entered into as of the day and year first written above.

OWNER:
MB REDEVELOPMENT, INC.

CONSTRUCTION MANAGER:
LEHRER McGOVERN BOVIS, INC.

By: _____

By: _____

Date: _____

Date: _____

ATTEST: _____

ATTEST: _____

**AIA** **CAUTION: You should sign an original AIA document which has this caution printed in red. An original assures that changes will not be obscured as may occur when documents are reproduced.**

AIA DOCUMENT A121/CMc and AGC DOCUMENT 565 • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1991 EDITION AIA® • ©1991 • THE AMERICAN INSTITUTE OF ARCHITECTS. 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5209 AGC® • ©1991 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA. 1957 E STREET, N.W., WASHINGTON, D.C. 20006-5209 • **WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.**

**A121/CMc**
**AGC 565- 1991   15**

struction Manager or reason of such termination

## 10.2   TERMINATION SUBSEQUENT TO ESTABLISHING GUARANTEED MAXIMUM PRICE

Subsequent to execution by both parties of Amendment No. 1 the Contract may be terminated as provided in Article 14 of AIA Document A201.

**10.2.1**  In the event of such termination by the Owner, the amount payable to the Construction Manager pursuant to Subparagraph 14.1.2 of AIA Document A201 shall not exceed the amount the Construction Manager would have been entitled to receive pursuant to Subparagraphs 10.1.2 and 10.1.3 of this Agreement.

**10.2.2**  In the event of such termination by the Construction Manager, the amount to be paid to the Construction Manager

provided under Subparagraphs
such that the Construction Manager's Fee shall be increased as if the Work had been fully completed by the Construction Manager, including a reasonable estimate of the Cost of the Work for Work not actually completed.

## 10.3   SUSPENSION

The Work may be suspended by the Owner as provided in Article 14 of AIA Document A201; in such case, the Guaranteed Maximum Price, if established, shall be increased as provided in Subparagraph 14.3.2 of AIA Document A201 except that the term "cost of performance of the Contract" in that Subparagraph shall be understood to mean the Cost of the Work and the term "profit" shall be understood to mean the Construction Manager's Fee as described in Subparagraphs 5.1.1 and 5.3.4 of this Agreement.

## ARTICLE 11
### OTHER CONDITIONS AND SERVICES

This Agreement entered into as of the day and year first written above.

OWNER:
MB REDEVELOPMENT, INC.

By: _____

Date: _____

ATTEST: _____

CONSTRUCTION MANAGER:
LEHRER McGOVERN BOVIS, INC.

By: _____

Date: 9/27/96

ATTEST: _____

**CAUTION: You should sign an original AIA document which has this caution printed in red. An original assures that changes will not be obscured as may occur when documents are reproduced.**

AIA DOCUMENT A121/CMc and AGC DOCUMENT 565 • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1991 EDITION
AIA® • ©1991 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5209
AGC® • ©1991 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, 1957 E STREET, N.W., WASHINGTON, D.C.
20006-5209 • WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

**A121/CMc**
**AGC 565 - 1991   15**

RIDER TO STANDARD FORM OF AGREEMENT BETWEEN MB REDEVELOPMENT, INC., AS OWNER, AND LEHRER McGOVERN BOVIS, INC., AS CONSTRUCTION MANAGER

The following Rider changes, deletes from or adds to the "Standard Form of Agreement between Owner and Construction Manager where the Construction Manager is also the Constructor" (the "Agreement"), AIA Document A121/CMc and AGC Document 565 (1991 Edition). When any Article of the Agreement or any Paragraph, Subparagraph or Sub-subparagraph thereof is modified, deleted, amended, superseded, or added to by this Rider, the unaltered provisions of such Article, Paragraph, Subparagraph, or Sub-subparagraph shall remain in full force and effect. All defined terms in this Rider shall have the same meaning as in the Agreement, except as otherwise noted. In the event of any conflict between the provisions of the Agreement and the provisions of this Rider, this Rider shall control.

ARTICLE 1; GENERAL PROVISIONS.

In Paragraph 1.1, in the tenth line, insert the following after "the Owner":

as made known to Construction Manager.

Add the following as Paragraphs 1.3, 1.4, and 1.5:

1.3    PROJECT DESCRIPTION

As a general description, the Project consists of Preconstruction, Construction, and Construction Management Services for an approximately 800 room, 675,000 gross square foot first-class convention center hotel (the "Hotel"), some of which will be located in the existing St. Moritz Hotel, as well as ancillary public space, convention/meeting space, food and beverage facilities, back-of-house space, limited parking (the balance, to be located in an approximately 800 space parking garage to be constructed by the City of Miami Beach (the "City") (by or through the Miami Beach Redevelopment Agency (the "Agency") and located across from the Hotel (the "Municipal Garage"), is not included within this Project), and various exterior buildings and recreational facilities, all totalling approximately 675,000 gross square feet, and in accordance with the Drawings, Specifications, and addenda on which the Guaranteed Maximum Price is based. A legal description of the Project site is attached hereto as Attachment "A."

1.4    PHASES

1.4.1    The Work to be performed by Construction Manager shall comprise three "Phases":

Preconstruction Phase: That period effective April 1, 1996 (the date that Construction Manager began performing services for Owner) and terminating on the date of this Agreement. The parties acknowledge that the Preconstruction Phase is completed as of the date hereof.

Construction Phase: That period effective on the date of this Agreement, until the later of (i) the date that a temporary Certificate of Occupancy (the "CO") is issued by the appropriate governmental bodies for the Project, or (ii) the date of Substantial Completion of the Project, as defined in that certain Hotel Development Agreement between Owner and the Agency and the opening date of the Hotel pursuant to Owner's Hotel Management Agreement.

Post-Construction Phase: That period effective upon completion of the Construction Phase and terminating on the later of the date that (i) fixtures, furnishings, and finishes are installed except for FF&E (as hereinafter defined) not being installed by Construction Manager, as described in Paragraph 11.12, (ii) punch-list obligations of Construction Manager and its subcontractors are completed and accepted by Owner, (iii) final governmental approvals, certifications, and inspections are obtained by Construction Manager with any

MI962620.082

deficiencies appropriately cured, (iv) defects as to title as may be caused by liens and/or disputes involving Construction Manager and/or any of its subcontractors are fully remedied other than liens and/or disputes arising out of Owner's failure to make required payments properly due Construction Manager, and (v) building systems have been tested by Construction Manager (with testing specifications as determined by Owner) and are fully operational. The satisfaction of these obligations does not relieve Construction Manager from its remaining obligations pursuant to applicable warranties.

1.4.2    Construction Manager will perform those services for each Phase in accordance with the tasks as enumerated Attachment "B." However, this scope of services is not necessarily all inclusive of those services which may be required for Construction Manager to perform with respect to the Project (including, without limitation, that Construction Manager shall be responsible for coordinating the construction of the Project with the construction of the Municipal Garage by the Agency and other public improvements being undertaken by the Agency or the City in connection with the Project, located at Collins Avenue and 16th Street). In any event, Construction Manager will not be entitled to any compensation other than the Fee and General Conditions, both as hereinafter defined, except as otherwise expressly provided for herein and related to change orders and delays not caused by Construction Manager or any of its Subcontractors, suppliers, or agents.

1.5     LICENSURE

Construction Manager represents that it is duly licensed as a general contractor by the Florida Department of Professional Regulation with extensive knowledge and experience in the construction of hotels. Construction Manager shall maintain such license in good standing.

## ARTICLE 2; CONSTRUCTION MANAGER'S RESPONSIBILITIES.

In Subparagraph 2.1.6:

    (a)     in the sixth and seventh lines, delete "The Architect" and replace it with the following:

        Owner.

    (b)     in the eighth line, delete "Architect or Owner know" and replace it with the following:

        Owner knows.

    (c)     in the tenth and twelfth lines, delete "or Architect."

Add the following as Sub-subparagraph 2.2.4.6:

    .6     The Scope Modifications to Drawings and Specifications, as set forth in Amendment No. 1 to this Agreement.

Add the following as Subparagraphs 2.2.11, 2.2.12, and 2.2.13:

    2.2.11   Without limiting the generality of the foregoing, the Guaranteed Maximum Price as set forth in Amendment No. 1 to this Agreement is based on (i) "Trade Costs" (inclusive of subcontractor profit/overhead and applicable sales tax) which are either fixed-priced based upon securement of subcontractor agreements and/or bids or "Allowances" for Trade Costs which will be converted to fixed prices pursuant to the Buy-Out, as hereinafter defined, all of which are based on the Project being at prevailing wage (as prescribed by the Davis-Bacon Act, 40 U.S.C. §276(a) and the requirements of City Ordinance No. 94-2960), together with a list of classifications and assumptions and a statement of their basis; (ii) "General Condition" costs related to on-site costs and other specified costs; (iii) "Construction Reserve" which is fixed and subject to restrictions; (iv) "Bonds";:

(A) Construction Manager Bond (to the extent required by Owner), and (B) Trade Bonds, both as described in Article 11 of AIA Document A201; provided however, that the cost of both the Construction Manager Bond and the Trade Bonds are capped at an amount not to exceed $1,000,000.00 and Construction Manager is responsible for any and all costs for Bonds in excess of such capped amount, which excess may be paid out of the Construction Reserve; and (v) the "Construction Manager Fee" which includes (without limitation) consideration for corporate expenses not specified as General Conditions.

2.2.12   Construction Manager hereby specifically acknowledges and declares that the Contract Documents are full and complete, are sufficient to have enabled the Construction Manager to determine the Cost of the Work therein in order to enter into this Agreement and that the Drawings, the Specifications, and all addenda are sufficient to enable it to construct the Work outlined therein in accordance with applicable laws, statutes, building codes and regulations to the best of Construction Manager's knowledge, and otherwise to fulfill all its obligations hereunder.   The Construction Manager further acknowledges that it has visited the site, examined all conditions affecting the Work, is fully familiar with all of the conditions thereon and affecting the same, and, having carefully examined all Drawings, Specifications and addenda that there are no discrepancies or omissions in the Contract Documents of which Construction Manager knows or should have known upon using reasonable diligence.

2.2.13   The Guaranteed Maximum Price set forth in Amendment No. 1 to this Agreement includes the scope of work described in Amendment No. 1 as the Elevator and Escalator Scope Package and the Lighting and Dimming Package.   It is Owner's intention to attempt to achieve a savings of approximately $500,000.00 in connection with the Elevator and Escalator Scope Package and a to-be-determined amount in connection with the Lighting and Dimming Package, which savings, if achieved, will reduce the Guaranteed Maximum Price.   To the extent the Guaranteed Maximum Price is so reduced, the Fee shall be increased by an amount equal to 10% of such reduction so that any Fee reduction or portion thereof due to the Trade Costs portion of the Guaranteed Maximum Price being in excess of $59,000,000.00 pursuant to Paragraph 4.1.3 shall be earned back by Construction Manager.   Notwithstanding anything to the contrary contained herein, any reduction in connection with the Elevator and Escalator Scope Package and the Lighting and Dimming Package shall not be deemed to be Savings pursuant to Subparagraph 5.2.3, and any reduction in connection with the Elevator and Escalator Scope Package and the Lighting and Dimming Package shall accrue to the full benefit of Owner by reducing the Guaranteed Maximum Price.   In addition, to the extent that the parties, working together, achieve, or to the extent that Owner, as a result of Owner's direct-buys or other efforts, achieves, savings prior to the Buy-Out pursuant to Subparagraph 5.2.3 (including, without limitation, any savings in connection with those items described as Potential Additional Scope Modifications to the Drawings and Specifications in Exhibit "C-4" to Amendment No. 1 to this Agreement), then the savings, if achieved, will reduce the Guaranteed Maximum Price.   To the extent the Guaranteed Maximum Price is so reduced, the Fee shall be increased by an amount equal to 10% of such reduction so that any Fee reduction or portion thereof due to the Trade Costs portion of the Guaranteed Maximum Price being in excess of $59,000,000.00 pursuant to Paragraph 4.1.3 shall be earned back by Construction Manager, and any such reduction in connection with such other savings shall not be deemed to be Savings pursuant to Subparagraph 5.2.3 and shall accrue to the full benefit of Owner by reducing the Guaranteed Maximum Price.   Owner makes no representation that any of the savings described in this Subparagraph 2.2.13 will be achieved and shall have no liability or responsibility for the failure by Owner to achieve any such savings.

Delete Subparagraph 2.3.1.1.

In Subparagraph 2.3.2.1, delete the eleventh line and replace it with the following:

and Architect, which.

Add the following as Subparagraph 2.3.2.8:

MI962620.082                                                    3

2.3.2.8  Construction Manager shall be responsible to the Owner and the Architect for any and all acts and omissions of the Construction Manager's agents, employees, Subcontractors, Sub-subcontractors, material suppliers, and laborers, and the agents and employees of the Subcontractors, Sub-subcontractors, material suppliers, and laborers performing or supplying work in connection with the Project.

In Subparagraph 2.4, in the third through fifth lines, delete "unless such services are specifically required by the Contract Documents for a portion of the Work or."

ARTICLE 3; OWNER'S RESPONSIBILITIES.

Delete Subparagraph 3.1.2.

Add the following as Subparagraph 3.1.4.6:

3.1.4.6  Construction Manager acknowledges and agrees that any and all reports, surveys, drawings, services, and tests described in Subparagraph 3.1.4 necessary for Construction Manager to perform its scope of Work under this Agreement have been delivered to Construction Manager prior to the date of this Agreement and have all been reviewed by Construction Manager and taken into account as part of Construction Manager's analysis, and input into the preparation, of the Drawings and Specifications and Guaranteed Maximum Price.

Add the following at the end of Subparagraph 3.2:

Owner assigns Eric Nesse as its representative.  Owner may at any time replace its representative from time to time.  In order for Owner to effectively manage the Project and assure that Construction Manager does not receive conflicting instructions regarding its Work, Construction Manager shall promptly notify Owner's representative upon receiving any instructions or other communication in connection with Construction Manager's Work from any employee of Owner or other purported agent of Owner other than Owner's representative. Owner also assigns John Turner as its on-site construction director.  Owner may at any time replace its on-site construction director from time to time.

For the entire term of this Agreement, Construction Manager shall assign Peter Marchetto as Officer-in-Charge, Carlos Pesant as Project Executive, and Mark Harari as Project Manager.  In addition, Owner retains the right to approve candidates for key on-site personnel in accordance with their experience with similar projects and local marketplace conditions.  Once approved, individuals cannot be changed without Owner's prior approval.  During the entire term, it is agreed that the local project manager assigned by Construction Manager will devote his time exclusively to the Project, unless Owner consents to a reduction in such time.  It is also understood that for the entire term Peter Marchetto as Officer-in-Charge, Carlos Pesant as Project Executive, and Mark Harari as Project Manager will be an integral participant in the overall coordination and administration of that scope to be performed pursuant to this Agreement.

All services provided by Construction Manager shall be performed in accordance with the highest professional standards recognized and adhered to by construction managers and contractors rendering services in the State of Florida.

Add the following as Paragraph 3.5:

3.5     OTHER OWNER'S DUTIES

3.5.1    Whenever Construction Manager submits a plan, proposal, specification, drawing, or request for information or clarification, Owner shall respond, and cause the Architect or applicable consultant to respond, promptly, either graphically or in writing, with the needed information or clarification, approval, rejection, or other decision as required.

3.5.2   If Owner learns of or observes a fault or defect in any of the Work, Owner shall notify Construction Manager in writing of the fault or defect, and Construction Manager agrees to either promptly correct such fault or defect (if the fault or defect is attributable to Construction Manager's own forces) or direct the applicable Subcontractor(s) involved to make such corrections. The failure of Owner to so notify Construction Manager shall not relieve Construction Manager of any of its obligations under this Agreement.

3.5.3   Owner shall not negotiate or communicate with Subcontractors except through or in the presence of Construction Manager.

3.5.4   The Project identification sign located at the Project site shall identify Construction Manager as the construction manager for the Project.

3.5.5   Owner shall execute all applications for permits and approvals or Construction Manager may execute such applications in Owner's name as attorney-in-fact upon Owner's written approval thereof.

ARTICLE 4; COMPENSATION AND PAYMENTS FOR PRECONSTRUCTION PHASE SERVICES.

Delete Article 4 and replace it with the following:

4.1   THE FEE

4.1.1   The Construction Manager's fee ("Fee") shall be a fixed fee of One Million Six Hundred Thousand and No/100 ($1,600,000.00) Dollars, for those services during the Preconstruction, Construction, and Post-Construction Phases of the Project. The Fee shall not be adjusted except as otherwise expressly provided herein.

4.1.2   Construction Manager's engagement of any of its affiliate companies to perform any of its services in connection with the Project shall not result in any additional Fee or other compensation to Construction Manager.

4.1.3   Notwithstanding the foregoing, if, as of the date of this Agreement, the Trade Costs portion of the Guaranteed Maximum Price is more than $59,000,000.00, then the Fee shall be decreased by ten (10%) percent of the amount of Trade Costs in excess of $59,000,000.00, subject to the Savings provisions described in Subparagraph 5.2.3 and the provisions of Subparagraph 2.2.13. If Trade Costs are less than $59,000,00.00, then the Fee shall remain at $1,600,000.00, subject to the Savings provisions described in Subparagraph 5.2.3 and the provisions of Subparagraph 2.2.13. The parties shall execute any instruments necessary to reflect any such decrease in the Fee.

4.1.4   The Fee shall be paid for each Phase in accordance with the following schedule:

Preconstruction Phase:   A lump sum of $105,000.00, payable upon the mutual execution and delivery of this Agreement.

Construction Phase:   The Fee, less that payable for Preconstruction and Post-Construction (which is $1,095,000.00; i.e., $1,600,000.00 minus $105,000.00 lump sum paid for the Preconstruction Phase minus $400,000.00 Post-Construction Phase retainage), shall be paid as a percentage of completed scope on a monthly basis.

Post-Construction Phase:   A retainage of $400,000.00 of the Fee shall be withheld by Owner with same payable as follows:  $250,000.00 within thirty (30) days after completion of the Construction Phase, with the balance, or $150,000.00, paid at the time the Post-Construction Phase is completed.

MI962620.082                                         5

4.1.5   Any incentives are payable as described below.

ARTICLE 5; COMPENSATION FOR CONSTRUCTION PHASE SERVICES.

Delete Subparagraph 5.1.1 and replace it with the following:

5.1.1   For the Construction Manager's performance of the Work pursuant to this Agreement, the Owner shall pay the Construction Manager in current funds the Contract Sum, consisting of the Cost of the Work as defined in Article 7 and the portion of the Construction Manager's Fee relating to the Construction Phase.

Add the following as Subparagraphs 5.2.2, 5.2.3, and 5.2.4:

5.2.2   ALLOWANCES:

5.2.2.1 As of the date of this Agreement, although the Guaranteed Maximum Price has been submitted, certain Trade Costs have not been fully substantiated with subcontractor bids and/or agreements, because the Drawings and Specifications have not been sufficiently completed regarding the scope for such Trade Costs. In such instances, the cost of such scope has been included in the Trade Costs as Allowances.

5.2.2.2 The Allowances have been mutually agreed to by Construction Manager and Owner, based upon the Drawings and Specifications as completed through the date hereof and Construction Manager's estimate as to the cost of scope of Work. All Allowances have been defined in detail, utilizing whatever supportive documentation is appropriate to clarify the scope of Work assumed by such Allowances. The Allowances are described in Exhibit B to Amendment No. 1 to this Agreement.

5.2.2.3 No later than one hundred twenty (120) days after issuance of a building permit (other than the foundation permit) is obtained for the Project, Construction Manager will convert all Allowances to confirmed Trade Costs, based upon all construction scope being under contract with Subcontractors and/or suppliers. However, Owner may specify certain Allowances to remain as such beyond one hundred twenty (120) day period (but such specification shall not affect the utilization of the Savings, as hereinafter defined).

5.2.2.4 If any Allowance, at the time of conversion to a firm Trade Cost, is inadequate in consideration of the related scope of Work, Construction Manager will, subject to Owner's consent, either, in the following order: (i) Utilize the savings from conversion of any other Allowances, if any, (ii) Utilize Savings if any, from Construction Manager's Buy-Out of trade-related scope to offset such inadequate amounts (prior to such Savings being subject to the Savings provisions as set forth herein), (iii) work together with Owner to revise relevant scope of Work, consistent with the amount and scope as established for such Allowance (and if Owner elects not to revise the scope of Work, it shall be deemed to be an additive change order), or (iv) utilize the Construction Reserve to offset 50% of same (with the other 50% being payable from Owner's separate owner's contingency).

5.2.3   SAVINGS:

5.2.3.1 Savings against Trade Costs (including Allowances):

No later than one hundred twenty (120) days after the issuance of a building permit (other than the foundation permit) for the Project, Construction Manager will have all Trade-Cost related scope and Allowances under contract (the "Buy-Out") with subcontractors. Within thirty (30) days after the Buy-Out, Construction Manager will submit to Owner a written statement of the amount, if any, by which the Trade Costs and Allowances set forth in the Guaranteed Maximum Price exceeds the amount of the Buy-Out (and such amount is hereinafter referred to as the "Savings"). Forty (40%) percent of the Savings, if any, will be deemed to be part of the Construction Reserve, and may be used by Construction Manager in accordance herewith, and sixty (60%)

percent of the Savings, if any, shall be available for Owner to utilize toward Additive Alternative scope, as described in Subparagraph 5.3.8. At such time (providing the construction schedule is not materially adversely impacted), Owner may elect to allocate all or any portion of its Savings toward Additive Alternative scope, as described in Subparagraph 5.3.8. Any Savings resulting from the conversion of Allowances after such one hundred twenty (120) day period shall accrue to the full benefit of Owner. In connection with the Buy-Out, within ninety (90) days after the issuance of a building permit (other than the foundation permit) for the Project, Owner will provide the revised Drawings and Specifications necessary for the Buy-Out. Construction Manager shall notify Owner within fifteen (15) days after the date of the Agreement if certain of the revised Drawings and Specifications are needed sooner than ninety (90) days because of the impact of the applicable item on the CPM Schedule, as hereinafter defined. If Construction Manager so notifies Owner, Owner will use reasonable efforts to cause such revised Drawings and Specifications to be issued sooner than ninety (90) days. As part of the Buy-Out, Owner and Construction Manager shall work together to establish the number of Subcontractors invited to bid for particular major trade subcontracts.

5.2.3.2 Upon the completion of the Post-Construction Phase, the remaining Construction Reserve, if any, shall be shared equally (i.e., fifty (50%) percent to Construction Manager and fifty (50%) percent to Owner).

5.2.3.3 At such time as the construction of the structural shell of the Hotel is completed, then up to 25% of Owner's share of the remaining Construction Reserve (i.e., 25% of one-half of the then-remaining Construction Reserve) may be utilized by Owner toward additional scope to be performed by Construction Manager. In addition, at such time as the Hotel building is enclosed, then an additional 25% of Owner's share of the remaining Construction Reserve may be utilized by Owner toward additional scope to be performed by Construction Manager.

5.2.3.4 Savings Against General Conditions:

Any Savings accrue to the full benefit of Construction Manager.

5.2.3.5 Savings Against Bonds:

Any Savings accrue to the full benefit of Owner.

5.2.3.6 Any such Savings due Owner as a result of the Buy-Out may be utilized by Owner, in Owner's sole discretion, for (i) additive change order(s) and/or (ii) additional scope of work not included within Construction Manager's scope (including, without limitation, Additive Alternatives, as hereinafter defined, or installation of FF&E, as hereinafter defined). Any additive change order or additional scope of work based upon expenditures from Owner's share of Savings shall not result in any additional Fee or an increase in General Conditions, except as otherwise expressly set forth in connection with Additive Alternative Scope, as described in Subparagraph 5.3.9.

5.2.3.7 Any Savings due Construction Manager will be subject to: (i) Completion of all obligations of Construction Manager pursuant to the Post-Construction Phase; and (ii) Verification of Savings by an audit to be undertaken by Owner determined on a cumulative basis after Substantial Completion, and not on an individual line-item basis. Such Savings due Construction Manager, if any, and in an amount not to exceed $500,000.00, shall be held in escrow by Owner, in an interest bearing account accruing to Construction Manager's benefit for a period not to exceed twelve (12) months after the opening date of the Hotel pursuant to Owner's Hotel Management Agreement (unless the failure to obtain a final CO for the Project is due to any negligent acts or omissions by Construction Manager and/or its subcontractors, suppliers, and/or agents) for the limited purpose of remedying any defects which are Construction Manager's obligations pursuant to this Agreement, surviving warranties, and/or as a matter of law.

MI962620.082                                      7

5.2.4    CREDITS:

5.2.4.1    In order to account for certain work performed in connection with the Project prior to the date hereof, Owner shall be entitled to a credit against the Trade Costs portion of the Guaranteed Maximum Price, as more particularly described in this Subparagraph 5.2.4.

5.2.4.2    Owner shall be entitled to a credit of approximately $70,000.00 for work performed by Jaffer Associates, Inc., if it is confirmed that the test wells installed on the site by Jaffer Associates, Inc. can be a part of the permanent drainage necessary for the site. The exact amount of the credit shall be confirmed by Construction Manager within thirty (30) days after the date hereof.

5.2.4.3    In addition to the credit described above, Owner shall be entitled to an additional credit of approximately $10,000.00 for work performed by Ecker, Inc., if Ecker, Inc. is engaged by Construction Manager as a Subcontractor or in any other capacity in connection with the Project. The exact amount of the credit shall be confirmed by Construction Manager within thirty (30) days after the date hereof.

5.2.4.4    In addition to the credits described above, Owner shall be entitled to an additional credit of approximately $10,000.00 for work performed by HJ Foundation, Inc., if HJ Foundation, Inc. is engaged by Construction Manager as a Subcontractor or in any other capacity in connection with the Project. The exact amount of the credit shall be confirmed by Construction Manager within thirty (30) days after the date hereof.

Delete Subparagraph 5.3.4 and replace it with the following:

5.3.4    Any additive change order involving expenditure from the Construction Reserve shall not result in any additional Fee or an increase in General Conditions.

Add the following as Subparagraphs 5.3.5, 5.3.6, 5.3.7, 5.3.8, and 5.3.9:

5.3.5    Any other additive change orders beyond Construction Manager's control requiring expenditure in excess of the Guaranteed Maximum Price (but not with respect to increases in cost of materials and/or labor) shall be based on the following: (i) an additional Fee based upon 1.25% against the Trade Cost value of the applicable change order and (ii) General Conditions, only if such a change order adversely impacts the schedule and with the specific amount to be negotiated based upon actual on-site costs premised upon the status of the overall Project, but in no event in excess of 7% against the Trade Cost value of the change order. However, if a change order will cause a Delay as defined in Subparagraph 6.1.1A.3, then the parties will negotiate any increase in General Conditions, as described in Subparagraph 6.1.1A.3.

5.3.6    Notwithstanding the foregoing, any additive change order or additional scope of work based upon expenditures from Owner's share of Savings, as described in Subparagraph 5.2.3, shall not result in any additional Fee or an increase in General Conditions, except as otherwise expressly set forth in connection with Additive Alternative Scope, as described in Subparagraph 5.3.9.

5.3.7    Any deductive change order benefiting the Guaranteed Maximum Price (Trade Costs and Construction Reserve) shall not reduce the Fee nor General Conditions, as both are fixed. However, if deductive change orders, on an individual or cumulative basis, exceed ten (10%) percent of the Guaranteed Maximum Price, the Fee and General Conditions will be reduced on a negotiated basis and in consideration of the remaining scope to be completed at the time such a change order(s) is considered. Any such reduction will not reduce that amount due under the Savings provision.

5.3.8    During the process leading to the Guaranteed Maximum Price, Construction Manager and Owner have developed a list of scope of work (the "Additive Alternatives") deleted from the Project to help achieve the Guaranteed Maximum Price, which may, in whole or in part, be added back by Owner into

Construction Manager's scope, in Owner's sole discretion. Any Additive Alternatives will be funded by Owner either from its share of Savings or, alternatively, from its separate owner's contingency (as opposed to the Construction Reserve). The list of Additive Alternatives, along with appropriate drawings and/or specifications therefor, have been included in the bid documents issued by Construction Manager to its prospective Subcontractors. Each Additive Alternative has a fixed Trade Cost identified with each Additive Alternative. The list of Additive Alternatives is attached hereto as Attachment "C."

5.3.9    A maximum of $2,000,000.00 of Additive Alternatives may be added by Owner to Construction Manager's scope without any additional Fee or increase in General Conditions due Construction Manager. If Owner elects to add more than $2,000,000.00 of Additive Alternatives to Construction Manager's scope, then such additional scope will be deemed to be an additive change order, and shall be subject to the provisions of Subparagraph 5.3.5.

ARTICLE 6; COST OF THE WORK FOR CONSTRUCTION PHASE.

Add the following at the end of Subparagraph 6.1.1:

For purposes hereof, the Cost of the Work shall be actual costs incurred in connection with the Trade Costs, General Conditions, Construction Reserve, and Bonds.

Add the following as Subparagraph 6.1.1A:

6.1.1A  GENERAL CONDITIONS

6.1.1A.1    Definition: The General Conditions are the cost of management, supervisory, and field labor personnel; temporary utilities and services; field office; safety and maintenance requirements; insurance as described below, and generally those items necessary for Construction Manager to perform its scope of services during the Construction Phase as set forth in detail in the attached line-item General Conditions budget (Attachment "D"). The cost of General Conditions is $4,000,000.00 for the entire scope of services and as set forth within Attachment "D".    Any equipment purchased by Construction Manager in accordance with Attachment "D" is the property of Owner and will be delivered to Owner upon completion of the Post-Construction Phase. In connection with the $4,000,000.00 General Conditions, the costs referred to in Attachment "D" are based on the amounts (i) charged by Construction Manager and (ii) charged by others engaged by or through Construction Manager, for work, labor, and services in furtherance of or related to the Work. In addition, in connection with the salary costs included in General Conditions, for any personnel who devote at least forty (40) hours to the Project during the payroll week, the General Conditions anticipate that an amount equal to the weekly salary for such personnel will be charged against the General Conditions line item of $4,000,000.00. If any such personnel devotes less than forty (40) hours to the Project during the payroll week, the General Conditions anticipate that an amount equal to one-fortieth (1/40) of the weekly salary paid to such personnel, multiplied by the number of hours worked on the Project, will be charged against the General Conditions line item of $4,000,000.00.    Such method of determining salary costs within the $4,000,000.00 General Conditions shall not serve to increase General Conditions.

6.1.1A.2    Construction Manager may, subject to Owner's approval, reallocate costs, except as set forth in Subparagraph 2.2.11. Any costs attributable to obligations of Subcontractors and Construction Manager's executive home offices (including but not limited to senior management and related travel and entertainment) are excluded, except to the extent that General Conditions include an express amount for the salaries and/or costs for the Project Executive and Project Manager as part of Attachment "D."

6.1.1A.3    Notwithstanding the above, the only allowable increase to the General Conditions shall be those costs attributable to an individual delay of no less than five (5) consecutive days in excess of the construction schedule (a "Delay"), providing (a) such Delays are no fault of Construction Manager and/or its

1  subcontractors, suppliers, and/or agents, and (b) such Delays aggregate to at least sixty (60) days of Delay. If
2  such Delays aggregate to at least sixty (60) days of Delay, then the increased General Conditions will be
3  negotiated based upon the remaining work to be completed and Construction Manager's actual "out-of-pocket"
4  expenses, which shall not exceed $185,000.00 per month. However, to the extent that any Savings increase the
5  amount of the Construction Reserve, then such Savings may be utilized by Construction Manager for increased
6  General Conditions incurred in connection with Delays up to such aggregate of sixty (60) days.
7

8        6.1.1A.4      During the Preconstruction Phase, up to $280,000.00 of the General Conditions
9  (including, without limitation, office rent and related overhead incurred in the Preconstruction Phase regarding
10  Construction Manager's Miami office) was estimated to be incurred by Construction Manager with monthly
11  expenditures thereafter also estimated (Attachment "E"). All General Conditions costs incurred during the
12  Preconstruction Phase will be paid on a accrued basis at such time as vertical construction of the Project
13  commences. In addition, such amount is subject to verification and audit by Owner.
14

15        6.1.1A.5      Without limiting the generality of the foregoing, it is expressly acknowledged that the
16  cost of all (i) security for the Project site (including, without limitation, overnight security guards) and (ii) parking
17  at or in the vicinity of the Project site for Construction Manager, its agents, employees, Subcontractors,
18  Sub-subcontractors, material suppliers, and laborers, and the agents and employees of the Subcontractors,
19  Sub-subcontractors, material suppliers, and laborers performing or supplying work in connection with the Project,
20  are included within Construction Manager's General Conditions or Trade Costs.
21

22  Add the following as Subparagraph 6.1.1B:
23

24        6.1.1B  CONSTRUCTION RESERVE
25

26        6.1.1B.1      Definition:  The Construction Reserve shall be fixed at $1,200,000.00, subject to
27  adjustment in accordance with Subparagraph 5.2.3. The Construction Reserve may be used by Construction
28  Manager as may be necessary solely for actual costs associated with Trade Costs and/or General Conditions
29  and/or Bonds relating to (i) Increases in cost of materials and/or labor, (ii) Additional labor and/or mobilization
30  costs to comply with schedule requirements of this Agreement; (iii) Bond costs in excess of $1,000,000.00;
31  (iv) Increases in General Conditions caused by Delays as described in Subparagraph 6.1.1A.3 (but only to the
32  extent that Savings, as hereinafter defined, increase the amount of the Construction Reserve), and (v) If any
33  Allowance, at time of conversion to a firm Trade Cost, is inadequate in consideration of related scope of Work
34  after utilizing overages in Allowances as set forth in clauses (i), (ii), or (iii) under Subparagraph 5.2.2.4 (and on a
35  50/50 basis with Owner's separate owner's contingency as set forth in clause (iv) under Subparagraph 5.2.2.4).
36  Construction Manager will notify Owner in writing simultaneously with or immediately upon any use of the
37  Construction Reserve by Construction Manager, and Construction Manager will provide an on-going accounting to
38  Owner of the use of the Construction Reserve.
39

40        6.1.1B.2      The Construction Reserve is not be utilized by Construction Manager for any negligent
41  acts or omissions by Construction Manager and/or its Subcontractors, Sub-subcontractor, suppliers, and/or agents.
42  All costs and expenses arising out of any such negligent acts or omissions are the sole responsibility of
43  Construction Manager. In addition, the Construction Reserve is not to be utilized by Construction Manager for:
44  (a) Changes to the scope of services as requested by Owner, for whatever reason, unless such change is requested
45  after the Project is Substantially Completed and the remaining Construction Reserve account is mutually deemed
46  adequate with respect to the scope yet to be completed; (b) Any restrictions which Owner's lender and/or Agency
47  may require in connection with expenditures from Construction Reserve (and Owner will consult with
48  Construction Manager with respect to any such restrictions); (c) Unforeseen conditions limited to soil/subsurface
49  conditions contrary to those shown within the soils report, foundation specifications, and/or existing surveys and
50  drawings supplied to Construction Manager by Owner; and/or hidden conditions within the existing St. Moritz
51  contrary to assumed conditions as stated within applicable specifications; (d) Requirements of building code and/or
52  regulatory authorities adopted subsequent to the issuance of required building permits; and/or (e) Requirements of

1  regulatory agency inspectors if such are not provided for within applicable codes. All costs and expenses arising
2  out of items (a) through (e) are the sole responsibility of Owner.
3
4  Add the following as Subparagraph 6.1.1C:
5
6      6.1.1C  INCONSISTENCIES
7
8      6.1.1C.1      In the event of any conflict between the provisions of Subparagraphs 6.1 and 6.2, on
9  the one hand, and Subparagraphs 6.1.1A and 6.1.1B (and the Attachments referred to therein), on the other hand,
10  the provisions of Subparagraphs 6.1.1A and 6.1.1B (and the Attachments referred to therein) shall control.
11
12  Add the following at the end of Subparagraph 6.4.1:
13
14      Without limiting the generality of the foregoing, Construction Manager shall be fully responsible for
15  compliance with any and all Department of Housing and Urban Development recordkeeping and accounting
16  requirements in effect from time to time in connection with federal labor standards, including, without limitation,
17  the Davis-Bacon Act (40 U.S.C. 276(a), as amended, the Contract Work Hours and Safety Standards Act (40
18  U.S.C. 327-333), and the Federal Labor Standards Provisions (29 CFR Part 5.5), the requirements of which are
19  incorporated herein by reference. Attached as Attachment "F" is the Davis-Bacon Act Wage Decision applicable
20  to the Project as of the date hereof issued by the Department of Housing and Urban Development. Any and all
21  records to be maintained by Construction Manager pursuant to this Agreement shall be kept on the basis of
22  generally accepted accounting principles consistently applied and shall be available for inspection and copying by
23  Owner or Owner's authorized representative at all reasonable times.
24
25  <u>ARTICLE 7; CONSTRUCTION PHASE.</u>
26
27  In Subparagraph 7.1.3:
28
29      (a)      in the second line, delete "fifteenth (15th)" and replace it with the following:
30
31          last.
32
33      (b)      in the third line, delete "following."
34
35  In Subparagraph 7.1.7.3, in the first line, delete "ten percent (10%)" and replace it with the following:
36
37      N/A.
38
39  Add the following as Subparagraph 7.1.11:
40
41      In addition to the Post-Construction Phase retainage on the Fee as described above, the only retainage
42  shall be the ten (10%) percent retainage on Trade Costs, as described in Subparagraph 7.1.8. In connection with
43  such Trade Costs retainage, to the extent permitted under Owner's construction loan, no further retainage will be
44  required with respect to a category of Project costs as set forth in the Budget at such time as fifty (50%) percent
45  of the amount budgeted for such category of Project costs has been advanced pursuant to the terms hereof. In
46  addition, retainage, if any, due a Subcontractor may be released by Owner, in its sole discretion, if (i) the labor
47  and/or materials to be provided by such Subcontractor have been completed or supplied pursuant to the
48  subcontract substantially in accordance with the subcontract and the Drawings and Specifications applicable to
49  such subcontract, (ii) the Subcontractor has executed and delivered a final waiver of lien and certification
50  reasonably satisfactory to Owner, (iii) all requirements of all governmental authorities and of Owner have been
51  satisfied with respect to the Subcontractor's work, and (iv) Owner's construction lender has confirmed in writing
52  that such Subcontractor has complied with clauses (i) and (iii).

In the last line of Subparagraph 7.2.1, delete "or as follows" and replace it with the following:

      and otherwise subject to the retainages described in Subparagraphs 4.1.4 and 5.2.3.7.

ARTICLE 8; INSURANCE AND BONDS.

Delete Article 8 and replace it with the following:

      Construction Manager shall maintain insurance and obtain payment and performance bonds pursuant to the provisions of Article 11 of AIA Document A201.

ARTICLE 9; MISCELLANEOUS PROVISIONS.

Delete Subparagraphs 9.1.1, 9.1.2, 9.1.3, 9.1.4, 9.1.5, and 9.1.6.

Delete Subparagraph 9.2.1 and replace it with the following:

      Any dispute, disagreement, controversy or claim between Owner and Construction Manager arising out of or relating to this Agreement, or the breach hereof, shall be resolved in accordance with Article 4 of AIA Document A201.

Add the following at the end of Subparagraph 9.3.2:

      Notwithstanding the foregoing, the parties entered into that certain term sheet dated as of April 1, 1996, which term sheet constitutes a binding agreement with respect to the Preconstruction Phase services described therein to reflect a general outline of the process leading to a submission by Construction Manager of the Guaranteed Maximum Price. With respect to the Preconstruction Phase, the term sheet shall govern in connection with any inconsistency between the term sheet and this Agreement. With respect to the Construction Phase and Post-Construction Phase, this Agreement supersedes the term sheet and this Agreement shall govern in connection with any inconsistency between the term sheet and this Agreement.

Add the following at the end of Subparagraph 9.3.5:

      Notwithstanding the foregoing, Owner may assign this Agreement, without Construction Manager's consent, to any entity controlling, controlled by, or under common control with Owner, or to any entity resulting from a merger or consolidation of Owner, or as otherwise permitted under this Agreement. The assignee will have at least the same financial capability as Owner hereunder. In addition, Construction Manager represents to Owner that that certain financial statement of Construction Manager, prepared by KPMG Peat Marwick dated February 16, 1996 for the fiscal year ended December 31, 1995, is a true, correct and complete copy which accurately reflects the financial condition of Construction Manager as of December 31, 1995, and there have been no material changes in Construction Manager's financial condition since such date.

ARTICLE 10; TERMINATION OR SUSPENSION.

Delete Article 10.

ARTICLE 11; OTHER CONDITIONS AND SERVICES.

11.1    CITY-RELATED PROVISIONS

11.1.1  Construction Manager hereby waives all rights of recovery, claims, actions or causes of action against the Agency (and any successor fee owner of the Project site), the City, Florida and their respective elected and appointed officials (including, without limitation, the Agency's Chairman and Members and the City's Mayor and City Commissioners), directors, officials, officers, shareholders, members, employees, successors, assigns, agents, contractors, subcontractors, experts, licensees, lessees, mortgagees, trustees, partners, principals, invitees and affiliates, for any loss or damage to property of Construction Manager which may occur at any time in connection with the Project.

11.1.2  To the fullest extent permitted by law, Construction Manager shall and does hereby indemnify and hold harmless the Agency (and any successor fee owner of the Project site), the City and their respective elected and appointed officials (including the Agency's Chairman and Members and the City's Mayor and City Commissioners), directors, officials, officers, shareholders, members, employees, successors, assigns, agents, contractors, subcontractors, experts, licensees, lessees, mortgagees, trustees, partners, principals, invitees and affiliates, from and against any and all liability, claims, demands, damages, losses, fines, penalties, expenses and costs of every kind and nature, including, without limitation, costs of suit and attorneys' fees and disbursements (collectively, "Expenses"), resulting from or in any manner arising out of, in connection with or on account of: (1) any act, omission, fault or neglect of Construction Manager, or anyone employed by it in connection with the work or any phase thereof, or any of its agents, contractors, subcontractors, employees, invitees or licensees in connection with the work, or anyone for whose acts any of them may be liable, (2) claims of injury (including physical, emotional, economic or otherwise) to or disease, sickness or death of persons or damage to property (including, without limitation, loss of use resulting therefrom) occurring or resulting directly or indirectly from the work or any portion thereof or the activities of Construction Manager or anyone employed by it in connection with the work, or any portion thereof, or any of its respective agents, contractors, subcontractors, employees, invitees or licensees in connection with the work, or anyone for whose acts any of them may be liable, or (3) mechanics' or materialmen's or other liens or claims (and all costs or expenses associated therewith) asserted, filed or arising out of the work or any phase thereof other than liens or claims arising out of Owner's failure to make required payments properly due Construction Manager.  In no event shall Construction Manager be able to seek or be entitled to consequential damages (including, without limitation, loss of profits or loss of business opportunity) for claims arising under this contract.  This indemnification obligation shall not be limited in any way by: (x) any limitation on the amount or type of damages, compensation or benefits payable to Construction Manager under worker's compensation acts, disability benefit acts or other employee benefit acts or other insurance provided for by this contract; or (y) the fact that the Expenses were caused in part by a party indemnified hereunder.  The Construction Manager further agrees that this indemnification shall be made a part of all contracts and purchase orders with sub-contractors or material suppliers.  The indemnification agreement included in this Subparagraph is to be assumed by all Subcontractors.

11.1.3  Nothing contained in Subparagraph 11.1.2 above is deemed to modify the obligations of MB Redevelopment, Inc. as to Construction Manager.

11.1.4  Owner may assign to the Agency, subject and subordinate to the rights of Owner's lender, this Agreement and Owner's rights thereunder, at the Agency's request, without the consent of the Construction Manager, and without the necessity of such assignment and without thereby assuming any of the obligations of Owner under this Agreement occurring prior to such assignment and/or purchase order, except for Owner's payment obligations, the Agency shall have the right to enforce the full and prompt performance by the Construction Manager of such Construction Manager's obligations under this Agreement.

11.1.5  Upon an Event of Default by Owner resulting in a termination of that certain Agreement of Lease between Owner and the Agency in connection with the Project site (the "Ground Lease"), pursuant to which Owner (as tenant) has agreed to lease the land on which the Project is to be constructed, Construction Manager will, at the option of the Agency, subject and subordinate to the rights of Owner's lender, be terminated or Construction Manager will honor this Agreement as if this Agreement had been originally entered into with the Agency.

11.1.6   Nothing contained in this Agreement is in any way intended to be a waiver of the prohibition on Construction Manager's ability to file liens against property of the Agency, or of any other constitutional, statutory, common law or other protections afforded to public bodies or governments.

11.1.7   Upon an Event of Default by Owner resulting in a termination of the Ground Lease, all covenants, representations, guarantees and warranties of Construction Manager hereunder shall be, subject and subordinate to the rights of Owner's lender, deemed to be made for the benefit of the Agency (and the Agency shall be deemed to be a third-party beneficiary hereof) and shall be, subject and subordinate to the rights of Owner's lender, enforceable by the Agency.

11.1.8   Unless and until the Agency expressly assumes the obligations of the Owner under this Agreement (and then only to the extent the same arise from and after such assumption), the Agency shall not be a party to this Agreement and will in no way be responsible to any party for any claims of any nature whatsoever arising or which may arise in connection with this Agreement.

11.1.9   Construction Manager hereby agrees that notwithstanding that Construction Manager performed work at the Project site or any part thereof, the Agency shall not be liable in any manner for payment or otherwise to Construction Manager in connection with the work performed at the Project site, except to the extent the Agency expressly assumes the obligations of Owner hereunder (and then only to the extent such obligations arise from and after such assumption).

11.1.10  Owner may assign this Agreement to its lender and the successors and assigns of the lender, and Construction Manager agrees to extend the Contract for such period following the scheduled completion of Construction Manager's Work as may be required by the lender to obtain title to the Project following a default by Owner under its loan and to continue performance on behalf of lender (or its designee or nominee) under this Agreement in accordance with its terms and conditions and without any additional charges above those specified in this Agreement provided that the lender (or its designee or nominee) make all payments, other than payments accruing or otherwise becoming due and payable solely as a result of any default under this Agreement, due to the Construction Manager pursuant to the terms and conditions of this Agreement.

## 11.2   MUNICIPAL GARAGE

11.2.1   The Project excludes the Municipal Garage intended to supplement limited parking provided in the Project, which Municipal Garage is to be owned by the Agency and leased to the City (with Owner intended as the developer).  Construction Manager and Owner acknowledge that a determination as to the engagement of Construction Manager as construction manager or contractor for the Municipal Garage is at the Agency's sole discretion.  However, if Construction Manager is engaged to perform similar services for the Municipal Garage, it will manage same with resources and personnel separate and apart from the Project, so as not to be hinder and/or delay the Project or the Municipal Garage, and coordinate the completion of both (although Carlos Pesant may be involved in both).

## 11.3   LATE COMPLETION LIQUIDATED DAMAGES

11.3.1   If Substantial Completion does not occur by the "Completion Deadline" (i.e., twenty-two (22) months after the date the foundation is initiated), the Fee payable to Construction Manager shall be reduced at the rate of $50,000.00 per month (prorated on a per diem basis at $1,667.67 per day), unless such delay is caused by circumstances beyond the control of Construction Manager, its subcontractors, or suppliers.  The foregoing reduction in the Fee is intended solely as liquidated damages for Construction Manager's failure to cause Substantial Completion to occur by the Completion Deadline and is not intended as a penalty.  Notwithstanding the foregoing, there shall be no reduction in the Fee pursuant to this Subparagraph if Substantial Completion occurs within fourteen (14) days after the Completion Deadline.  Any Fee reduction pursuant to this Subparagraph

shall be deducted from the payment(s) due Construction Manager for the Post-Construction Phase to the extent sufficient, with the balance, if any, deducted from other portions of the Fee paid or payable to Construction Manager.

11.3.2   Attached as Attachment "G" are the definitions of "Substantial Completion" and "Unavoidable Delays." Attached as Attachment "H" is the classification and division of responsibilities for budget, design, contract documents, purchasing, and installation.

### 11.4   CITY CONSULTANT

11.4.1   Construction Manager acknowledges that the City and/or the Agency has engaged a third-party consultant to monitor the Project and advise the City and/or the Agency with regard to its participation in the Project. While the third-party consultant will have access to all documentation and work product produced by Construction Manager, any communication and/or requests for same will be directed through Owner.

### 11.5   EQUAL OPPORTUNITY

11.5.1   Construction Manager shall provide an equal opportunity for employment, without discrimination as to race, religion, sex, national origin, color, or creed.

### 11.6   CONFIDENTIALITY

11.6.1   Construction Manager acknowledges that it is not authorized to make any public statements or issue press releases on Owner's behalf without Owner's prior written approval.

11.6.2   By virtue of Construction Manager's involvement with Owner, Construction Manager may acquire or become privy to certain information (the "Confidential Information") which Owner desires to maintain secret and confidential. Construction Manager shall not, without the prior written consent of Owner at any time during the Term or thereafter, use or disclose, directly or indirectly, any Confidential Information concerning Owner or its business activities. Confidential Information includes, but is not limited to, any real estate development or construction techniques or designs which have been or are being conducted by Owner or any of its affiliates. It shall not be a violation of this Agreement to use Confidential Information in connection with the performance by Construction Manager of its obligations under this Agreement or in order to comply with the requirements of a subpoena; provided, however, that Construction Manager shall notify Owner in writing within two (2) business days after service of any such subpoena and Owner shall have the right thereafter to seek a protective order preventing disclosure. Construction Manager acknowledges that the Confidential Information is a unique and valuable asset of Owner, that this restriction is both reasonable and necessary for the protection of Owner, and that any violation of this restriction shall be construed strictly against Construction Manager.

### 11.7   PARTIAL INVALIDITY; MODIFICATIONS; CONSTRUCTION

11.7.1   If any provision of this Agreement is held or rendered illegal or unenforceable, it shall be considered separate and severable from this Agreement and the remaining provisions of this Agreement shall remain in force and bind the parties as though the illegal or unenforceable provision had never been included in this Agreement. This Agreement may not be modified except by agreement in writing executed by the parties hereto. This Agreement and all Contract Documents have been fully reviewed and negotiated by each party and their counsel and shall not be more strictly construed against either party.

### 11.8   REFERENCES

11.8.1   The captions and paragraph headings of this Agreement are for the purpose of convenience of reference only, and in no way define, limit or describe the scope or intent of this Agreement or in any way affect

this Agreement. All references in this Agreement to the terms "herein", "hereunder" and words of similar import shall refer to this Agreement, as distinguished from the Article, Paragraph, or Subparagraph within which such term is located.

11.9    CORPORATE OBLIGATIONS

11.9.1  It is expressly understood that this Agreement and obligations issued hereunder are solely corporate obligations, and that, except for conversion, fraud, or willful misconduct, no personal liability will attach to, or is or shall be incurred by, the incorporators, stockholders, officers, directors, or employees, as such, of the Owner or Construction Manager, or of any successor corporation, or any of them, under or by reason of the obligations, covenants or agreements contained in this Agreement or implied therefrom; and, except for conversion, fraud, or willful misconduct, that any and all such personal liability, either at common law or in equity or by constitution or statute, of, and any and all such rights and claims against, every such incorporator, stockholder, officer, director, or employee, as such, or under or by reason of the obligations, covenants or agreements contained in this Agreement or implied therefrom are expressly waived and released as a condition of, and as a consideration for, the execution of this Agreement.

11.10    MODEL GUEST ROOMS

11.10.1 Owner intends to seek approval from the City and/or the Agency to construct up to six (6) model guest rooms of the Hotel within a trailer or other temporary building or structure, in a location in the general vicinity of the Project site, such as a nearby parking lot. If Owner obtains the necessary approvals to construct such model guest rooms, then Construction Manager shall cause the construction of such model guest rooms without any additional Fee or an increase in General Conditions. The Trade Costs associated with the construction of such model guest rooms will be established by Owner and Construction Manager pursuant to separate agreement.

11.11    DEVELOPMENT TEAM

11.11.1 Construction Manager acknowledges that Owner, at Owner's expense, has retained the services of Forest City Ratner Companies ("Forest City") and Codina Development Corporation ("Codina") as independent contractors to provide development services for the Project on behalf of Owner. Construction Manager shall perform its services hereunder in recognition of such engagements, and shall cooperate with Forest City and Codina in connection with the development and construction of the Project, it being understood and agreed that Owner shall be responsible for coordination of all development services.

11.12    FF&E

11.12.1 Attached hereto as Attachment "I" is a preliminary schedule setting forth by category the types of furnishings, fixtures, equipment, accessories, and materials for use in the operation of the Hotel, which are to be purchased by Owner as set forth herein (collectively, "FF&E") (and which schedule is hereinafter referred to as the "FF&E Schedule").

11.12.2 Owner shall provide to Construction Manager a projected delivery schedule for goods purchased based on production and delivery dates furnished by suppliers. Construction Manager shall incorporate and coordinate this schedule with the construction schedule under this Agreement and coordinate with Owner the placing of purchase orders within sufficient time to allow delivery in accordance with the projected construction schedule.

11.12.3 Owner shall be responsible to purchase the FF&E, and Construction Manager shall not be responsible for payment of any purchase orders and agreements for FF&E.

*Project Methodology and Construction Management Se*            Scope of Services
                                                               By  Phase

## Major Issues

- Assist owner during his interim pre-contract phase with the City of Miami Beach with scope definition and development management activities as identified in our enclosed 90 day look ahead schedule while limiting his expenses during this period.

- Develop a detailed permitting and agency approval process and schedule. Determine required level of information needed for each component including possible partial permitting required to respond to aggressive construction schedule.

- Assist owner with overall program/project management including recomendation and selection of most qualified consulting team.

- Develop a logical and effective phasing plan for both design and construction using the following building components:

  - Main building which contain 654 hotel rooms, extensive ballrooms and meeting space and five quality restaurants

  - The complete restoration of the St. Moritz and construction of a Lanai Wing for a combined total of an additional 176 rooms.

  - Three and a half acres of landscaping, including one of the largest hotel pools in Miami Beach

- Anticipation and coordination of document review and approval with proper government agencies.

- Develop and issue early on a *differentiation document* assigning responsibility for designing, detailing, costing, purchasing and installing the numerous items of construction materials, finishes, special systems, equipment and supplies.

- Work with owner and operator to develop a realistic schedule for turning over areas of the building in a manner responsive to the massive pre-opening, training and hiring effort.

The Scope of Work LMB will provide on the Loews Miami Beach Hotel has been the base of our business from its inception. As construction professionals, LMB acts as a proactive member of the project team and will serve as the owner's advocate.

We have included personnel with extensive experience in the hospitality market and unique qualifications for the complex and highly specialized task of managing the preconstruction, construction, furnishing and equipping of a world-class headquarters convention hotel and resort project of this magnitude.

## Preconstruction Phase

- Projects can be made or broken in the planning stage. In recognition of this, LMB has established the stand-alone Technical Services Group. Its members' sole responsibilities are to support the LMB project and design teams with extensive estimating, scheduling, logistics planning, value engineering services, and design review services. Years of experience have demonstrated that preplanning is the key to cost and time savings and to the solution of complex construction issues.

- Project Kick Off Workshop with all Team members

### *Milestone Planning*

- Establish Master Schedule for:

  - Owner decisions

  - Procurement

  - Trade/building operations coordination

  - Construction/testing

  - Planned overtime or shift work

  - Equipment deliverables

  - Start up and commissioning

- Establish logistics plan

- Establish equipment start-up plan

- Develop a differentiation document

### Budgeting

- Finalize total construction budget by trade
- Identify and minimize contingency values
- Establish cost control reporting procedures for field work in progress
- Cash flow projections
- Identify cost alternative scenarios
- Selection of materials and methods of installation

### Procurement

- Review contract documents to confirm completeness of drawings, specifications, work definition
- Recommend value engineering alternates as may be appropriate
- Prepare and recommend potential bidders
- Prepare scope and sequence of bid packages identifying specific Loews Miami Beach Hotel requirements
- Hold prebid conferences/site walk-throughs with prospective bidders
- Solicit, qualify, and review submitted bids
- Negotiate and recommend final bid awards with Loews Miami Beach Hotel Architect and Engineering Consulting Team.

### Coordination of Consultant, Contractor and Owner Activities

- Establish approvals/review process between all parties
- Establish regular project meetings and provide action meeting minutes
- Establish and maintain document distribution and control procedures
- Establish sequence of design comments for document coordination, including LMB review for coordination and constructibility
- Establish schedule and ongoing monitoring of permit applications, regulatory sign-offs, inspections and approvals.

- Coordinate the ordering, delivery and installation of FF&E items with owner's purchasing agent

### Scheduling

Our project team's first focus on the Loews Miami Beach Hotel Project will be to produce an overall project schedule incorporating realistic data as available from all parties, including designers, outside vendors, trades, operator, and technical facility requirements. This establishes the original schedule, and once agreed to by all parties, serves as the measuring point for the entire project process. The schedule lists all durations, highlights critical milestones and decisions, and illustrates requirements for Loews Miami Beach Hotel, the trade contractors and other participants. The project's progress is continually updated and tracked in comparison to the original schedule.

This project schedule will focus heavily on:

- Initial Value Engineering Effort Deadlines
  - ❏ Schedule/cost alternatives for mechanical and electrical installations
  - ❏ Schedule/cost alternatives for structure
  - ❏ Schedule/cost alternatives for core and exterior finishes
  - ❏ Schedule/cost alternatives for equipment items
- Coordinated Phasing Plan
  - ❏ Sequence of MEP coordination and installations
  - ❏ Early access areas for MEP deliveries and installations
  - ❏ Commissioning of MEP systems
- Owner Critical Decision Milestone Dates
- Design Document Delivery Dates
  - ❏ Specifications for long-lead procurement and coordination items
- Bid Procedures
- Owner Equipment and Outside Vendor Dates

### Estimating

The LMB team will refine pre-bid estimates based on the design documents at each phase, supplemented where required by defined assumptions mutually agreed to by

Loews Miami Beach Hotel and the design team. These estimates will include:

- A list of all cost items broken down by codes (per CSI or as required by Loews Miami Beach Hotel).

- A list of documents with issue dates.

- A list of qualifications, assumptions and allowances.

- A list of excluded work, if any.

This estimate will refine the first pre-bid quantity take-off, and will again be prepared by LMB's Technical Services Group in conjunction with the Project Managers. These same Project Managers play a "hands-on" role in developing the estimate that they will personally execute through the procurement and construction phases.

This hands-on involvement in the continuation of the estimating process benefits Loews Miami Beach Hotel in many ways:

- The estimate will more closely adhere to the design intent.

- The estimate is a realistic value which takes into account all of the known information about the project — not just what is indicated on the drawings and in the specifications.

- Information relative to the levels of quality, time frames when the various portions of the work are to be performed, equipment delivery dates, and working conditions and restraints are factored into the estimate.

- The estimate provides the target towards which the design and value engineering must aim.

- Inclusive of general conditions all estimates will be broken down into trade-specific categories with back-up consisting of:

  - Quantitative item estimates with the unit prices used for each.

  - Assumptions and qualifications for clarity and understanding.

  - Allowances are included in the estimate where the scope of work may not be determined.

  - Value engineering ideas and recommendations along with advantages and/or disadvantages of each item, and both cost and schedule impact.

- The level of detail contained in the estimates is sufficient to provide Loews Miami Beach Hotel with all information necessary to make firm, informed decisions within a predetermined time frame.

Accurate cost estimating depends on having experienced professionals who know the building business. Our professionals utilize various computer-based systems to assist in quickly and accurately performing their tasks.

Our basic estimating system is $MC^2$, an integrated database, which uses digitizing equipment and light pens to produce quick and accurate quantity take-offs. It stores definitions of systems components, such as size and quantity, for producing detailed estimates from conceptual data. The system has a unit price catalog for extending costs on detailed estimates. The system maintains an historical cost library for production of both conceptual and detailed estimates. In addition, it has the capability of generating a variety of reports, such as variance reports between budget updates. Furthermore, data contained within $MC^2$ can be transferred into spreadsheet or database programs for customized reports.

LMB uses LOTUS 1-2-3 spreadsheet programs to permit the allocation of budgets to multiple funding sources. This gives us the ability to track and allocate costs in any number of ways. The spread sheet functions, pre-defined templates, and macros assist in the analysis of cash-flow, manpower and work-in-place forecasting. It is an extremely flexible approach which maintains the integrity of project data while permitting "what-if" analysis.

This provides Loews Miami Beach Hotel with accurate estimates within flexible formats.

### Value Engineering

Our group includes professionals in the mechanical, electrical, communication, structural and architectural disciplines as well as cost estimators, scheduling professionals and logistics planners. These professionals work as an integral part of LMB project teams.

Backed by sophisticated and proprietary computer capabilities, they provide such services:

- Detailed analysis of the project's programming requirements, including existing building conditions, trade schedules and target budget;

*Lehrer McGovern Bovis*

2-3

- Estimates – comprehensive quantity takeoffs including cost items by trade, issue dates and alternatives which provide a basis for cost control throughout all phases of the project; and

- Value engineering – an extensive evaluation of construction alternatives to identify possible project enhancements as well as possible cost reductions.

LMB is strongly aware of the important role our project team plays in providing service and information to our clients. Our Technical Services Group is armed with the most up-to-the-minute information on trade costs achieving the required or enhanced function at a reduced cost as well as the most recent technologies in the construction industry. LMB has consistently incorporated value engineering into all of its respective projects. We have researched and developed specific tools and procedures and provided value engineering and value planning as a stand-alone consultancy service. We have saved our clients many millions of dollars over the years through this value engineering expertise.

Successful value engineering must be a team exercise with participation from Loews Miami Beach Hotel, LMB, the designers and engineers. When properly conducted it leads to a stronger team commitment to project objectives.

The value engineering process examines and quantifies the areas where significant contributions can be made to reduce cost, speed construction, and enhance a project's value. LMB does not view value engineering as a process to eliminate scope, but rather as an opportunity to develop innovative approaches to achieve the design intent. Value engineering is successful because of the abilities, experience and expertise which our Technical Services support staff brings to the process, throughout the preconstruction phase. Our knowledge of the marketplace and sensitivity to our client's needs and wishes are taken into account when developing value engineering ideas.

The Loews Miami Beach Hotel Project's major components and alternate schemes will be analyzed and evaluated with an eye toward the following:

- What are the lifecycle costs of the scheme?

- How will it affect the overall budget and design/construction schedule?

- Are there possible modifications to the proposed component?

- What are the advantages and disadvantages with respect to design, cost, practicality, construction and maintenance?

- Are these solutions durable yet aesthetically pleasing?

- What are the alternatives that can be analyzed for each of the many components of the project?

- What is the availability of reliable, qualified, local and competitive Contractors/ Manufacturers/Suppliers?

- What will the effects be on regulatory authorities, union jurisdiction and practices, tolerance and installation?

- What are the impacts on other trades, budgets and the sequencing of work?

- Are the components or systems to be pre-purchased or secured through a bid package?

As required, detailed reports and recommendations will be produced, so that Loews Miami Beach Hotel can consider the implications of all options and make informed decisions. Providing concise documentation is another way LMB can bring continuity to the Loews Miami Beach Hotel Project.

Below are observations specific to the Loews Miami Beach Hotel Project:

### Construction Market Analysis

During Value Engineering and Planning we analyze construction market factors that could impact the construction. We consider:

- The impact and leverage of major project in a construction marketplace such as Miami Beach

- Current availability of local labor force and/or use of out of town contractors

- Availability of specialty trades

- Optimal breakdown of the project into trades

- Management and financial capability, bondability, quality, and workload of potential bidders

- Constructibility of details and materials

- Compliance with design intent

### Cost Control

LMB's proven cost control system is based on a software package known as CMIS, short for Construction Management Information System. This system has been in place for 8 years. It is capable of producing an infinite variety of reports tailored to Loews Miami Beach Hotel needs. A representative list of functions CMIS performs is as follows:

- Maintains original budget by trade, facility, cost center or any other variable

- Allows for establishment of a standardized code of accounts specifically designed to meet the project's requirements

- Produces instructions for transmittal, and logs a commitment for each issuance of contract drawings and specifications

- Produces contract change orders

- Tracks scope changes by trade, facility, cost center or any other variable

- Produces requisition worksheets

- Produces payment requisitions

- Produces electronic data files in flexible formats

- Produces AIA application for payment

- Produces flexible, free-formatted, customized reports from data contained in a relational database

CMIS also produces a variety of action logs for items such as:

- Status of contractor bid requiring formal approval

- Status of written contracts awaiting approvals

- Status of pending and approved changes

- Status of pending or potential claims (for items of work or changes that are in contention)

- Status of instructions, requests for information or directives awaiting approval or actions

Similar to our estimating system, CMIS data can be transferred to spreadsheet or database programs for analysis and reporting.

Spreadsheet functions will assist Loews Miami Beach Hotel in the analysis of cash-flow and work-in-place forecasting, as well as the analysis of manpower requirements and forecasting. In addition, templates and macros have been developed by LMB on similar project management assignments to produce earned-value analysis charts and graphs.

### Procurement Management

During the design phase we will develop a contracting and purchasing strategy for the work. This strategy will take into account factors such as:

- The appropriate breakdown of the work into bid packages

- The workload of local contractors in the general marketplace

- The opportunities available for bulk purchases

- Long-lead delivery of equipment, systems and materials.

- The production sequence of biddable design

- Building access constraints, local union requirements, local agency requirements, utility requirements and permitting needs

- The turn-over sequence which best corresponds with Loews Miami Beach Hotel equipment schedule

We will initially focus on bid packages for site/civil, structural steel and MEP trades requiring extensive long lead coordination early in the construction document development process.

Simultaneously with the design phase, LMB will provide and develop with Loews Miami Beach Hotel and the design team recommended bidders for concrete HVAC, electrical, vertical transportation and finish trades.

LMB currently has one of the largest ongoing backlogs of work of any construction management firm. We will bring that buying power to the procurement negotiations for Loews Miami Beach Hotel.

Particular attention is paid to prequalification of bidders based on their ability to adequately man the project, previous track record, and, importantly, financial stability. The buying process addresses the project schedule, and successful contractors are contractually obligated to perform on schedule. The process includes negotiations and arrange-

scope compliance, knowledge of the job, and obtain the contractor's commitment to staff the project adequately, and to complete the project on time.

After recommended trade contractors have been identified for each bid package, we will review contractor bids with Loews Miami Beach Hotel, including:

■ Preparation of a final comparison sheet listing each trade contractor's base price, alternate price, and unit prices, showing the original and final negotiated prices.

■ Recommendation of a preliminary trade contract containing the contract form, general conditions, special conditions, list of drawings and specifications, comprehensive scope of work, and lists of unit and alternate prices. We then submit the applicable portions of these

During the _____ _____ phase of the project, Lehrer McGovern Bovis will provide management, administrative and related services to properly supervise, monitor and most importantly, coordinate the work of all subcontractors. We will establish basic work rules and then carefully monitor adherence to these rules. This helps maintain safety, security, an orderly flow of work and project site discipline.

The Project Manager(s) and Superintendents assigned for the duration of the project will be on-site and dedicated 100% to the Loews Miami Beach Hotel project. They will be directly responsible for the following:

■ Coordinate contract work

■ Monitor progress and the work of on-site contractors on a day-to-day basis

**Lehrer McGovern Bovis**

- Monitor contractor records regarding labor performed, weather conditions, progress, project

- Maintain schedule progress checks, advising solutions to potential delays, or intervening to correct delays

- Prepare and review with Loews Hotel Inc. Monthly Project Progress Reports

### Scheduling

- Coordination with ongoing building operations and building management

- Monitor project progress on trade-by-trade basis

- Recommend and implement corrective schedule actions as may be required

- Coordinate and schedule Owner FF&E items

### Cost Control

- Maintain field reports of actual work computed and monitor progress against original projections

- Review for action any trade requests for change orders. Negotiate final cost and schedule change orders with each trade, and process through Loews Miami Beach Hotel's change order system

- Review for action monthly trade contractor payment requests

- Supervise and monitor all general conditions expenses

- Finalize all claims from trade contractors

- Adjust and approve for recommendation monthly trade requisitions. Coordinate such requisitions through Loews Miami Beach Hotel's approval process

- Obtain and track partial release of lien, insurance certificates, and all other documentation required for monthly requisition processing

- Maintain accurate and complete records of all accounts payable/receivable; review such records on regular basis with Owner

### Time Management

LMB's approach to successfully managing a project includes detailed and comprehensive scheduling techniques. The organization of the project's components into a Work Breakdown Structure (WBS) format sets the framework for planning, monitoring and reporting. The planning tool is a network analysis system. The software tool is the Critical Path Method (CPM) program. "Primavera/Primavision" and "SureTRAC" all products of Primavera Software, Inc.

Primavera is probably the most dominant scheduling product in the industry and is commonly used on PC system and therefore provides a common method of reporting by all project participants.

The integration of scheduling data with other applications software is facilitated because the system can be downloaded into our estimating system, MC2 and our cost control system, CMIS.

Complete estimates developed in MC2 can be loaded into Primavera to automatically establish task lists with activity descriptions, durations and resource (labor and material) requirements. In addition, LOTUS 1-2-3 can be used for data entry into Primavera. This allows LMB to have nontechnical staff provide support to managers, a cost-and time-saving feature.

With early development of the WBS, a correlation is established between cost and schedule information. This correlation permits costs and resources to be analyzed either within the Primavera program, the CMIS program or within LOTUS 1-2-3. This greatly enhances our ability to analyze manpower requirements and produce forecasts of work-in-place activity.

The scheduling system is used to develop detailed network logic diagrams based upon the detailed design documents. A systematic approach, similar to the quality take-off process, is employed to ensure that the network logic reflects not only what is shown on the plans but also what is called for in the specifications.

Prior to contracting for any of the construction work, the system allows for analysis of the required performance of each work package and, if necessary, within each sub-component contained in the work package. The established milestone events, interface points and performance time-frames are utilized in the preparation of scope packages and incorporated into contracts as performance criteria, as appropriate.

### *Coordination of Consultant, Contractor and Owner Activities*

- Coordinate and review all shop drawing/submissions from trade contractors

- Provide full time, on-site supervision

- Maintain document distribution and control procedures

- Monitor regulatory agency review and approval process

- Obtain regulatory agency inspections and sign-offs

- Conduct and document weekly project meetings

- Provide weekly status reports

- Assist in preparation of client's move-in program

### *Project Close-Out*

- Assemble and provide all project records (as builts, maintenance and operation manuals, warranties, handbooks, etc.)

- Assist in establishing operations and maintenance procedures

- Schedule and coordinate training by vendors/contractors as required

- Assist Architect/Engineer in preparation of punchlist items

- Schedule and expedite punchlist completion, in coordination with ongoing operations

- Recommend final payments

- Assemble final lien releases from all trades

### *Quality Management Plan*

Quality is often defined as achieving "conformance with requirements." In keeping with that definition, LMB believes that the only way to assure that the Loews Miami Beach Hotel will meet quality criteria is through the commitment of senior management and the accurate definition of quality requirements during preconstruction. The LMB team will run the Project following Peter M. Lehrer's philosophy: *"Do it right the first time."*

For the Loews Miami Beach Hotel Project, quality control procedures will be established by the entire project team. Our field staff will have the primary responsibility for implementing and coordinating quality control procedures so that the Project's specifications are met.

A Quality Management Manual will be prepared to describe the detailed quality requirements for each significant element of the Loews Miami Beach Hotel, and the specific inspection and acceptance procedures to be employed in achieving quality results.

Based on the defined requirements, LMB works with the project team to ensure the design documentation being prepared fully conveys the quality criteria, and establishes meaningful testing procedures with defined acceptance or rejection parameters.

Through the procurement phase, LMB strives to clearly convey quality requirements to prequalify subcontractor firms, using a procurement strategy developed to take best advantage of local market capabilities and provide the greatest control over the performance of the work.



During the construction phase, quality control will be integrated into every facet of the Loews Miami Beach Hotel and will include:

■ Maintaining a full-time professional supervisory staff at the jobsite for coordination and control of the work.

■ Preparing a Quality Control Plan (QCP) that identifies all quantitative performance requirements by specification section.

■ Project Superintendents review the scope of work, details and required quality with each trade prior to actual start of work.

■ LMB's supervisory staff reviews the completed work for quality with each trade contractor independent of the design team. All deficiencies will be corrected prior to the architect's and engineer's punchlists. We document and track this effort with our Quality Control Log data base.

■ LMB develops and implements an off site mock-up program to establish the requirements for final quality, thereby resolving potential problems before the work is installed.

■ LMB prepares a fully coordinated construction schedule with each trade and highlights the areas that affect quality control. The schedule is closely monitored and revised as needed throughout the project. The client is alerted to any conditions causing substantial changes in the schedule that affect quality control.

■ LMB coordinates regularly scheduled job meetings to discuss progress, quality of work, procedures and potential problems.

■ LMB arranges for and coordinates all testing provided by others and maintains records of all tests, inspections conducted, findings, and test reports. The client is advised of each condition. -

■ LMB controls the submission of all shop drawings, coordination drawings, brochures and material samples.

■ LMB discusses all drawing and specification interpretations with the architect and/ or engineer, and transmits the information to the appropriate contractors in writing.

■ LMB coordinates preparation of punchlists, expedites their completion and prepares certificates of completion, all within previously established quality standards.

■ LMB will assemble guarantees and warranties as required by the contract documents and coordinate the preparation of operating manuals, "as-built" drawings and similar instructions by the contractors.

The most important ingredient in all quality programs, I'm sure you will agree, is the people. With seasoned veterans like Carlos Pesant and Colin Parkes the demands of quality are self-imposed. There is only one way to perform a task.

## Site Safety Plan

Our philosophy and policy regarding safety and health in the workplace is a clear concept. We are dedicated to maintaining the safest work environment possible for all employees.

We also strive to assure that each Contractor or Subcontractor on our projects adopt a similar policy for their employees. We consider the safety and health of employees, the client's staff and tenants, the consultants, and the public an equal consideration with other concerns such as finance, marketing, personnel, and commercial matters.

The major components of our Corporate Safety Program will be modified to meet the specific requirements of the Loews Miami Beach Hotel Project after extensive review of the plans and specifications. The Loews Miami Beach Hotel Safety Program that is developed will provide direction to each contractor that will result in a safe and cost-effective completion of the project.

## Program Objectives

The objective of our Corporate Safety Program is to establish and maintain a safe working environment for LMB, all contractor employees, and visitors or members of the public who may have access to the project work site.

## Responsibilities

The responsibilities of all levels of management, site contractors, our insurance carrier, and the owner are detailed in this section.

## Training

The components include new employee orientation, weekly contractor safety meetings, weekly employee safety meet-

ings and supervisor safety training. All training sessions at the contractor and supervisor level are conducted by our Corporate Director of Safety or our Regional Safety Manager. Training sessions at the employee level are conducted by the employee's immediate supervisor.

## Protection of the Public

Requirements are mandated that will provide safe access for members of the public who may travel on the exterior of the project.

## Site Security

The components of the site security plan include coordination with the local police precinct, fire department and ambulance facilities; lighting and fencing; security service; and contractor identification badges, if required by the owner.

## Site Hazard Reduction Guidelines

This area of the program addresses requirements requiring contractor compliance in the following areas: personal protective equipment, housekeeping, sanitation, excavations and trenches, confined spaces, ladders, scaffolds and work platforms, guarding openings, concrete construction, mechanized equipment, cranes and rigging, steel erection, welding and burning, temporary electrical systems, explosives and blasting, non-ionizing radiation, signage and uncovering hazardous substances.

For each of the items listed above an Activity Hazard Analysis will be conducted by the Corporate Safety Department for each major phase of work; such as steel erection, concrete placement, roofing, mechanical systems, and facade placement. This analysis will result in the development of project specific requirements that will be provided to the contractors who are performing those phases of work.



## Emergency Procedures

This section provides details of our response in the event of a serious incident or injury, emergency telephone numbers, fire prevention plan, severe weather conditions, and public relations.

## Hazard Communication Program

LMB has established a comprehensive Hazard Communication program. The implementation of this program is a federal requirement which will ensure that all site employees are informed of their exposure to hazardous substances while they are working on our project. The government considers hazardous materials to be common construction items that include gasoline, kerosene, oxygen, acetylene, motor oil, and concrete.

## Documentation, Reporting & Record Keeping

This portion of the program provides instructions to project management to ensure that accurate record keeping is maintained throughout the course of the project. Documentation includes safety meeting minutes, training records, accident reports, first aid cases, OSHA record keeping, and contractor evaluation.

*Lehrer McGovern Bovis*

## 100% Fall Protection

In an effort to maximize the safety of workers on the Loews Miami Beach Hotel Project, LMB will require contractors to implement a 100% fall protection program. This program mandates that contractors provide a means of fall protection (e.g. full body harness and motion suppression system) for those employees who are exposed to a fall greater than 10 feet, if those employees are not protected by such standard methods as guardrails. Any employee found in violation of these rules will be removed from the job site. LMB will require strict contractor conformance to safety standards and policies. Noncompliance will result in actions that could include withholding of requisition payments or termination of an employee. The Site Safety Manager will inspect for maintenance of the vertical and horizontal netting systems, and guardrails.

## Alcohol/Substance Abuse

LMB adheres to a strict policy concerning the possession or use of alcohol or controlled substances on construction sites: Under no circumstances will alcoholic beverages or controlled substances be permitted on the job site. Anyone found in violation of this policy will be removed from the site. Violation of this policy may also result in immediate dismissal. The use of narcotics, unless authorized by a licensed physician, is prohibited.

## Contractors' Responsibilities

Each contractor will instruct each employee in the recognition and avoidance of unsafe conditions to control or eliminate any hazards or other exposure to illness or injury. The employer will require all employees to wear appropriate personal protective equipment in all operations where there is an exposure to a hazard and will initiate and maintain such programs to comply with OSHA's general conditions. During construction, alteration, or repairs form and scrap lumber with protruding nails as well as other debris will be kept clear from work areas, passageways, and stairs in and around the construction site. Our accident prevention programs provide for frequent and regular inspection of the job site, materials and equipment accompanied by the contractors'; safety representative for the immediate correction of any unsafe conditions.

In an effort to monitor the effectiveness of the Project's Regular Safety Program, LMB's project management team will review the site for safety concerns on a daily basis. Our Corporate Safety Department will periodically audit the project to assist the project management team and provide appropriate safety training.

### RIDER - ATTACHMENT "C"

LIST OF ADDITIVE ALTERNATIVES

Within 30 days of the Effective Date of this Agreement, Construction Manager will submit costs for each of the items contained herein.

The attached list is not intended to prioritize any scope.

RIDER ATTACHMENT "C"

*(handwritten: per Exec - LMB two ...)*

September 20, 1996

Amendment - EXHIBIT "E"

List and Description of Add Alternates

(Construction Manager to re-submit this Exhibit within 30 days with fixed total costs for each item.)

| # | Item | Location | Total Costs | Description |
|---|------|----------|-------------|-------------|
| 1 | Crown Moldings | Both Buildings/ Guest Corridors | | As per Detail 33, dated June 24, 1996, as per Hirsch Bedner. |
| 2 | Base Boards | Both Buildings/ Guest Corridors | | As per Detail 7, dated June 24, 1996, as per Hirsch Bedner. |
| 3 | Custom Profile Entry Door Frames | Both Buildings/ Guest Rooms | | As per Detail 8, dated June 24,1996, as per Hirsch Bedner. |
| 4 | Crown Moldings and Valence | Both Buildings/ Guest Rooms | | As per Detail 10, dated June 24, 1996, as per Hirsch Bedner. |
| 7 | Exterior Pre-Cast (Base) | New Building | | As per Reference Drawings: A 9.0 through A 9.6, dated July 24, 1996 and prepared by Nichols Brosch. |
| 8 | Exterior Pre-Cast (Decorative Friezes) | New Building | | In lieu of the stucco decorative friezes, as shown on Reference Drawings A 8.0, A 8.1, A 8.2, and A 8.3. ( noted as item 23 on the elevations), dated July 24, 1996 and prepared by Nichols Brosch. |
| 9 | Screening Room Build Out | New Building | | Includes all finishes, drywall, any secondary concrete pours, construction of stage and all sealing. Excludes all mechanical services and provisions to perimeter of space; and fire sprinkler /life safety system within space required for code and Certificate of Occupancy, with same included in GMP Trade Costs. |
| 10 | Cooling Tower- Decorative Screen | New Building | | As per Reference Drawings A 9.3, A 9.0, and A 4.20, dated July 24, 1996  as prepared by Nichols Brosch. Assumes cooling tower locations as per Drawings and Specifications. |
| 11 | Exterior Keystone Treads and Risers | New Building and Site | | Limited to those steps from Collins Avenue to retail terrace, from arrival court to Palm Court, from Palm Court up to main entrance of St. Moritz, at Grand Walkway between fountains, from Grand Ballroom Terrace to Great Lawn, from upper to lower sun decks, at walkway from Collins Ave. to convention drop-off, and from loggia to central walkway. As per Drawings A 10.9 and A10.11 (dated July 24, 1996) by Nichols Brosch and Drawings L1 through L6, and L/13 and L14 (dated July 24, 1996) by Bradshaw Gill. |
| 12 | Loggia Tile | New Building/ Second Level Terrace | | As per drawing A 4.11 (dated July 24, 1996) by Nichols Brosch to be finished with 24" x24" x1" cast coral pavers on a 1 1/2" setting bed in lieu of sealed concrete.  This shall require the slab to be depressed an extra 2 1/2" to accommodate the pavers. |

September 20, 1996

Amendment - EXHIBIT "E"

List and Description of Add Alternates

(Construction Manager to re-submit this Exhibit within 30 days with fixed total costs for each item )

| # | Item | Location | Total Costs | Description |
|---|------|----------|-------------|-------------|
| 13 | Sunburst Windows | Rotunda/Loggia | | Assumes 1/4" tempered glass and aluminum with a Kynar finish to match the other windows. Pattern as shown on Drawings A 8.0, A 8.1, A 8.2, A 8.3, A 9.0, A 9.1, A 9.3, and A 9.5 (dated July 24, 1996) by Nichols Brosch. These are in lieu of windows as shown on Drawings A 8.0, A 8.1, A 8.2, A 8.3, A 9.0, A 9.1, A 9.3, and A 9.5. |
| 14 | Spray-on Finish on Ceilings | New Building/ Guest Rooms | | In lieu of skim coat finish, as per Drawing A16.1 and specifications Section 03300 and 09900 (dated July 24, 1996) by Nichols Brosch |
| 15 | Elevator Wall Fountain | New Building/ Second Floor Atrium | | To be South wall of the passage elevator structure add a Floor/wall fountain, complete with pumps and piping, as shown on Drawings AR AS-1, FF12.2, EM 12.3, and detail 54 in the Material Reference and Details Manual (dated May 10, 1996) by Hirsch Bedner, Drawings F1 and F3 (dated July 24, 1994) by Hall Fountains and Detail 54, (dated June 24, 1996) by Hirsch Bedner |
| 16 | Ceramic Tile (in lieu of Quarry) | New Building/ Presidential Suite | | As per Drawings A 4.16 and A 4.17 (dated July 24, 1996) by Nichols Brosch, provide a non-skid 12" x 12" ceramic or quarry tile to be approved by Owner and Architect.  This is in lieu of scored concrete |
| 17 | Canopies | North Retail Building | | As per Drawings A 8.0, A 9.0 and Specifications Section 3/A10.3 (dated July 24, 1996) by Nichols Brosch. |
| 18 | Quarry Tile | Throughout/ Kitchen Areas | | Includes Main Kitchen, Banquet Pantries on Second and Third Floors; and St. Moritz Kitchen.  In lieu of epoxy floor and base.  Quarry tile shall be 6 x 6 x 5 1/16", non-skid, sealed with latex Portland cement grout. |
| 19 | Fans - Electrical | New Building/ Loggia | | Assumes fans with lights suspended on 14'-0" pendant rods.  Each pendant shall be held in place with 4 stainless steel tie back cables.  Fans shall be 52" wide, with 5 blades, all white, for exterior use, as manufactured by Hunter or approved equal.  These shall be in lieu of pendant lights as shown on Drawings A 8.0, A 8.1, A 8.2, A 8.3, A 9.0, A9.1, A9.3, and A 9.5 (dated July 24, 1996) by Nichols Brosch. |
| 20 | Third Jacuzzi | Site | | As per drawings L-1 (dated July 24, 1996) by Bradshaw Gill and A 1.3 (dated July 24, 1996) by Nichols Brosch Includes all required pumps, heater and piping (to the Jacuzzi). |
| 21 | Display Boxes | St. Moritz/ Lower Level Corridor | | For four (4) display boxes 5'-0" wide, 16" deep, and 8"-0" high. Includes considerations for internal illumination, assuming electrical to locations included in GMP Trade Costs |
| 22 | Hoistway Entrances | St. Moritz | | Replace excluding hoistway entrances in two elevators, in lieu of reusing the existing hoistway rails. Determination subject to on-site inspection by elevator subcontractor, Owner and Consultants. |

September 20, 1996

Amendment - EXHIBIT "E"

List and Description of Add Alternates

(Construction Manager to re-submit this Exhibit within 30 days with fixed total costs for each item.)

| # | Item | Location | Total Costs | Description |
|---|------|----------|-------------|-------------|
| 23 | Retail Building | Collins Avenue | | As per Drawings: A 3.0, A3.1, A 3.2, A 10.16, S 1-3, S 1-6, S 1-8, C-2, C-3, C-4 L-1, L-1a, L-4,  L-8, LP-1, LP-2, LP-3 (dated July 24, 1996) by Nichols Brosch. Includes shell construction only, with interior improvements excluded. |
| 24 | Beauty Salon - Finish Out | St. Moritz/ Lower Level | | Includes the drywall at the interior areas of enclosing walls, and all finishes, fixtures, lighting, A/C grilles, and other as shown on Drawings SMA 3.0  A/C-18, E-19, P-19 (dated July 24, 1996) by Nichols Brosch and Drawings AR 60.1, FF 60.2, EM 60.3, RC 60.4, FC 60.5 (dated July 24, 1996) by Hirsch Bedner. Excludes all mechanical services and provisions to the perimeter of space; and fire sprinkler/life safety systems within space required for code and Certificate of Occupancy, with same included in GMP Trade Costs. |
| 25 | Porte Cochere | New Building Exterior | | As per Drawings 1 through 3 identified as "Alternative #20" (dated July 24, 1996) by Nichols Brosch. Assume required pilings, footings, and conduit for electrical to Porte Cochere, included in GMP Trade Costs. |
| 26 | Laundry Equipment (FF&E)     (*) | New Building Laundry Room | | N/A |
| 27 | Screening Room (FF&E)     (*) | New Building Second Level | | N/A |

NOTE: FF&E Additions are non-Trade Costs related, excluded from LMB Scope.

(*)

September 2, .96

RIDER—ATTACHMENT "C"

List and Description of Allowances Items

| # | Item | Location | Amount | Description |
|---|------|----------|--------|-------------|
| 1 | Hardware | Throughout Project | $ 750,000 | For scope generally as per drawings A17.0, A17.1, A17.2, ASM 10.0 and hardware schedule (dated August 13, 1996) as prepared by Nichols, Brosch and Sandoval. |
| 2 | Toilet Accessories | Throughout Project | 300,000 | Consists of towel bars, shower rods, paper holders, soap holders, grab bars (ADA Compliant) all other items identified as PF.35 - PF.58 and as per Drawing S-1 (dated July 24, 1996) and prepared by Hirsh Bedner. It includes material and labor, with required backing within walls assumed in GMP Trade Costs. Also, includes Back-of-House scope as per Drawings A.5.8, A.5.9, and A.6.0 (dated July 24, 1996) as prepared by Nichols Brosch & Sandoval. |
| 3 | Decorative Ornamental Railing | New Building/ Grand Staircase, Atrium, and 3rd Floor | 250,000 | For approximately 300 ft of rail related to grand staircase and atrium, and approximately 200 ft of rail around opening between 2nd and 3rd floor meeting room levels and escalator areas. For scope generally as per Drawings AR 10.1, AR 12.1, AR 14.1, AR 15.1, EL 10.10, EL 10.11, EL 10.13, and EL 15.10 (dated July 24, 1996) as prepared by Hirsh Bedner. (Includes installation. Excludes any consideration for lighting of railing, which is included in the GMP Trade Costs.) |
| 4 | De-Watering | New Building | 25,000 | Incidental for elevator core and piling caps, as required |
| 5 | Structural Remediation | St. Moritz | 100,000 | For concrete repair to columns, beams, walls, joists and slabs (exclusive of engineering and laboratory testing), window openings, including scope related to still replacement, structural elements now hidden by plaster or other; roof, shoring of existing walls and other. ( Repair scope to be approved by Structural Engineer and Architect, prior to implementation ) |
| 6 | Elevator Cab Interiors | St. Moritz/New Building | 180,000 | Assume $20,000 each for nine (9) passenger elevators   Trade Costs include finish package for freight elevators. |
| 7 | Chandelier Installation | New Building/ Ballroom and Pre-Assembly Areas | 25,000 | N/A |
| 8 | Floor Mosaics | New Building/ All locations | 50,000 | Floor mosaics material and labor in any location, as per Material Reference Manual (dated June 24, 1996) by Hirsch Bedner. In lieu of field tile or floor material. |
| 9 | Cupolla Mast | Main Building | 100,000 | For re-designed aluminum portion of cupolla, as per drawing A.10.6 (dated July 24, 1996) and prepared by Nichols Brosch Sandoval Limited to portion of cupola from elevation 247'-4" to top of Mast. |

1 of 3

RIDER-ATTACHMENT "C"

## List and Description of Allowances Items

| Item | Location | Amount | Description |
|---|---|---|---|
| 10 Decorative Entry Gates | St. Moritz/Restaurant and Bar | 22,000 | As per drawing details 70, 71, and 72 (dated July 24, 1996) by Hirsch Bedner. Includes both panels. |
| 11 Secondary Railing | St. Moritz/Lobby | 20,000 | Assume code requirement to install independent glass & stainless steel rail parallel to existing rail for stair connecting lobby to lower level (includes installation) |
| 12 Glass Block Wall | St. Moritz/Lower Corridor | 2,000 | For westerly end of corridor, to match existing |
| 13 Stone Wainscoting/Restore Marble Base | St. Moritz/Lower Corridor | 15,000 | For approximately 300 ft of 30" height cast stone with cap.  Existing marble base to be restored. |
| 14 Lighting Screen | St. Moritz/Children's Camp Foyer | 2,000 | Restore existing ceiling coffer & lighting detail as per as-built survey and subject to approval by City Historic Preservation officer. |
| 15 Restaurant/Bar Wainscoting | St. Moritz | 10,000 | For approximately 265 ft of approximately 18" high paint grade panels with applied moldings.  As per existing survey drawing SMA 3.1, Elevations/Sections A-SMA 7.2, C-SMA 7.3, D-SMA 7.3, and ASMA 7.4 (dated June 28, 1996) by Zyscovich, Inc. |
| 16 Faux Painting | New Building/Lower 3 Levels | 100,000 | Includes coffers, trim, and miscellaneous details in public areas. As per Drawings RC 10.4, RC 11.4, RC 12.4, RC 13.4, RC 14.4, RC 15.4, A/EL 10.10, F, O/EL 10.11, D/EL 10.12, D/EL 12.10, A, B, C/EL 15.10, A/EL 15.11, RC 61.4, M, N/ELL 61.14, O/EL 61.11, Q, R/EL 61.10, and S, T/EL 61.17 (dated July 24, 1996) by Hirsch Bedner. (PT numbers are listed in the Drawings specified above.) |
| 17 Underground Obstructions | Throughout Project | 10,000 | Includes removal of existing piling and/or foundations as per exploratory excavation. |
| 18 Decorative Frame | Main Bldg./Display Kitchen | 17,000 | Generally, as per Drawing A/EL 10.12, dated June 24, 1996 and as prepared by Hirsch Bedner. |
| 19 Architectural Columns | Presidential/ Hospitality Suites | 15,000 | Assumes cast stone or GFRG faux columns   Generally as per Drawings AR 43.1, AR 46.1, AR 47.1, AR 50.1, AR 51.1 (dated July 24, 1996) by Hirsh Bedner. |
| 20 Light Fixtures/Dimming Systems | Throughout Project | 1,420,000 | Includes front-of-house fixtures and dimming systems (valued at $1.120 million) as per Drawings L.1A through LC.5 (29 sheets) (dated September 15, 1996) prepared by PHA Lighting. Includes back-of-house fixtures (valued at $300,000) as per Drawing E.92 (dated September 9, 1996) prepared by Steven Feller Inc. (Includes only materials, with all labor for installation of fixtures and dimming included in Trade Costs.) Includes consideration for custom exterior light fixtures, attached to both buildings (types "EP", "ER", "EE", "ES", "ET", "EG", "EV", "EW"), and yet to be designed. Owner reserves the right to directly purchase all or some of the Allowance from Third Party and direct assign to Construction Manager (Handling expense to be negotiated.) |

September ;                    6

RIDER–ATTACHMENT "C"

**List and Description of Allowances Items**

| # | Item | Location | Amount | Description |
|---|------|----------|--------|-------------|
| 21 | Lightning Preventor | New Building | 30,000 | Scope generally as per Drawings E 93 and E 94 (dated August 9, 1996) and Specifications Section 16601. |
| 22 | Cabanas | Exterior (North and South Groups) | 50,000 | For scope generally as per Drawings A 13.1 and A 1.2 (dated July 24, 1996) by Nichols Brosch. Assumes that electrical for light is included in Trade Costs, not in the Allowance. |
| 23 | Pool and Fountains | Site | 85,000 | For pool boilers and heat exchangers (valued at $10,000); plumbing connections for the tanks and spa collectors (valued at $10,000); pool, spa, and fountain starters (valued in total at $5,000) and handling and installation of equipment for fountains (valued at $50,000). As to the latter, such is based on pool equipment being purchased by third party other than the installer. |
|  | Total |  | $ 3,578,000 |  |

9 20 96

## RIDER - ATTACHMENT "D"

## DETAIL BUDGET - GENERAL CONDITIONS

## ( SEE DETAILED BUDGET - ATTACHMENT 'D-1" )

SALARIES AND BENEFITS (1)

| | | | |
|---|---|---|---|
| MANAGEMENT PERSONNEL | $ 1,966,236 | | |
| WORKMAN'S COMPENSATION | 61,815 | | |
| | | $ 2,028,050 | |
| SITE PERSONNEL (2) | 594,710 | | |
| WORKMAN'S COMPENSATION | 45,079 | | |
| | | 639,789 | |
| SITE OFFICE / OVERHEAD (3) | 629,950 | | |
| | | 629,950 | |
| INSURANCE (4) | 362,240 | | |
| | | 362,240 | |
| SUBTOTAL | | | 3,660,029 |
| PRE-CLOSING EXPENSES (5) | | | |
| OFF-SITE OFFICE  / OVERHEAD | | 60,000 | |
| SALARIES & BENEFITS | | 280,000 | |
| SUBTOTAL | | | 340,000 |
| **TOTAL** | | | $ 4,000,029 |

NOTES:

(1) Includes all fringes and benefits; personnel relocation; and, staff vehicles ( or allowances ).

(2) Includes cost of security.

(3) Assume cost of hoist ( including operators ),portable toilets , perimeter fence, site rubbish removal, scaffolding, temporary fire protection, interim elevator maintenance, protection of work in place and site safety compliance included in Trade Costs within GMP.

Assumes cost of temporary HVAC within building for three months as of start of installation of millwork and other scope requiring controlled environment with balance of HVAC cost assumed by Owner.

Assumes City of Miami Beach Building Permit; and Dade County / City of Miami Beach Impact Fees assumed by Owner, with Construction Manager assuming all costs related to trade permits and temporary utilities ( for on-site office and construction ).

(4) Assumes full consideration as to requirements of Agreement.

(5) Includes costs as per interim Agreement executed as of April 1, 1996. ( If final costs exceed that amount herein, difference  will be credited against General Conditions Budget, with the Budget to be revised to reflect same. Upon approval of revised Budget by Owner, same will supercede that contained herein ).

MAN POWER LOADING CHART

INPUT (THE TOTAL NUMBER OF HOURS TO BE BILLED)

| DATE / DURATION | Aug 96 MO1 | Sep 96 MO2 | Oct 96 MO3 | Nov 96 MO4 | Dec 96 MO5 | Jan 97 MO6 | Feb 97 MO7 | Mar 97 MO8 | Apr 97 MO9 | May 97 MO10 | Jun 97 MO11 | Jul 97 MO12 | Aug 97 MO13 | Sep 97 MO14 | Oct 97 MO15 | Nov 97 MO16 | Dec 97 MO17 | Jan 98 MO18 | Feb 98 MO19 | Mar 98 MO20 | Apr 98 MO21 | May 98 MO22 | Jun 98 MO23 | Jul 98 MO24 | Aug 98 MO25 | Sep 98 MO26 | MO27 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PROJ. AMOUNT | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| PROJECT EXECUTIVE (ESMIN/HARIARI) | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| PM INTERCROSSIFFEE | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| SR PROJECT MANAGER (LECKENSTEI) | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| PROJECT MANAGER (M. COE) | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| PROJECT MANAGER MEP (TBO) | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ASSISTANT PM 1 (TBO) | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ASSISTANT PM 2 (TBO) | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| SECRETARY (D. CLARIELL) | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| SCHEDULE/ESTIMATE (TBO) | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| SUPERINTENDENT (N / A) | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ASSISTANT SUPER (MECH) (TBO) | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ASSISTANT SUPER (CS) (TBO) | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ASSISTANT SUPER (LR) (TBO) | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ASSISTANT SUPER (HR) (TBO) | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| DOCUMENT CONTROL (TBO) | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| PROJECT ACCOUNTANT (TBO) | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| DATE / DURATION | Aug 96 MO1 | Sep 96 MO2 | Oct 96 MO3 | Nov 96 MO4 | Dec 96 MO5 | Jan 97 MO6 | Feb 97 MO7 | Mar 97 MO8 | Apr 97 MO9 | May 97 MO10 | Jun 97 MO11 | Jul 97 MO12 | Aug 97 MO13 | Sep 97 MO14 | Oct 97 MO15 | Nov 97 MO16 | Dec 97 MO17 | Jan 98 MO18 | Feb 98 MO19 | Mar 98 MO20 | Apr 98 MO21 | May 98 MO22 | Jun 98 MO23 | Jul 98 MO24 | Aug 98 MO25 | Sep 98 MO26 | MO27 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LABOR PERS | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| LABORER (REG +RS) | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| LABORER (OT) | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| LABORER (REG) | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| UPPER ENG (REG) | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| UPPER ENG (OT) | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| SECURITY/GUARD | | | | | | | | | | | | | | | | | | | | | | | | | | | |

RIDER-ATTACHMENT "E"

## JS MIAMI BEACH HOTEL (PRE-CON/GMP DEVELOPMENT)

| POSITION | EMPLOYEE | Apr-96 | May-96 | Jun-96 | Jul-96 | Aug-96 | Sep-96 | Total |
|---|---|---|---|---|---|---|---|---|
| OFFICER IN CHARGE/EXECUTIVE VICE PR | MARCHETTO PETER | 102 | 106 | 80 | 80 | 80 | 80 | 528 |
| VICE PRESIDENT | PESANT CARLOS | 37 | 64 | 32 | 64 | 80 | 120 | 397 |
| SENIOR PROJECT MANAGER | TBA | | | | | | | 0 |
| PROJECT MANAGER | COE MARK | | 29 | 120 | 84 | 120 | 120 | 453 |
| PROJECT MANAGER PRE-CON | HARARI MARK | 65 | 132 | 80 | 80 | 80 | 80 | 517 |
| TECHNICAL SERVICES | VARIOUS | 48 | 657 | 600 | 400 | 700 | 610 | 3,015 |
| SECRETARY | JOSEPH AZOLMA | 75 | 188 | 80 | 80 | 85 | 80 | 588 |
| PROJECT ACCOUNTANT | MILONE KEVIN | 5 | 2 | 10 | 10 | 10 | 10 | 47 |
| | Total Hours | 331 | 1,178 | 1,002 | 778 | 1,155 | 1,100 | 5,544 |
| | Escalation (If Applicable) | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | |
| | Total Base Payroll Charges(Escalated if applicable) | 14,966 | 37,755 | 35,580 | 29,461 | 41,774 | 41,701 | $201,326 |
| | X Multiplier | 1.44 | 1.44 | 1.44 | 1.44 | 1.44 | 1.44 | |
| | Total Payroll, Fringes, Overhead, & Profit | 21,491 | 54,216 | 51,083 | 42,305 | 59,987 | 60,012 | 289,105 |
| | Less Payroll & Fringe Charges | 21,491 | 54,216 | 51,083 | 42,305 | 59,987 | 60,012 | 289,105 |
| | Total Fee (Overhead & Profit) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Projections

Page

RIDER-ATTACHMENT "G"

**"Substantial Completion"** or **"Substantially Complete"** or **"Substantially Completed"** means, with respect to the Project, that (1) it shall have been substantially completed in accordance with the Plans and Specifications, as certified by the Architect, and (2) all of the Improvements therein shall have been issued temporary certificates of occupancy.

"**Unavoidable Delays**" means delays due to strikes, slowdowns, lockouts, acts of God, inability to obtain labor or materials, war, enemy action, civil commotion, fire, casualty, catastrophic weather conditions, a court order which causes a delay (unless resulting from disputes between or among the party alleging an Unavoidable Delay, present or former employees, officers, members, partners or shareholders of such alleging party or Affiliates (or present or former employees, officers, partners, members or shareholders of such Affiliates) of such alleging party), the application of any Requirement, or another cause beyond such party's control or which, if susceptible to control by such party, shall be beyond the reasonable control of such party. Such party shall use reasonable good faith efforts to notify the other party not later than twenty (20) days after such party knows of the occurrence of an Unavoidable Delay; provided, however, that either party's failure to notify the other of the occurrence of an event constituting an Unavoidable Delay shall not alter, detract from or negate its character as an Unavoidable Delay or otherwise result in the loss of any benefit or right granted to the delayed party under this Agreement. In no event shall (i) any party's financial condition or inability to fund or obtain funding or financing constitute an "**Unavoidable Delay**" with respect to such party and (ii) any delay arising from a party's (or its Affiliate's) default under any Project Document constitute an "**Unavoidable Delay**" with respect to such party's obligations hereunder. The times for performance set forth in this Agreement (other than for monetary obligations of a party and with respect to completion of the Project by the Default Date) shall be extended to the extent performance is delayed by Unavoidable Delay, except as otherwise expressly set forth in this Agreement. The City's failure to fund the Owner's Contribution shall constitute an Unavoidable Delay with respect to the Developer's obligations hereunder.



*AIA Document A201*

# General Conditions of the Contract for Construction

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES; CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS MODIFICATION*

## 1987 EDITION
### TABLE OF ARTICLES

1. GENERAL PROVISIONS

2. OWNER

3. CONTRACTOR

4. ADMINISTRATION OF THE CONTRACT

5. SUBCONTRACTORS

6. CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS

7. CHANGES IN THE WORK

8. TIME

9. PAYMENTS AND COMPLETION

10. PROTECTION OF PERSONS AND PROPERTY

11. INSURANCE AND BONDS

12. UNCOVERING AND CORRECTION OF WORK

13. MISCELLANEOUS PROVISIONS

14. TERMINATION OR SUSPENSION OF THE CONTRACT

This document has been approved and endorsed by the Associated General Contractors of America.

Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, ©1987 by The American Institute of Architects, 1735 New York Avenue, N.W., Washington, D.C., 20006. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will be subject to legal prosecutions.

 **CAUTION: You should use an original AIA document which has this caution printed in red. An original assures that changes will not be obscured as may occur when documents are reproduced.**

## INDEX

Acceptance of Nonconforming Work . . . . 9.6.6, 9.9.3, **12.3**
Acceptance of Work . . . . . . . 9.6.6, 9.8.2, 9.9.3, 9.10.1, 9.10.3
**Access to Work** . . . . . . . . . . . . . . **3.16**, 6.2.1, 12.1
Accident Prevention . . . . . . . . . . . . . . . . 4.2.3, 10
Acts and Omissions . . . . . 3.2.1, 3.2.2, 3.3.2, 3.12.8, 3.18, 4.2.3, 4.3.2,
. . . . 4.3.9, 8.3.1, 10.1.4, 10.2.5, 13.4.2, 13.7, 14.1
Addenda . . . . . . . . . . . . . . . . . . . 1.1.1, 3.11
Additional Cost, Claims for . . . . . 4.3.6, 4.3.7, 4.3.9, 6.1.1, 10.3
Additional Inspections and Testing . . . . . 4.2.6, 9.8.2, 12.2.1, 13.5
Additional Time, Claims for . . . . . 4.3.6, 4.3.8, 4.3.9, 8.3.2
**ADMINISTRATION OF THE CONTRACT** . . . 3.3.3, **4,** 9.4, 9.5
Advertisement or Invitation to Bid . . . . . . . . . . 1.1.1
Aesthetic Effect . . . . . . . . . . . . . . 4.2.13, 4.5.1
**Allowances** . . . . . . . . . . . . . . . . . . **3.8**
All-risk Insurance . . . . . . . . . . . . . . . . 11.3.1.1
**Applications for Payment** . . . 4.2.5, 7.3.7, 9.2, **9.3,** 9.4, 9.5.1, 9.6.3,
. . . . 9.8.3, 9.10.1, 9.10.3, 9.10.4, 11.1.3, 14.2.4
Approvals . . . . 2.4, 3.3.3, 3.5, 3.10.2, 3.12.4 through 3.12.8, 3.18.3,
. . . . 4.2.7, 9.3.2, 11.3.1.4, 13.4.2, 13.5
**Arbitration** . . . . . . . . . . 4.1.4, 4.3.2, 4.3.4, 4.4.4, **4.5,**
. . . . 8.3.1, 10.1.2, 11.3.9, 11.3.10
**Architect** . . . . . . . . . . . . . . . . . . . **4.1**
Architect, Definition of . . . . . . . . . . . . . . . 4.1.1
Architect, Extent of Authority . . . . 2.4, 3.12.6, 4.2, 4.3.2, 4.3.6,
. . . . 4.4, 5.2, 6.3, 7.1.2, 7.2.1, 7.3.6, 7.4, 9.2, 9.3.1,
. . . . 9.4, 9.5, 9.6.3, 9.8.2, 9.8.3, 9.10.1, 10.1.2, 12.1, 12.2.1,
. . . . 13.5.1, 13.5.2, 14.2.2, 14.2.4
Architect, Limitations of Authority and Responsibility . . 3.3.3, 3.12.8,
. . . . 3.12.11, 4.1.2, 4.2.1, 4.2.2, 4.2.3, 4.2.6, 4.2.7, 4.2.10, 4.2.12,
. . . . 4.2.13, 4.3.2, 5.2.1, 7.4, 9.4.2, 9.6.4, 9.6.6
Architect's Additional Services and Expenses . . . . . . . 2.4, 9.8.2,
. . . . 11.3.1.1, 12.2.1, 12.2.4, 13.5.2, 13.5.3, 14.2.4
**Architect's Administration of the Contract** . . . . . . **4.2,** 4.3.6,
. . . . 4.3.7, 4.4, 9.4, 9.5
Architect's Approvals . . 2.4, 3.5.1, 3.10.2, 3.12.6, 3.12.8, 3.18.3, 4.2.7
Architect's Authority to Reject Work . . . . 3.5.1, 4.2.6, 12.1.2, 12.2.1
Architect's Copyright . . . . . . . . . . . . . . . . . 1.3
Architect's Decisions . . . . . . . 4.2.6, 4.2.7, 4.2.11, 4.2.12, 4.2.13,
. . . . 4.3.2, 4.3.6, 4.4.1, 4.4.4, 4.5, 6.3, 7.3.6, 7.3.8, 8.1.3, 8.3.1,
. . . . 9.2, 9.4, 9.5.1, 9.8.2, 9.9.1, 10.1.2, 13.5.2, 14.2.2, 14.2.4
Architect's Inspections . . . . . 4.2.2, 4.2.9, 4.3.6, 9.4.2, 9.8.2,
. . . . 9.9.2, 9.10.1, 13.5
Architect's Instructions . . . 4.2.6, 4.2.7, 4.2.8, 4.3.7, 7.4.1, 12.1, 13.5.2
Architect's Interpretations . . . . . . . . . 4.2.11, 4.2.12, 4.3.7
Architect's On-Site Observations . . . . . . 4.2.2, 4.2.5, 4.3.6, 9.4.2,
. . . . 9.5.1, 9.10.1, 13.5
Architect's Project Representative . . . . . . . . . . . . 4.2.10
Architect's Relationship with Contractor . . . 1.1.2, 3.2.1, 3.2.2,
. . . . 3.3.3, 3.5.1, 3.7.3, 3.11, 3.12.8, 3.12.11, 3.16, 3.18, 4.2.3, 4.2.4,
. . . . 4.2.6, 4.2.12, 5.2, 6.2.2, 7.3.4, 9.8.2, 11.3.7, 12.1, 13.5
Architect's Relationship with Subcontractors . . . 1.1.2, 4.2.3, 4.2.4,
. . . . 4.2.6, 9.6.3, 9.6.4, 11.3.7
Architect's Representations . . . . . . . . . . . 9.4.2, 9.5.1, 9.10.1
Architect's Site Visits . . . . . . 4.2.2, 4.2.5, 4.2.9, 4.3.6, 9.4.2, 9.5.1,
. . . . 9.8.2, 9.9.2, 9.10.1, 13.5
Asbestos . . . . . . . . . . . . . . . . . . . . . . . 10.1
Attorneys' Fees . . . . . . . . . . . . 3.18.1, 9.10.2, 10.1.4
Award of Separate Contracts . . . . . . . . . . . . . . . 6.1.1
**Award of Subcontracts and Other Contracts for**
**Portions of the Work** . . . . . . . . . . . . . . . . **5.2**
**Basic Definitions** . . . . . . . . . . . . . . . . . . **1.1**
Bidding Requirements . . . . . . . . 1.1.1, 1.1.7, 5.2.1, 11.4.1
**Boiler and Machinery Insurance** . . . . . . . . . . . . **11.3.2**
Bonds, Lien . . . . . . . . . . . . . . . . . . . . . 9.10.2
Bonds, Performance and Payment . . . . 7.3.6.4, 9.10.3, 11.3.9, 11.4

Building Permit . . . . . . . . . . . . . . . . . . . 3.7.1
**Capitalization** . . . . . . . . . . . . . . . . . . **1.4**
Certification of Substantial Completion . . . . . . . . . 9.8.2
**Certificates for Payment** . . . 4.2.5, 4.2.9, 9.3.3, **9.4,** 9.5, 9.6.1,
. . . . 9.6.6, 9.7.1, 9.8.3, 9.10.1, 9.10.3, 13.7, 14.1.1.3, 14.2.4
Certificates of Inspection, Testing or Approval . . 3.12.11, 13.5.4
Certificates of Insurance . . . . . . . . 9.3.2, 9.10.2, 11.1.3
**Change Orders** . . . . . 1.1.1, 2.4.1, 3.8.2.4, 3.11, 4.2.8, 4.3.3, 5.2.3,
. . . . 7.1, **7.2,** 7.3.2, 8.3.1, 9.3.1.1, 9.10.3, 11.3.1.2,
. . . . 11.3.4, 11.3.9, 12.1.2
Change Orders, Definition of . . . . . . . . . . . . . . . 7.2.1
**Changes** . . . . . . . . . . . . . . . . . . . . . . **7.1**
**CHANGES IN THE WORK** . . . . 3.11, 4.2.8, **7,** 8.3.1, 9.3.1.1, 10.1.3
Claim, Definition of . . . . . . . . . . . . . . . . . . **4.3.1**
**Claims and Disputes** . . . . . . . . . . . **4.3,** 4.4, 4.5, 6.2.5, 8.3.2,
. . . . 9.3.1.2, 9.3.3, 9.10.4, 10.1.4
**Claims and Timely Assertion of Claims** . . . . . . . . . . **4.5.6**
**Claims for Additional Cost** . . . . . 4.3.6, **4.3.7,** 4.3.9, 6.1.1, 10.3
**Claims for Additional Time** . . . . . . . 4.3.6, **4.3.8,** 4.3.9, 8.3.2
**Claims for Concealed or Unknown Conditions** . . . . . . **4.3.6**
Claims for Damages . . . 3.18, 4.3.9, 6.1.1, 6.2.5, 8.3.2, 9.5.1.2, 10.1.4
Claims Subject to Arbitration . . . . . . . . . . 4.3.2, 4.4.4, 4.5.1
**Cleaning Up** . . . . . . . . . . . . . . . . . . **3.15,** 6.3
**Commencement of Statutory Limitation Period** . . . . . **13.7**
Commencement of the Work, Conditions Relating to . . . . . . 2.1.2,
. . . . 2.2.1, 3.2.1, 3.2.2, 3.7.1, 3.10.1, 3.12.6, 4.3.7, 5.2.1,
. . . . 6.2.2, 8.1.2, 8.2.2, 9.2, 11.1.3, 11.3.6, 11.4.1
Commencement of the Work, Definition of . . . . . . . . . . 8.1.2
Communications Facilitating Contract
. . . . Administration . . . . . . . . . . . . 3.9.1, 4.2.4, 5.2.1
Completion, Conditions Relating to . . . . . 3.11, 3.15, 4.2.2, 4.2.9,
. . . . 4.3.2, 9.4.2, 9.8, 9.9.1, 9.10, 11.3.5, 12.2.2, 13.7.1
**COMPLETION, PAYMENTS AND** . . . . . . . . . . . . . **9**
Completion, Substantial . . . . . . . . 4.2.9, 4.3.5.2, 8.1.1, 8.1.3, 8.2.3,
. . . . 9.8, 9.9.1, 12.2.2, 13.7
Compliance with Laws . . . . . . 1.3, 3.6, 3.7, 3.13, 4.1.1, 10.2.2, 11.1,
. . . . 11.3, 13.1, 13.5.1, 13.5.2, 13.6, 14.1.1, 14.2.1.3
Concealed or Unknown Conditions . . . . . . . . . . . . . 4.3.6
Conditions of the Contract . . . . . . . . . . 1.1.1, 1.1.7, 6.1.1
Consent, Written . . . . . . . . . . 1.3.1, 3.12.8, 3.14.2, 4.1.2,
. . . . 4.3.4, 4.5.5, 9.3.2, 9.8.2, 9.9.1, 9.10.2, 9.10.3, 10.1.2, 10.1.3,
. . . . 11.3.1, 11.3.1.4, 11.3.1.1, 11.3.2, 13.4.2
**CONSTRUCTION BY OWNER OR BY SEPARATE**
**CONTRACTORS** . . . . . . . . . . . . . . 1.1.4, **6**
Construction Change Directive, Definition of . . . . . . . . . 7.3.1
**Construction Change Directives** . . . 1.1.1, 4.2.8, 7.1, **7.3,** 9.3.1.1
Construction Schedules, Contractor's . . . . . . . . . 3.10, 6.1.3
**Contingent Assignment of Subcontracts** . . . . . . . . . **5.4**
**Continuing Contract Performance** . . . . . . . . . . . . **4.3.4**
Contract, Definition of . . . . . . . . . . . . . . . . . . 1.1.2
**CONTRACT, TERMINATION OR**
**SUSPENSION OF THE** . . . . . . . . . . . 4.3.7, 5.4.1.1, **14**
Contract Administration . . . . . . . . . . . 3.3.3, 4, 9.4, 9.5
Contract Award and Execution, Conditions Relating to . . . . . 3.7.1,
. . . . 3.10, 5.2, 9.2, 11.1.3, 11.3.6, 11.4.1
**Contract Documents, The** . . . . . . . . . . . . . 1.1, 1.2.1
Contract Documents, Copies Furnished and Use of . . 1.3, 2.2.5, 5.3
Contract Documents, Definition of . . . . . . . . . . . . . 1.1.1
Contract Performance During Arbitration . . . . . . 4.3.4, 4.5.3
**Contract Sum** . . . . . . . 3.8, 4.3.6, 4.3.7, 4.4.4, 5.2.3,
. . . . 6.1.3, 7.2, 7.3, **9.1,** 9.7, 11.3.1, 12.2.4, 12.3, 14.2.4
**Contract Sum, Definition of** . . . . . . . . . . . . . . **9.1**
Contract Time . . . . . . . . 4.3.6, 4.3.8, 4.4.4, 7.2.1.3, 7.3,
. . . . 8.2.1, 8.3.1, 9.7, 12.1.1
Contract Time, **Definition of** . . . . . . . . . . . . . . **8.1.1**

**AIA DOCUMENT A201** • GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION • FOURTEENTH EDITION
AIA® • ©1987 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**

**CONTRACTOR** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
Contractor, **Definition** of . . . . . . . . . . . . . . . . . **3.1,** 6.1.2
Contractor's Bid . . . . . . . . . . . . . . . . . . . . . . . . . . . 1.1.1
**Contractor's Construction Schedules** . . . . . . . . **3.10,** 6.1.3
Contractor's Employees . . . . . . . 3.3.2, 3.4.2, 3.8.1, 3.9, 3.18, 4.2.3,
4.2.6, 8.1.2, 10.2, 10.3, 11.1.1, 14.2.1.1
**Contractor's Liability Insurance** . . . . . . . . . . . . . . . . . **11.1**
Contractor's Relationship with Separate Contractors
and Owner's Forces . . . . . . 2.2.6, 3.12.5, 3.14.2, 4.2.4, 6, 12.2.5
Contractor's Relationship with Subcontractors . . . . . . . 1.2.4, 3.3.2,
3.18.1, 3.18.2, 5.2, 5.3, 5.4, 9.6.2, 11.3.7, 11.3.8, 14.2.1.2
Contractor's Relationship with the Architect . . . . 1.1.2, 3.2.1, 3.2.2,
3.3.3, 3.5.1, 3.7.3, 3.11, 3.12.8 3.16, 3.18, 4.2.3, 4.2.4, 4.2.6,
4.2.12, 5.2, 6.2.2, 7.3.4, 9.8.2, 11.3.7, 12.1, 13.5
Contractor's Representations . . . . 1.2.2, 3.5.1, 3.12.7, 6.2.2, 8.2.1, 9.3.3
Contractor's Responsibility for Those
Performing the Work . . . . . . . . . . . . . . . 3.3.2, 3.18, 4.2.3, 10
Contractor's Review of Contract Documents . . . . 1.2.2, 3.2, 3.7.3
Contractor's Right to Stop the Work . . . . . . . . . . . . . . . 9.7
Contractor's Right to Terminate the Contract . . . . . . . . . . . 14.1
Contractor's Submittals . . . . . . . 3.10, 3.11, 3.12, 4.2.7, 5.2.1, 5.2.3,
7.3.6, 9.2, 9.3.1, 9.8.2, 9.9.1, 9.10.2,
9.10.3, 10.1.2, 11.4.2, 11.4.3
Contractor's Superintendent . . . . . . . . . . . . . . . . 3.9, 10.2.6
Contractor's Supervision and Construction Procedures . . . 1.2.4,
3.3, 3.4, 4.2.3, 8.2.2, 8.2.3, 10
Contractual Liability Insurance . . . . . . . . . . . . . . 11.1.1, 7, 11.2.1
Coordination and Correlation . . . . . . . . . . . . . . 1.2.2, 1.2.4, 3.3.1,
3.10, 3.12.7, 6.1.3, 6.2.1
Copies Furnished of Drawings and Specifications . . . 1.3, 2.2.5, 3.11
Correction of Work . . . . . . . . . . . . . . . . . . . 2.3, 2.4, 4.2.1, 9.8.2,
9.9.1, 12.1.2, 12.2, 13.7 1.3
Cost, Definition of . . . . . . . . . . . . . . . . . . . . 7.3.6, 14.3.5
Costs . . . . 2.4, 3.2.1, 3.7.4, 3.8.2, 3.15.2, 4.3.6, 4.3.7, 4.3.8.1, 5.2.3,
6.1.1, 6.2.3, 6.3, 7.3.3.3, 7.3.6, 7.3.7, 9.7, 9.8.2, 9.10.2, 11.3.1.2,
11.3.1.3, 11.3.4, 11.3.9, 12.1, 12.2.1, 12.2.4, 12.2.5, 13.5, 14
**Cutting and Patching** . . . . . . . . . . . . . . . . . . . . **3.14,** 6.2.6
Damage to Construction of Owner or Separate Contractors . . 3.14.2,
6.2.4, 9.5.1.5, 10.2.1.2, 10.2.5, 10.3, 11.1, 11.3, 12.2.5
Damage to the Work . . . . . 3.14.2, 9.9.1, 10.2.1.2, 10.2.5, 10.3, 11.3
Damages, Claims for . . 3.18, 4.3.9, 6.1.1, 6.2.5, 8.3.2, 9.5.1.2, 10.1.4
Damages for Delay . . . . . . . . . . . . 6.1.1, 8.3.3, 9.5.1.6, 9.7
Date of Commencement of the Work, Definition of . . . . . . . 8.1.2
Date of Substantial Completion, Definition of . . . . . . . . . 8.1.3
Day, Definition of . . . . . . . . . . . . . . . . . . . . . . . . . . 8.1.4
Decisions of the Architect . . . . . . 4.2.6, 4.2.7, 4.2.11, 4.2.12, 4.2.13,
4.3.2, 4.3.6, 4.4.1, 4.4.4, 4.5, 6.3, 7.3.6, 7.3.8, 8.1.3, 8.3.1, 9.2,
9.4, 9.5.1, 9.8.2, 9.9.1, 10.1.2, 13.5.2, 14.2.2, 14.2.4
**Decisions to Withhold Certification** . . . . . . **9.5,** 9.7, 14.1.1.3
Defective or Nonconforming Work, Acceptance,
Rejection and Correction of . . . . . . . . . . . 2.3, 2.4, 3.5.1, 4.2.1,
4.2.6, 4.3.5, 9.5.2, 9.8.2, 9.9.1, 10.2.5, 12, 13.7 1.3
Defective Work, Definition of . . . . . . . . . . . . . . . . . . . 3.5.1
Definitions . . . . . . 1.1, 2.1.1, 3.1, 3.5.1, 3.12.1, 3.12.2, 3.12.3, 4.1.1,
4.3.1, 5.1, 6.1.2, 7.2.1, 7.3.1, 7.3.4, 7.3.5, 7.3.8,
**Delays and Extensions of Time** . . . . . . . 4.3.1, 4.3.8.1, 4.3.8.2,
6.1.1, 6.2.3, 7.2.1, 7.3.1, 7.3.4, 7.3.5, 7.3.8,
7.3.9, 8.1.1, **8.3,** 10.3.1, 14.1.1.4
Disputes . . . . . . . . . . . 4.1.4, 4.3, 4.4, 4.5, 6.2.5, 6.3, 7.3.8, 9.3.1.2
Documents and Samples at the Site . . . . . . . . . . . . . . . 3.11
Drawings, Definition of . . . . . . . . . . . . . . . . . . . . . . 1.1.5
Drawings and Specifications, Use and Ownership of . . . . 1.1.1, 1.3,
2.2.5, 3.11, 5.3
Duty to Review Contract Documents and Field Conditions . . . 3.2
Effective Date of Insurance . . . . . . . . . . . . . . . . 8.2.2, 11.1.2

Emergencies . . . . . . . . . . . . . . . . . . . . . . . . . . 4.3.7, **10.3**
Employees, Contractor's . . . . . . . . . 3.3.2, 3.4.2, 3.8.1, 3.9, 3.18.1,
3.18.2, 4.2.3, 4.2.6, 8.1.2, 10.2, 10.3, 11.1.1, 14.2.1.1
Equipment, Labor, Materials and . . . . . . . . . 1.1.3, 1.1.6, 3.4, 3.5.1,
3.8.2, 3.12.2, 3.12.7, 3.12.11, 3.13, 3.15.1, 4.2.7,
6.2.1, 7.3.6, 9.3.2, 9.3.3, 11.3, 12.2.4, 14
Execution and Progress of the Work . . . . . 1.1.3, 1.2.3, 3.2, 3.4.1,
3.5.1, 4.2.2, 4.2.3, 4.3.4, 4.3.8, 6.2.2, 7.1.3,
7.3.9, 8.2, 8.3, 9.5, 9.9.1, 10.2, 14.2, 14.3
**Execution, Correlation and Intent** of the
Contract Documents . . . . . . . . . . . . . . . . . . 1.2, 3.7.1
Extensions of Time . . . . . . . . . . . . 4.3.1, 4.3.8, 7.2.1.3, 8.3, 10.3.1
Failure of Payment by Contractor . . . . . . . . . . 9.5.1.3, 14.2.1.2
Failure of Payment by Owner . . . . . . . . . . . 4.3.7, 9.7, 14.1.3
Faulty Work (See Defective or Nonconforming Work)
**Final Completion and Final Payment** . . . . . . . 4.2.1, 4.2.9, 4.3.2,
4.3.5, **9.10,** 11.1.2, 11.1.3, 11.3.5, 12.3.1, 13.7
Financial Arrangements, Owner's . . . . . . . . . . . . . . . . 2.2.1
Fire and Extended Coverage Insurance . . . . . . . . . . . . . . 11.3
**GENERAL PROVISIONS** . . . . . . . . . . . . . . . . . . . . . . **1**
**Governing Law** . . . . . . . . . . . . . . . . . . . . . . . . . . **13.1**
Guarantees (See Warranty and Warranties)
Hazardous Materials . . . . . . . . . . . . . . . . . . . . 10.1, 10.2.4
Identification of Contract Documents . . . . . . . . . . . . . . 1.2.1
Identification of Subcontractors and Suppliers . . . . . . . . . 5.2.1
**Indemnification** . . . . . . . 3.17, **3.18,** 9.10.2, 10.1.4, 11.3.1.2, 11.3.7
**Information and Services Required of the Owner** . . . 2.1.2, **2.2,**
4.3.4, 6.1.3, 6.1.4, 6.2.6, 9.3.2, 9.6.1, 9.6.4, 9.8.3, 9.9.2,
9.10.3, 10.1.4, 11.2, 11.3, 13.5.1, 13.5.2
**Injury or Damage to Person or Property** . . . . . . . . . . . **4.3.9**
Inspections . . . . . . . . . . . . . . . . . . 3.3.3, 3.3.4, 3.7.1, 4.2.2,
4.2.6, 4.2.9, 4.3.6, 9.4.2, 9.8.2, 9.9.2, 9.10.1, 13.5
Instructions to Bidders . . . . . . . . . . . . . . . . . . . . . . 1.1.1
Instructions to the Contractor . . . . 3.8.1, 4.2.8, 5.2.1, 7, 12.1, 13.5.2
Insurance . . . . . . 4.3.9, 6.1.1, 7.3.6.4, 9.3.2, 9.8.2, 9.9.1, 9.10.2, 11
**Insurance, Boiler and Machinery** . . . . . . . . . . . . . . **11.3.2**
**Insurance, Contractor's Liability** . . . . . . . . . . . . . . . **11.1**
Insurance, Effective Date of . . . . . . . . . . . . . . . 8.2.2, 11.1.2
**Insurance, Loss of Use** . . . . . . . . . . . . . . . . . . . . . **11.3.3**
**Insurance, Owner's Liability** . . . . . . . . . . . . . . . . . . **11.2**
**Insurance, Property** . . . . . . . . . . . . . . . . . . . 10.2.5, **11.3**
Insurance, Stored Materials . . . . . . . . . . . . . . . 9.3.2, 11.3.1.4
**INSURANCE AND BONDS** . . . . . . . . . . . . . . . . . . . . **11**
Insurance Companies, Consent to Partial Occupancy . 9.9.1, 11.3.11
Insurance Companies, Settlement with . . . . . . . . . . . . 11.3.10
Intent of the Contract Documents . . . . . . . . . . . . 1.2.3, 3.12.4,
4.2.6, 4.2.7, 4.2.12, 4.2.13, 7, 4
**Interest** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13.6**
**Interpretation** . . . . . . . . 1.2.5, 1.4, **1.5,** 4.1.1, 4.3.1, 5.1, 6.1.2, 8.1.4
Interpretations, Written . . . . . . . . . . . . . 4.2.11, 4.2.12, 4.3.7
Joinder and Consolidation of Claims Required . . . . . . . . . 4.5.6
**Judgment on Final Award** . . . . . . . . . . . . . . . 4.5.1, 4.5.4.1, **4.5.7**
**Labor and Materials,** Equipment . . . . 1.1.3, 1.1.6, **3.4,** 3.5.1, 3.8.2,
3.12.2, 3.12.3, 3.12.7, 3.12.11, 3.13, 3.15.1,
4.2.7, 6.2.1, 7.3.6, 9.3.2, 9.3.3, 12.2.4, 14
Labor Disputes . . . . . . . . . . . . . . . . . . . . . . . . . . 8.3.1
Laws and Regulations . . . . . . . 1.3, 3.6, 3.7, 3.13, 4.1.1, 4.5.5, 4.5.7,
9.9.1, 10.2.2, 11.1, 11.3, 13.1, 13.4, 13.5.1, 13.5.2, 13.6
Liens . . . . . . . . . . . . 2.1.2, 4.3.2, 4.3.5.1, 8.2.2, 9.3.3, 9.10.2
**Limitation on Consolidation or Joinder** . . . . . . . . . . . **4.5.5**
Limitations, Statutes of . . . . . . . . . . . . . 4.5.4.2, 12.2.6, 13.7
Limitations of Authority . . . . . . . . . . . . . 3.3.1, 4.1.2, 4.2.1,
4.2.3, 4.2.7, 4.2.10, 5.2.2, 5.2.4, 7.4, 11.3.10

Limitations of Liability . . . . 2.3, 3.2.1, 3.5.1, 3.7.3, 3.12.8, 3.12.11,
3.17, 3.18, 4.2.6, 4.2.7, 4.2.12, 6.2.2, 9.4.2, 9.6.4, 9.10.4,
10.1.4, 10.2.5, 11.1.2, 11.2.1, 11.3.7, 13.4.2, 13.5.2
Limitations of Time, General . . . . . . . . 2.2.1, 2.2.4, 3.2.1, 3.7.3,
3.8.2, 3.10, 3.12.5, 3.15.1, 4.2.1, 4.2.7, 4.2.11, 4.3.2,
4.3.3, 4.4, 4.3.6, 4.3.9, 4.5.4.2, 5.2.1, 5.2.3, 6.2.4, 7.3.4, 7.4,
8.2, 9.5, 9.6.2, 9.8, 9.9, 9.10, 11.1.3, 11.3.1, 11.3.2, 11.3.5,
11.3.6, 12.2.1, 12.2.2, 13.5, 13.7
Limitations of Time, Specific . . . . . . . 2.1.2, 2.2.1, 2.4, 3.10, 3.11,
3.15.1, 4.2.1, 4.2.11, 4.3, 4.4, 4.5, 5.3, 5.4, 7.3.5, 7.3.9, 8.2,
9.2, 9.3.1, 9.3.3, 9.4.1, 9.6.1, 9.7, 9.8.2, 9.10.2, 11.1.3, 11.3.6,
11.3.10, 11.3.11, 12.2.2, 12.2.4, 12.2.6, 13.7, 14
**Loss of Use Insurance** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11.3.3**
Material Suppliers . . . . . . . . . . 1.3.1, 3.12.1, 4.2.4, 4.2.6, 5.2.1,
9.3.1, 9.3.1.2, 9.3.3, 9.4.2, 9.6.5, 9.10.4
Materials, Hazardous . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10.1, 10.2.4
Materials, Labor, Equipment and . . . . . . 1.1.3, 1.1.6, 3.4, 3.5.1, 3.8.2,
3.12.2, 3.12.3, 3.12.7, 3.12.11, 3.13, 3.15.1, 4.2.7, 6.2.1,
7.3.6, 9.3.2, 9.3.3, 12.2.4, 14
Means, Methods, Techniques, Sequences and
Procedures of Construction . . . . . . 3.3.1, 4.2.3, 4.2.7, 9.4.2
**Minor Changes in the Work** . . . . . . . . 1.1.1, 4.2.8, 4.3.7, 7.1, **7.4**
**MISCELLANEOUS PROVISIONS** . . . . . . . . . . . . . . . . . . . . . . . **13**
Modifications, Definition of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1.1.1
Modifications to the Contract . . . . . . . . . 1.1.1, 1.1.2, 3.7.3, 3.11,
4.1.2, 4.2.1, 5.2.3, 7, 8.3.1, 9.7
**Mutual Responsibility** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6.2**
**Nonconforming Work, Acceptance of** . . . . . . . . . . . . . . . . . . . **12.3**
Nonconforming Work, Rejection and Correction of . . . . . . . . 2.3.1,
4.3.5, 9.5.2, 9.8.2, 12.1, 13.7.1.3
Notice . . . . . . . . . 2.3, 2.4, 3.2.1, 3.2.2, 3.7.3, 3.7.4, 3.9, 3.12.8,
3.12.9, 3.17, 4.3, 4.4.4, 4.5, 5.2.1, 5.3, 5.4.1.1, 8.2.2, 9.4.1,
9.5.1, 9.6.1, 9.7, 9.10, 10.1.2, 10.2.6, 11.1.3, 11.3, 12.2.2,
12.2.4, 13.3, 13.5.1, 13.5.2, 14
**Notice, Written** . . . . . . . . . 2.3, 2.4, 3.9, 3.12.8, 3.12.9, 4.3,
4.4.4, 4.5, 5.2.1, 5.3, 5.4.1.1, 8.2.2, 9.4.1, 9.5.1, 9.7, 9.10,
10.1.2, 10.2.6, 11.1.3, 11.5, 12.2.2, 12.2.4, **13.3**, 13.5.2, 14
Notice of Testing and Inspections . . . . . . . . . . . . . . . 13.5.1, 13.5.2
Notice to Proceed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8.2.2
**Notices, Permits, Fees and** . . . . . . . . 2.2.3, **3.7**, 3.13, 7.3.6.4, 10.2.2
Observations, Architect's On-Site . . . . . . . . . . . . . . . 4.2.2, 4.2.5,
4.3.6, 9.4.2, 9.5.1, 9.10.1, 13.5
Observations, Contractor's . . . . . . . . . . . . . . . . . . . . . . 1.2.2, 3.2.2
Occupancy . . . . . . . . . . . . . . . 9.6.6, 9.8.1, 9.9, 11.3.11
On-Site Inspections by the Architect . . . . . . . 4.2.2, 4.2.9, 4.3.6,
9.4.2, 9.8.2, 9.9.2, 9.10.1
On-Site Observations by the Architect . . . . . . 4.2.2, 4.2.5, 4.3.6,
9.4.2, 9.5.1, 9.10.1, 13.5
Orders, Written . . . . . . 2.3, 3.9, 4.3.7, 7, 8.2.2, 11.3.9, 12.1,
12.2, 13.5.2, 14.3.1

**OWNER** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**
Owner, **Definition of** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2.1**
**Owner, Information and Services Required of the** . . . . . . . 2.1.2,
**2.2**, 4.3.4, 6, 9, 10.1.4, 11.2, 11.3, 13.5.1, 14.1.1.5, 14.1.3
Owner's Authority . . . . . . . . . 3.8.1, 4.1.3, 4.2.9, 5.2.1, 5.4.1,
7.3.1, 8.2.2, 9.3.1, 9.3.2, 11.4.1, 12.2.4, 13.5.2, 14.2, 14.3.1
Owner's Financial Capability . . . . . . . . . . . . . . 2.2.1, 14.1.1.5
**Owner's Liability Insurance** . . . . . . . . . . . . . . . . . . . . . . . . . . . **11.2**
Owner's Loss of Use Insurance . . . . . . . . . . . . . . . . . . . . . . . . 11.3.3
Owner's Relationship with Subcontractors . . . . . . . . . . . 1.1.2,
5.2.1, 5.4.1, 9.6.4
Owner's Right to Carry Out the Work . . . . . . 2.4, 12.2.4, 14.2.2.2
**Owner's Right to Clean Up** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6.3**

**Owner's Right to Perform Construction and to**
**Award Separate Contracts** . . . . . . . . . . . . . . . . . . . . . . . . **6.1**
**Owner's Right to Stop the Work** . . . . . . . . . . . . . . . . . . **2.3**, 4.3.7
Owner's Right to Suspend the Work . . . . . . . . . . . . . . . . . . . . 14.3
Owner's Right to Terminate the Contract . . . . . . . . . . . . . . . 14.2
**Ownership and Use of Architect's Drawings, Specifications**
**and Other Documents** . . . . . . . . . . . . 1.1.1, **1.3**, 2.2.5, 5.3
**Partial Occupancy or Use** . . . . . . . . . . . . 9.6.6, **9.9**, 11.3.11
**Patching, Cutting and** . . . . . . . . . . . . . . . . . . . . . . . **3.14**, 6.2.6
**Patents, Royalties and** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3.17**
**Payment, Applications for** . . . . . . . . . . . . . . 4.2.5, 9.2, **9.3**, 9.4,
9.5.1, 9.8.3, 9.10.1, 9.10.3, 9.10.4, 14.2.4
**Payment, Certificates for** . . . . . . . 4.2.5, 4.2.9, 9.3.3, **9.4**, 9.5,
9.6.1, 9.6.6, 9.7.1, 9.8.3, 9.10.1, 9.10.3, 13.7, 14.1.1.3, 14.2.4
**Payment, Failure of** . . . . . . . . . . . . . . . . . . . . . . . . 4.3.7, 9.5.1.3,
**9.7**, 9.10.2, 14.1.1.3, 14.2.1.2
Payment, Final . . . . . . . . . . . . 4.2.1, 4.2.9, 4.3.2, 4.3.5, 9.10, 11.1.2,
11.1.3, 11.3.5, 12.3.1
**Payment Bond, Performance Bond and** . . . . . . . . . . . . 7.3.6.4,
9.10.3, 11.3.9, **11.4**
Payments, Progress . . . . . . . . . . . . . . . . . . 4.3.4, 9.3, 9.6,
9.8.3, 9.10.3, 13.6, 14.2.3
**PAYMENTS AND COMPLETION** . . . . . . . . . . . . . . . . . . . **9**, 14
Payments to Subcontractors . . . . . . . . . . . . . 5.4.2, 9.5.1.3,
9.6.2, 9.6.3, 9.6.4, 11.3.8, 14.2.1.2
PCB . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10.1
Performance Bond and Payment Bond . . . . . . . . . . . . . . . 7.3.6.4,
9.10.3, 11.3.9, 11.4
**Permits, Fees and Notices** . . . . . . . 2.2.3, **3.7**, 3.13, 7.3.6.4, 10.2.2
**PERSONS AND PROPERTY, PROTECTION OF** . . . . . . . . . **10**
Polychlorinated Biphenyl . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10.1
Product Data, Definition of . . . . . . . . . . . . . . . . . . . . . . . . . . . 3.12.2
**Product Data and Samples, Shop Drawings** . . 3.11, **3.12**, 4.2.7
**Progress and Completion** . . . . . . . . . . . . . . 4.2.2, 4.3.4, **8.2**
Progress Payments . . . . . . . . . . . . . . . . . . . . . . 4.3.4, 9.3,
**9.6**, 9.8.3, 9.10.3, 13.6, 14.2.3
**Project, Definition of the** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1.1.4**
**Project Manual, Definition of the** . . . . . . . . . . . . . . . . . . . . . . **1.1.7**
Project Manuals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2.2.5
Project Representatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.2.10
**Property Insurance** . . . . . . . . . . . . . . . . . . . . . . . 10.2.5, **11.3** .
**PROTECTION OF PERSONS AND PROPERTY** . . . . . . . . . **10**
Regulations and Laws . . . . . . . . . . 1.3, 3.6, 3.7, 3.13, 4.1.1, 4.5.5,
4.5.7, 10.2.2, 11.1, 11.3, 13.1, 13.4, 13.5.1, 13.5.2, 13.6, 14
Rejection of Work . . . . . . . . . . . . . . . . . . . . 3.5.1, 4.2.6, 12.2
Releases of Waivers and Liens . . . . . . . . . . . . . . . . . . . . . . . 9.10.2
Representations . . . . . . . . . . . . . . . . . . . . . . 1.2.2, 3.5.1, 3.12.7,
6.2.2, 8.2.1, 9.3.3, 9.4.2, 9.5.1, 9.8.2, 9.10.1
Representatives . . . . . . . . . . . . . . . . . . . . . . . . . 2.1.1, 3.1.1, 3.9,
4.1.1, 4.2.1, 4.2.10, 5.1.1, 5.1.2, 13.2.1
**Resolution of Claims and Disputes** . . . . . . . . . . . . . . . **4.4**, 4.5
Responsibility for Those Performing the Work . . . . . . . . . 3.3.2,
4.2.3, 6.1.3, 6.2, 10
Retainage . . . . . . . . . . . . 9.3.1, 9.6.2, 9.8.3, 9.9.1, 9.10.2, 9.10.3
**Review of Contract Documents and Field**
**Conditions by Contractor** . . . . . . . . . . 1.2.2, **3.2**, 3.7.3, 3.12.7
Review of Contractor's Submittals by
Owner and Architect . . . . . . . . . 3.10.1, 3.10.2, 3.11, 3.12,
4.2.7, 4.2.9, 5.2.1, 5.2.3, 9.2, 9.8.2
Review of Shop Drawings, Product Data
and Samples by Contractor . . . . . . . . . . . . . . . . . . . . . . 3.12.5
**Rights and Remedies** . . . . . . . . . . . . 1.1.2, 2.3, 2.4, 3.5.1, 3.15.2,
4.2.6, 4.3.6, 4.5, 5.3, 6.1, 6.3, 7.3.1, 8.3.1, 9.5.1, 9.7, 10.2.5,
10.3, 12.2.2, 12.2.4, **13.4**, 14
Royalties and Patents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3.17

**AIA DOCUMENT A201** • GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION • FOURTEENTH EDITION
AIA® • ©1987 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**

Rules and Notices for Arbitration . . . . . . . . . **4.5.2**
Safety of Persons and Property . . . . . . . . . . **10.2**
Safety Precautions and Programs . . . . 4.2.3, 4.2.7, **10.1**
Samples, Definition of . . . . . . . . . . . . . 3.12.5
Samples, Shop Drawings, Product Data and . . . 3.11, **3.12**, 4.2.7
Samples at the Site, Documents and . . . . . . . **3.11**
Schedule of Values . . . . . . . . . . . **9.2**, 9.3.1
Schedules, Construction . . . . . . . . . . . . 3.10
Separate Contracts and Contractors . . 1.1.4, 3.14.2, 4.2.4,
   4.5.5, 6, 11.3.7, 12.1.2, 12.2.5
Shop Drawings, Definition of . . . . . . . . . . 3.12.1
Shop Drawings, Product Data and Samples . . 3.11, **3.12**, 4.2.7
Site, Use of . . . . . . . . . . . . . **3.13**, 6.1.1, 6.2.1
Site Inspections . . 1.2.2, 3.3.4, 4.2.2, 4.2.9, 4.3.6, 9.8.2, 9.10.1, 13.5
Site Visits, Architect's . . . . . . . 4.2.2, 4.2.5, 4.2.9, 4.3.6,
   9.4.2, 9.5.1, 9.8.2, 9.9.2, 9.10.1, 13.5
Special Inspections and Testing . . . . . . 4.2.6, 12.2.1, 13.5
Specifications, Definition of the . . . . . . . . . **1.1.6**
Specifications, The . . . . 1.1.1, **1.1.6**, 1.1.7, 1.2.4, 1.3, 3.11
Statutes of Limitations . . . . . . . . 4.5.4.2, 12.2.6, 13.7
Stopping the Work . . . . . . . 2.3, 4.3.7, 9.7, 10.1.2, 10.3, 14.1
Stored Materials . . . 6.2.1, 9.3.2, 10.2.1.2, 11.3.1.4, 12.2.4
Subcontractor, Definition of . . . . . . . . . . 5.1.1
SUBCONTRACTORS . . . . . . . . . . . . . . **5**
Subcontractors, Work by . . . . . . . 1.2.4, 3.3.2, 3.12.1,
   4.2.3, 5.3, 5.4
Subcontractual Relations . . . . **5.3**, 5.4, 9.3.1.2, 9.6.2,
   9.6.3, 9.6.4, 10.2.1, 11.3.7, 11.3.8, 14.1.1, 14.2.1.2, 14.3.2
Submittals . . . . 1.3, 3.2.3, 3.10, 3.11, 3.12, 4.2.7, 5.2.1, 5.2.3,
   7.3.6, 9.2, 9.3.1, 9.8.2, 9.9.1, 9.10.2, 9.10.3, 10.1.2, 11.1.3
Subrogation, Waivers of . . . . . 6.1.1, 11.3.5, **11.3.7**
Substantial Completion . . . . 4.2.9, 4.3.5.2, 8.1.1, 8.1.3,
   8.2.3, **9.8**, 9.9.1, 12.2.1, 12.2.2, 13.7
Substantial Completion, Definition of . . . . . . 9.8.1
Substitution of Subcontractors . . . . . . . 5.2.3, 5.2.4
Substitution of the Architect . . . . . . . . . . 4.1.3
Substitutions of Materials . . . . . . . . . . . 3.5.1
Sub-subcontractor, Definition of . . . . . . . . 5.1.2
Subsurface Conditions . . . . . . . . . . . . 4.3.6
Successors and Assigns . . . . . . . . . . . **13.2**
Superintendent . . . . . . . . . . . . **3.9**, 10.2.6
Supervision and Construction Procedures . . 1.2.4, **3.3**, 3.4,
   4.2.3, 4.3.4, 6.1.3, 6.2.4, 7.1.3, 7.3.4, 8.2.2, 8.3.1, 10, 12, 14
Surety . . . . . . . 4.4.1, 4.4.4, 5.4.1.2, 9.10.2, 9.10.3, 14.2.2
Surety, Consent of . . . . . . . 9.9.1, 9.10.2, 9.10.3
Surveys . . . . . . . . . . . . . . 2.2.2, 3.18.3

Suspension by the Owner for Convenience . . . **14.3**
Suspension of the Work . . . 4.3.7, 5.4.2, 14.1.1.4, 14.3
Suspension or Termination of the Contract . . 4.3.7, 5.4.1.1, 14
Taxes . . . . . . . . . . . . . **3.6**, 7.3.6.4
Termination by the Contractor . . . . . . . . **14.1**
Termination by the Owner for Cause . . . 5.4.1.1, **14.2**
Termination of the Architect . . . . . . . . . 4.1.3
Termination of the Contractor . . . . . . . . . 14.2.2
TERMINATION OR SUSPENSION OF THE CONTRACT . . **14**
Tests and Inspections . . . 3.3.3, 4.2.6, 4.2.9, 9.4.2, 12.2.1, **13.5**
TIME . . . . . . . . . . . . . . . . . . . **8**
Time, Delays and Extensions of . . . . . 4.3.8, 7.2.1, **8.3**
Time Limits, Specific . . . . . 2.1.2, 2.2.1, 2.4, 3.10, 3.11, 3.15.1,
   4.2.1, 4.2.11, 4.3, 4.4, 4.5, 5.3, 5.4, 7.3.5, 7.3.9, 8.2, 9.2, 9.3.1,
   9.3.3, 9.4.1, 9.6.1, 9.7, 9.8.2, 9.10.2, 11.1.3,
   11.3.11, 12.2.2, 12.2.4, 12.2.6, 13.7, 14
Time Limits on Claims . . . . 4.3.2, **4.3.3**, 4.3.6, 4.3.9, 4.4, 4.5
Title to Work . . . . . . . . . . . . 9.3.2, 9.3.3
UNCOVERING AND CORRECTION OF WORK . . . **12**
Uncovering of Work . . . . . . . . . . . . . **12.1**
Unforeseen Conditions . . . . . . . . 4.3.6, 8.3.1, 10.1
Unit Prices . . . . . . . . . . . . 7.1.4, 7.3.3.2
Use of Documents . . . . . 1.1.1, 1.3, 2.2.5, 3.12.7, 5.3
Use of Site . . . . . . . . . . . **3.13**, 6.1.1, 6.2.1
Values, Schedule of . . . . . . . . . . **9.2**, 9.3.1
Waiver of Claims: Final Payment . . . . **4.3.5**, 4.5.1, 9.10.3
Waiver of Claims by the Architect . . . . . . . 13.4.2
Waiver of Claims by the Contractor . . . 9.10.4, 11.3.7, 13.4.2
Waiver of Claims by the Owner . . . . 4.3.5, 4.5.1, 9.9.3,
   9.10.3, 11.3.3, 11.3.5, 11.3.7, 13.4.2
Waiver of Liens . . . . . . . . . . . . . . 9.10.2
Waivers of Subrogation . . . . 6.1.1, 11.3.5, 11.3.7
Warranty and Warranties . . . . . . . **3.5**, 4.2.9,
   4.3.5.3, 9.3.3, 9.8.2, 9.9.1, 12.2.2, 13.7.1.3
Weather Delays . . . . . . . . . . . . . . 4.3.8.2
When Arbitration May Be Demanded . . . . **4.5.4**
Work, Definition of . . . . . . . . . . . . . 1.1.3
Written Consent . . . . . . 1.3.1, 3.12.8, 3.14.2, 4.1.2, 4.3.4,
   4.5.5, 9.3.2, 9.8.2, 9.9.1, 9.10.2, 9.10.3, 10.1.2, 10.1.3,
   11.3.1, 11.3.1.4, 11.3.11, 13.2, 13.4.2
Written Interpretations . . . . . . . 4.2.11, 4.2.12, 4.3.7
Written Notice . . . . 2.3, 2.4, 3.9, 3.12.8, 3.12.9, 4.3, 4.4,
   4.5, 5.2.1, 5.3, 5.4.1.1, 8.2.2, 9.4.1, 9.5.1, 9.7, 9.10, 10.1.2,
   10.2.6, 11.1.3, 11.3, 12.2.2, 12.2.4, **13.3**, 13.5.2, 14
Written Orders . . . . . . . . . . . 2.3, 3.9, 4.3.7,
   7, 8.2.2, 11.3.9, 12.1, 12.2, 13.5.2, 14.3.1

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION

## ARTICLE 1

## GENERAL PROVISIONS

### 1.1  BASIC DEFINITIONS

#### 1.1.1  THE CONTRACT DOCUMENTS

The Contract Documents consist of the Agreement between Owner and Contractor (hereinafter the Agreement), Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, addenda issued prior to execution of the Contract, other documents listed in the Agreement and Modifications issued after execution of the Contract. A Modification is (1) a written amendment to the Contract signed by both parties, (2) a Change Order, (3) a Construction Change Directive or (4) a written order for a minor change in the Work issued by the Architect. Unless specifically enumerated in the Agreement, the Contract Documents do not include other documents such as bidding requirements (advertisement or invitation to bid, Instructions to Bidders, sample forms, the Contractor's bid or portions of addenda relating to bidding requirements).

#### 1.1.2  THE CONTRACT

The Contract Documents form the Contract for Construction. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. The Contract may be amended or modified only by a Modification. The Contract Documents shall not be construed to create a contractual relationship of any kind (1) between the Architect and Contractor, (2) between the Owner and a Subcontractor or Subsubcontractor or (3) between any persons or entities other than the Owner and Contractor. The Architect shall, however, be entitled to performance and enforcement of obligations under the Contract intended to facilitate performance of the Architect's duties.

#### 1.1.3  THE WORK

The term "Work" means the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or a part of the Project.

#### 1.1.4  THE PROJECT

The Project is the total construction of which the Work performed under the Contract Documents may be the whole or a part and which may include construction by the Owner or by separate contractors.

#### 1.1.5  THE DRAWINGS

The Drawings are the graphic and pictorial portions of the Contract Documents, wherever located and whenever issued, showing the design, location and dimensions of the Work, generally including plans, elevations, sections, details, schedules and diagrams.

#### 1.1.6  THE SPECIFICATIONS

The Specifications are that portion of the Contract Documents consisting of the written requirements for materials, equip-

ment, construction systems, standards and workmanship for the Work, and performance of related services.

#### 1.1.7  THE PROJECT MANUAL

The Project Manual is the volume usually assembled for the Work which may include the bidding requirements, sample forms, Conditions of the Contract and Specifications.

### 1.2  EXECUTION, CORRELATION AND INTENT

**1.2.1** The Contract Documents shall be signed by the Owner and Contractor as provided in the Agreement. If either the Owner or Contractor or both do not sign all the Contract Documents, the Architect shall identify such unsigned Documents upon request.

**1.2.2** Execution of the Contract by the Contractor is a representation that the Contractor has visited the site, become familiar with local conditions under which the Work is to be performed and correlated personal observations with requirements of the Contract Documents.

**1.2.3** The intent of the Contract Documents is to include all items necessary for the proper execution and completion of the Work by the Contractor. The Contract Documents are complementary, and what is required by one shall be as binding as if required by all; performance by the Contractor shall be required only to the extent consistent with the Contract Documents and reasonably inferable from them as being necessary to produce the intended results.

**1.2.4** Organization of the Specifications into divisions, sections and articles, and arrangement of Drawings shall not control the Contractor in dividing the Work among Subcontractors or in establishing the extent of Work to be performed by any trade.

**1.2.5** Unless otherwise stated in the Contract Documents, words which have well-known technical or construction industry meanings are used in the Contract Documents in accordance with such recognized meanings.

### 1.3  OWNERSHIP AND USE OF ARCHITECT'S DRAWINGS, SPECIFICATIONS AND OTHER DOCUMENTS

**1.3.1** The Drawings, Specifications and other documents prepared by the Architect are instruments of the Architect's service through which the Work to be executed by the Contractor is described. The Contractor may retain one contract record set. Neither the Contractor nor any Subcontractor, Subsubcontractor or material or equipment supplier shall own or claim a copyright in the Drawings, Specifications and other documents prepared by the Architect, and unless otherwise indicated the Architect shall be deemed the author of them and will retain all common law, statutory and other reserved rights, in addition to the copyright. All copies of them, except the Contractor's record set, shall be returned or suitably accounted for to the Architect, on request, upon completion of the Work. The Drawings, Specifications and other documents prepared by the Architect, and copies thereof furnished to the Contractor, are for use solely with respect to this Project. They are not to be used by the Contractor or any Subcontractor, Subsubcontractor or material or equipment supplier on other projects or for additions to this Project outside the scope of the

**AIA DOCUMENT A201** • GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION • FOURTEENTH EDITION
AIA® • © 1987 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**

Work without the specific written consent of the Owner and Architect. The Contractor, Subcontractors, Sub-subcontractors and material or equipment suppliers are granted a limited license to use and reproduce applicable portions of the Drawings, Specifications and other documents prepared by the Architect appropriate to and for use in the execution of their Work under the Contract Documents. All copies made under this license shall bear the statutory copyright notice, if any, shown on the Drawings, Specifications and other documents prepared by the Architect. Submittal or distribution to meet official regulatory requirements or for other purposes in connection with this Project is not to be construed as publication in derogation of the Architect's copyright or other reserved rights.

**1.4    CAPITALIZATION**

**1.4.1** Terms capitalized in these General Conditions include those which are (1) specifically defined, (2) the titles of numbered articles and identified references to Paragraphs, Subparagraphs and Clauses in the document or (3) the titles of other documents published by the American Institute of Architects.

**1.5    INTERPRETATION**

**1.5.1** In the interest of brevity the Contract Documents frequently omit modifying words such as "all" and "any" and articles such as "the" and "an," but the fact that a modifier or an article is absent from one statement and appears in another is not intended to affect the interpretation of either statement.

## ARTICLE 2

## OWNER

**2.1    DEFINITION**

**2.1.1** The Owner is the person or entity identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The term "Owner" means the Owner or the Owner's authorized representative.

**2.1.2** The Owner upon reasonable written request shall furnish to the Contractor in writing information which is necessary and relevant for the Contractor to evaluate, give notice of or enforce mechanic's lien rights. Such information shall include a correct statement of the record legal title to the property on which the Project is located, usually referred to as the site, and the Owner's interest therein at the time of execution of the Agreement and, within five days after any change, information of such change in title, recorded or unrecorded.

**2.2    INFORMATION AND SERVICES
        REQUIRED OF THE OWNER**

**2.2.1** The Owner shall, at the request of the Contractor, prior to execution of the Agreement and promptly from time to time thereafter, furnish to the Contractor reasonable evidence that financial arrangements have been made to fulfill the Owner's obligations under the Contract. *[Note: Unless such reasonable evidence were furnished on request prior to the execution of the Agreement, the prospective contractor would not be required to execute the Agreement or to commence the Work.]*

**2.2.2** The Owner shall furnish surveys describing physical characteristics, legal limitations and utility locations for the site of the Project, and a legal description of the site.

**2.2.3** Except for permits and fees which are the responsibility of the Contractor under the Contract Documents, the Owner shall secure and pay for necessary approvals, easements, assess-

ments and charges required for construction, use or occupancy of permanent structures or for permanent changes in existing facilities.

**2.2.4** Information or services under the Owner's control shall be furnished by the Owner with reasonable promptness to avoid delay in orderly progress of the Work.

**2.2.5** Unless otherwise provided in the Contract Documents, the Contractor will be furnished, free of charge, such copies of Drawings and Project Manuals as are reasonably necessary for execution of the Work.

**2.2.6** The foregoing are in addition to other duties and responsibilities of the Owner enumerated herein and especially those in respect to Article 6 (Construction by Owner or by Separate Contractors), Article 9 (Payments and Completion) and Article 11 (Insurance and Bonds).

**2.3    OWNER'S RIGHT TO STOP THE WORK**

**2.3.1** If the Contractor fails to correct Work which is not in accordance with the requirements of the Contract Documents as required by Paragraph 12.2 or persistently fails to carry out Work in accordance with the Contract Documents, the Owner, by written order signed personally or by an agent specifically so empowered by the Owner in writing, may order the Contractor to stop the Work, or any portion thereof, until the cause for such order has been eliminated; however, the right of the Owner to stop the Work shall not give rise to a duty on the part of the Owner to exercise this right for the benefit of the Contractor or any other person or entity, except to the extent required by Subparagraph 6.1.3.

**2.4    OWNER'S RIGHT TO CARRY OUT THE WORK**

**2.4.1** If the Contractor defaults or neglects to carry out the Work in accordance with the Contract Documents and fails within a seven-day period after receipt of written notice from the Owner to commence and continue correction of such default or neglect with diligence and promptness, the Owner may after such seven-day period give the Contractor a second written notice to correct such deficiencies within a second seven-day period. If the Contractor within such second seven-day period after receipt of such second notice fails to commence and continue to correct any deficiencies, the Owner may, without prejudice to other remedies the Owner may have, correct such deficiencies. In such case an appropriate Change Order shall be issued deducting from payments then or thereafter due the Contractor the cost of correcting such deficiencies, including compensation for the Architect's additional services and expenses made necessary by such default, neglect or failure. Such action by the Owner and amounts charged to the Contractor are both subject to prior approval of the Architect. If payments then or thereafter due the Contractor are not sufficient to cover such amounts, the Contractor shall pay the difference to the Owner.

## ARTICLE 3

## CONTRACTOR

**3.1    DEFINITION**

**3.1.1** The Contractor is the person or entity identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The term "Contractor" means the Contractor or the Contractor's authorized representative.

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**

## 3.2 REVIEW OF CONTRACT DOCUMENTS AND FIELD CONDITIONS BY CONTRACTOR

**3.2.1** The Contractor shall carefully study and compare the Contract Documents with each other and with information furnished by the Owner pursuant to Subparagraph 2.2.2 and shall at once report to the Architect errors, inconsistencies or omissions discovered. The Contractor shall not be liable to the Owner or Architect for damage resulting from errors, inconsistencies or omissions in the Contract Documents unless the Contractor recognized such error, inconsistency or omission and knowingly failed to report it to the Architect. If the Contractor performs any construction activity knowing it involves a recognized error, inconsistency or omission in the Contract Documents without such notice to the Architect, the Contractor shall assume appropriate responsibility for such performance and shall bear an appropriate amount of the attributable costs for correction.

**3.2.2** The Contractor shall take field measurements and verify field conditions and shall carefully compare such field measurements and conditions and other information known to the Contractor with the Contract Documents before commencing activities. Errors, inconsistencies or omissions discovered shall be reported to the Architect at once.

**3.2.3** The Contractor shall perform the Work in accordance with the Contract Documents and submittals approved pursuant to Paragraph 3.12.

## 3.3 SUPERVISION AND CONSTRUCTION PROCEDURES

**3.3.1** The Contractor shall supervise and direct the Work, using the Contractor's best skill and attention. The Contractor shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract, unless Contract Documents give other specific instructions concerning these matters.

**3.3.2** The Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees, Subcontractors and their agents and employees, and other persons performing portions of the Work under a contract with the Contractor.

**3.3.3** The Contractor shall not be relieved of obligations to perform the Work in accordance with the Contract Documents either by activities or duties of the Architect in the Architect's administration of the Contract, or by tests, inspections or approvals required or performed by persons other than the Contractor.

**3.3.4** The Contractor shall be responsible for inspection of portions of Work already performed under this Contract to determine that such portions are in proper condition to receive subsequent Work.

## 3.4 LABOR AND MATERIALS

**3.4.1** Unless otherwise provided in the Contract Documents, the Contractor shall provide and pay for labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and other facilities and services necessary for proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work.

**3.4.2** The Contractor shall enforce strict discipline and good order among the Contractor's employees and other persons carrying out the Contract. The Contractor shall not permit employment of unfit persons or persons not skilled in tasks assigned to them.

## 3.5 WARRANTY

**3.5.1** The Contractor warrants to the Owner and Architect that materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the Work will be free from defects not inherent in the quality required or permitted, and that the Work will conform with the requirements of the Contract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. The Contractor's warranty excludes remedy for damage or defect caused by abuse, modifications not executed by the Contractor, improper or insufficient maintenance, improper operation, or normal wear and tear under normal usage. If required by the Architect, the Contractor shall furnish satisfactory evidence as to the kind and quality of materials and equipment.

## 3.6 TAXES

**3.6.1** The Contractor shall pay sales, consumer, use and similar taxes for the Work or portions thereof provided by the Contractor which are legally enacted when bids are received or negotiations concluded, whether or not yet effective or merely scheduled to go into effect.

## 3.7 PERMITS, FEES AND NOTICES

**3.7.1** Unless otherwise provided in the Contract Documents, the Contractor shall secure and pay for the building permit and other permits and governmental fees, licenses and inspections necessary for proper execution and completion of the Work which are customarily secured after execution of the Contract and which are legally required when bids are received or negotiations concluded.

**3.7.2** The Contractor shall comply with and give notices required by laws, ordinances, rules, regulations and lawful orders of public authorities bearing on performance of the Work.

**3.7.3** It is not the Contractor's responsibility to ascertain that the Contract Documents are in accordance with applicable laws, statutes, ordinances, building codes, and rules and regulations. However, if the Contractor observes that portions of the Contract Documents are at variance therewith, the Contractor shall promptly notify the Architect and Owner in writing, and necessary changes shall be accomplished by appropriate Modification.

**3.7.4** If the Contractor performs Work knowing it to be contrary to laws, statutes, ordinances, building codes, and rules and regulations without such notice to the Architect and Owner, the Contractor shall assume full responsibility for such Work and shall bear the attributable costs.

## 3.8 ALLOWANCES

**3.8.1** The Contractor shall include in the Contract Sum all allowances stated in the Contract Documents. Items covered by allowances shall be supplied for such amounts and by such persons or entities as the Owner may direct, but the Contractor shall not be required to employ persons or entities against which the Contractor makes reasonable objection.

**3.8.2** Unless otherwise provided in the Contract Documents:

    **.1** materials and equipment under an allowance shall be selected promptly by the Owner to avoid delay in the Work;

    **.2** allowances shall cover the cost to the Contractor of materials and equipment delivered at the site and all required taxes, less applicable trade discounts;

**AIA DOCUMENT A201** • GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION • FOURTEENTH EDITION
AIA® • © 1987 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**

.3 Contractor's costs for unloading and handling at the site, labor, installation costs, overhead, profit and other expenses contemplated for stated allowance amounts shall be included in the Contract Sum and not in the allowances;

.4 whenever costs are more than or less than allowances, the Contract Sum shall be adjusted accordingly by Change Order. The amount of the Change Order shall reflect (1) the difference between actual costs and the allowances under Clause 3.8.2.2 and (2) changes in Contractor's costs under Clause 3.8.2.3.

## 3.9   SUPERINTENDENT

**3.9.1** The Contractor shall employ a competent superintendent and necessary assistants who shall be in attendance at the Project site during performance of the Work. The superintendent shall represent the Contractor, and communications given to the superintendent shall be as binding as if given to the Contractor. Important communications shall be confirmed in writing. Other communications shall be similarly confirmed on written request in each case.

## 3.10   CONTRACTOR'S CONSTRUCTION SCHEDULES

**3.10.1** The Contractor, promptly after being awarded the Contract, shall prepare and submit for the Owner's and Architect's information a Contractor's construction schedule for the Work. The schedule shall not exceed time limits current under the Contract Documents, shall be revised at appropriate intervals as required by the conditions of the Work and Project, shall be related to the entire Project to the extent required by the Contract Documents, and shall provide for expeditious and practicable execution of the Work.

**3.10.2** The Contractor shall prepare and keep current, for the Architect's approval, a schedule of submittals which is coordinated with the Contractor's construction schedule and allows the Architect reasonable time to review submittals.

**3.10.3** The Contractor shall conform to the most recent schedules.

## 3.11   DOCUMENTS AND SAMPLES AT THE SITE

**3.11.1** The Contractor shall maintain at the site for the Owner one record copy of the Drawings, Specifications, addenda, Change Orders and other Modifications, in good order and marked currently to record changes and selections made during construction, and in addition approved Shop Drawings, Product Data, Samples and similar required submittals. These shall be available to the Architect and shall be delivered to the Architect for submittal to the Owner upon completion of the Work.

## 3.12   SHOP DRAWINGS, PRODUCT DATA AND SAMPLES

**3.12.1** Shop Drawings are drawings, diagrams, schedules and other data specially prepared for the Work by the Contractor or a Subcontractor, Sub-subcontractor, manufacturer, supplier or distributor to illustrate some portion of the Work.

**3.12.2** Product Data are illustrations, standard schedules, performance charts, instructions, brochures, diagrams and other information furnished by the Contractor to illustrate materials or equipment for some portion of the Work.

**3.12.3** Samples are physical examples which illustrate materials, equipment or workmanship and establish standards by which the Work will be judged.

**3.12.4** Shop Drawings, Product Data, Samples and similar submittals are not Contract Documents. The purpose of their submittal is to demonstrate for those portions of the Work for which submittals are required the way the Contractor proposes to conform to the information given and the design concept expressed in the Contract Documents. Review by the Architect is subject to the limitations of Subparagraph 4.2.7.

**3.12.5** The Contractor shall review, approve and submit to the Architect Shop Drawings, Product Data, Samples and similar submittals required by the Contract Documents with reasonable promptness and in such sequence as to cause no delay in the Work or in the activities of the Owner or of separate contractors. Submittals made by the Contractor which are not required by the Contract Documents may be returned without action.

**3.12.6** The Contractor shall perform no portion of the Work requiring submittal and review of Shop Drawings, Product Data, Samples or similar submittals until the respective submittal has been approved by the Architect. Such Work shall be in accordance with approved submittals.

**3.12.7** By approving and submitting Shop Drawings, Product Data, Samples and similar submittals, the Contractor represents that the Contractor has determined and verified materials, field measurements and field construction criteria related thereto, or will do so, and has checked and coordinated the information contained within such submittals with the requirements of the Work and of the Contract Documents.

**3.12.8** The Contractor shall not be relieved of responsibility for deviations from requirements of the Contract Documents by the Architect's approval of Shop Drawings, Product Data, Samples or similar submittals unless the Contractor has specifically informed the Architect in writing of such deviation at the time of submittal and the Architect has given written approval to the specific deviation. The Contractor shall not be relieved of responsibility for errors or omissions in Shop Drawings, Product Data, Samples or similar submittals by the Architect's approval thereof.

**3.12.9** The Contractor shall direct specific attention, in writing or on resubmitted Shop Drawings, Product Data, Samples or similar submittals, to revisions other than those requested by the Architect on previous submittals.

**3.12.10** Informational submittals upon which the Architect is not expected to take responsive action may be so identified in the Contract Documents.

**3.12.11** When professional certification of performance criteria of materials, systems or equipment is required by the Contract Documents, the Architect shall be entitled to rely upon the accuracy and completeness of such calculations and certifications.

## 3.13   USE OF SITE

**3.13.1** The Contractor shall confine operations at the site to areas permitted by law, ordinances, permits and the Contract Documents and shall not unreasonably encumber the site with materials or equipment.

## 3.14   CUTTING AND PATCHING

**3.14.1** The Contractor shall be responsible for cutting, fitting or patching required to complete the Work or to make its parts fit together properly.

**3.14.2** The Contractor shall not damage or endanger a portion of the Work or fully or partially completed construction of the Owner or separate contractors by cutting, patching or otherwise altering such construction, or by excavation. The Contractor shall not cut or otherwise alter such construction by the

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**

Owner or a separate contractor except with written consent of the Owner and of such separate contractor, such consent shall not be unreasonably withheld. The Contractor shall not unreasonably withhold from the Owner or a separate contractor the Contractor's consent to cutting or otherwise altering the Work.

### 3.15 CLEANING UP

**3.15.1** The Contractor shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations under the Contract. At completion of the Work the Contractor shall remove from and about the Project waste materials, rubbish, the Contractor's tools, construction equipment, machinery and surplus materials.

**3.15.2** If the Contractor fails to clean up as provided in the Contract Documents, the Owner may do so and the cost thereof shall be charged to the Contractor.

### 3.16 ACCESS TO WORK

**3.16.1** The Contractor shall provide the Owner and Architect access to the Work in preparation and progress wherever located.

### 3.17 ROYALTIES AND PATENTS

**3.17.1** The Contractor shall pay all royalties and license fees. The Contractor shall defend suits or claims for infringement of patent rights and shall hold the Owner and Architect harmless from loss on account thereof, but shall not be responsible for such defense or loss when a particular design, process or product of a particular manufacturer or manufacturers is required by the Contract Documents. However, if the Contractor has reason to believe that the required design, process or product is an infringement of a patent, the Contractor shall be responsible for such loss unless such information is promptly furnished to the Architect.

### 3.18 INDEMNIFICATION

**3.18.1** To the fullest extent permitted by law, the Contractor shall indemnify and hold harmless the Owner, Architect, Architect's consultants, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) including loss of use resulting therefrom, but only to the extent caused in whole or in part by negligent acts or omissions of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Paragraph 3.18.

**3.18.2** In claims against any person or entity indemnified under this Paragraph 3.18 by an employee of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, the indemnification obligation under this Paragraph 3.18 shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for the Contractor or a Subcontractor under workers' or workmen's compensation acts, disability benefit acts or other employee benefit acts.

**3.18.3** The obligations of the Contractor under this Paragraph 3.18 shall not extend to the liability of the Architect, the Archi-

tect's consultants, and agents and employees of any of them arising out of (1) the preparation or approval of maps, drawings, opinions, reports, surveys, Change Orders, designs or specifications, or (2) the giving of or the failure to give directions or instructions by the Architect, the Architect's consultants, and agents and employees of any of them provided such giving or failure to give is the primary cause of the injury or damage.

## ARTICLE 4

## ADMINISTRATION OF THE CONTRACT

### 4.1 ARCHITECT

**4.1.1** The Architect is the person lawfully licensed to practice architecture or an entity lawfully practicing architecture identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The term "Architect" means the Architect or the Architect's authorized representative.

**4.1.2** Duties, responsibilities and limitations of authority of the Architect as set forth in the Contract Documents shall not be restricted, modified or extended without written consent of the Owner, Contractor and Architect. Consent shall not be unreasonably withheld.

**4.1.3** In case of termination of employment of the Architect, the Owner shall appoint an architect against whom the Contractor makes no reasonable objection and whose status under the Contract Documents shall be that of the former architect.

**4.1.4** Disputes arising under Subparagraphs 4.1.2 and 4.1.3 shall be subject to arbitration.

### 4.2 ARCHITECT'S ADMINISTRATION OF THE CONTRACT

**4.2.1** The Architect will provide administration of the Contract as described in the Contract Documents, and will be the Owner's representative (1) during construction, (2) until final payment is due and (3) with the Owner's concurrence, from time to time during the correction period described in Paragraph 12.2. The Architect will advise and consult with the Owner. The Architect will have authority to act on behalf of the Owner only to the extent provided in the Contract Documents, unless otherwise modified by written instrument in accordance with other provisions of the Contract.

**4.2.2** The Architect will visit the site at intervals appropriate to the stage of construction to become generally familiar with the progress and quality of the completed Work and to determine in general if the Work is being performed in a manner indicating that the Work, when completed, will be in accordance with the Contract Documents. However, the Architect will not be required to make exhaustive or continuous on-site inspections to check quality or quantity of the Work. On the basis of on-site observations as an architect, the Architect will keep the Owner informed of progress of the Work, and will endeavor to guard the Owner against defects and deficiencies in the Work.

**4.2.3** The Architect will not have control over or charge of and will not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, since these are solely the Contractor's responsibility as provided in Paragraph 3.3. The Architect will not be responsible for the Contractor's failure to carry out the Work in accordance with the Contract Documents. The Architect will not have control over or charge of and will not be responsible for acts or omissions of the Con-

**AIA DOCUMENT A201** • GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION • FOURTEENTH EDITION
AIA® • ©1987 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**

tractor, Subcontractors, or their agents or employees, or of any other persons performing portions of the Work.

**4.2.4 Communications Facilitating Contract Administration.** Except as otherwise provided in the Contract Documents or when direct communications have been specially authorized, the Owner and Contractor shall endeavor to communicate through the Architect. Communications by and with the Architect's consultants shall be through the Architect. Communications by and with Subcontractors and material suppliers shall be through the Contractor. Communications by and with separate contractors shall be through the Owner.

**4.2.5** Based on the Architect's observations and evaluations of the Contractor's Applications for Payment, the Architect will review and certify the amounts due the Contractor and will issue Certificates for Payment in such amounts.

**4.2.6** The Architect will have authority to reject Work which does not conform to the Contract Documents. Whenever the Architect considers it necessary or advisable for implementation of the intent of the Contract Documents, the Architect will have authority to require additional inspection or testing of the Work in accordance with Subparagraphs 13.5.2 and 13.5.3, whether or not such Work is fabricated, installed or completed. However, neither this authority of the Architect nor a decision made in good faith either to exercise or not to exercise such authority shall give rise to a duty or responsibility of the Architect to the Contractor, Subcontractors, material and equipment suppliers, their agents or employees, or other persons performing portions of the Work.

**4.2.7** The Architect will review and approve or take other appropriate action upon the Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Architect's action will be taken with such reasonable promptness as to cause no delay in the Work or in the activities of the Owner, Contractor or separate contractors, while allowing sufficient time in the Architect's professional judgment to permit adequate review. Review of such submittals is not conducted for the purpose of determining the accuracy and completeness of other details such as dimensions and quantities, or for substantiating instructions for installation or performance of equipment or systems, all of which remain the responsibility of the Contractor as required by the Contract Documents. The Architect's review of the Contractor's submittals shall not relieve the Contractor of the obligations under Paragraphs 3.3, 3.5 and 3.12. The Architect's review shall not constitute approval of safety precautions or, unless otherwise specifically stated by the Architect, of any construction means, methods, techniques, sequences or procedures. The Architect's approval of a specific item shall not indicate approval of an assembly of which the item is a component.

**4.2.8** The Architect will prepare Change Orders and Construction Change Directives, and may authorize minor changes in the Work as provided in Paragraph 7.4.

**4.2.9** The Architect will conduct inspections to determine the date or dates of Substantial Completion and the date of final completion, will receive and forward to the Owner for the Owner's review and records written warranties and related documents required by the Contract and assembled by the Contractor, and will issue a final Certificate for Payment upon compliance with the requirements of the Contract Documents.

**4.2.10** If the Owner and Architect agree, the Architect will provide one or more project representatives to assist in carrying out the Architect's responsibilities at the site. The duties, responsibilities and limitations of authority of such project representatives shall be as set forth in an exhibit to be incorporated in the Contract Documents.

**4.2.11** The Architect will interpret and decide matters concerning performance under and requirements of the Contract Documents on written request of either the Owner or Contractor. The Architect's response to such requests will be made with reasonable promptness and within any time limits agreed upon. If no agreement is made concerning the time within which interpretations required of the Architect shall be furnished in compliance with this Paragraph 4.2, then delay shall not be recognized on account of failure by the Architect to furnish such interpretations until 15 days after written request is made for them.

**4.2.12** Interpretations and decisions of the Architect will be consistent with the intent of and reasonably inferable from the Contract Documents and will be in writing or in the form of drawings. When making such interpretations and decisions, the Architect will endeavor to secure faithful performance by both Owner and Contractor, will not show partiality to either and will not be liable for results of interpretations or decisions so rendered in good faith.

**4.2.13** The Architect's decisions on matters relating to aesthetic effect will be final if consistent with the intent expressed in the Contract Documents.

**4.3   CLAIMS AND DISPUTES**

**4.3.1 Definition.** A Claim is a demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of Contract terms, payment of money, extension of time or other relief with respect to the terms of the Contract. The term "Claim" also includes other disputes and matters in question between the Owner and Contractor arising out of or relating to the Contract. Claims must be made by written notice. The responsibility to substantiate Claims shall rest with the party making the Claim.

**4.3.2 Decision of Architect.** Claims, including those alleging an error or omission by the Architect, shall be referred initially to the Architect for action as provided in Paragraph 4.4. A decision by the Architect, as provided in Subparagraph 4.4.4, shall be required as a condition precedent to arbitration or litigation of a Claim between the Contractor and Owner as to all such matters arising prior to the date final payment is due, regardless of (1) whether such matters relate to execution and progress of the Work or (2) the extent to which the Work has been completed. The decision by the Architect in response to a Claim shall not be a condition precedent to arbitration or litigation in the event (1) the position of Architect is vacant, (2) the Architect has not received evidence or has failed to render a decision within agreed time limits, (3) the Architect has failed to take action required under Subparagraph 4.4.4 within 30 days after the Claim is made, (4) 45 days have passed after the Claim has been referred to the Architect or (5) the Claim relates to a mechanic's lien.

**4.3.3 Time Limits on Claims.** Claims by either party must be made within 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim, whichever is later. Claims must be made by written notice. An additional Claim made after the initial Claim has been implemented by Change Order will not be considered unless submitted in a timely manner.

**4.3.4 Continuing Contract Performance.** Pending final resolution of a Claim including arbitration, unless otherwise agreed in writing the Contractor shall proceed diligently with performance of the Contract and the Owner shall continue to make payments in accordance with the Contract Documents.

**4.3.5 Waiver of Claims: Final Payment.** The making of final payment shall constitute a waiver of Claims by the Owner except those arising from:

> .1 liens, Claims, security interests or encumbrances arising out of the Contract and unsettled;

> .2 failure of the Work to comply with the requirements of the Contract Documents; or

> .3 terms of special warranties required by the Contract Documents.

**4.3.6 Claims for Concealed or Unknown Conditions.** If conditions are encountered at the site which are (1) subsurface or otherwise concealed physical conditions which differ materially from those indicated in the Contract Documents or (2) unknown physical conditions of an unusual nature, which differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in the Contract Documents, then notice by the observing party shall be given to the other party promptly before conditions are disturbed and in no event later than 21 days after first observance of the conditions. The Architect will promptly investigate such conditions and, if they differ materially and cause an increase or decrease in the Contractor's cost of, or time required for, performance of any part of the Work, will recommend an equitable adjustment in the Contract Sum or Contract Time, or both. If the Architect determines that the conditions at the site are not materially different from those indicated in the Contract Documents and that no change in the terms of the Contract is justified, the Architect shall so notify the Owner and Contractor in writing, stating the reasons. Claims by either party in opposition to such determination must be made within 21 days after the Architect has given notice of the decision. If the Owner and Contractor cannot agree on an adjustment in the Contract Sum or Contract Time, the adjustment shall be referred to the Architect for initial determination, subject to further proceedings pursuant to Paragraph 4.4.

**4.3.7 Claims for Additional Cost.** If the Contractor wishes to make Claim for an increase in the Contract Sum, written notice as provided herein shall be given before proceeding to execute the Work. Prior notice is not required for Claims relating to an emergency endangering life or property arising under Paragraph 10.3. If the Contractor believes additional cost is involved for reasons including but not limited to (1) a written interpretation from the Architect, (2) an order by the Owner to stop the Work where the Contractor was not at fault, (3) a written order for a minor change in the Work issued by the Architect, (4) failure of payment by the Owner, (5) termination of the Contract by the Owner, (6) Owner's suspension or (7) other reasonable grounds, Claim shall be filed in accordance with the procedure established herein.

**4.3.8   Claims for Additional Time**

**4.3.8.1** If the Contractor wishes to make Claim for an increase in the Contract Time, written notice as provided herein shall be given. The Contractor's Claim shall include an estimate of cost and of probable effect of delay on progress of the Work. In the case of a continuing delay only one Claim is necessary.

**4.3.8.2** If adverse weather conditions are the basis for a Claim for additional time, such Claim shall be documented by data

substantiating that weather conditions were abnormal for the period of time and could not have been reasonably anticipated, and that weather conditions had an adverse effect on the scheduled construction.

**4.3.9 Injury or Damage to Person or Property.** If either party to the Contract suffers injury or damage to person or property because of an act or omission of the other party, of any of the other party's employees or agents, or of others for whose acts such party is legally liable, written notice of such injury or damage, whether or not insured, shall be given to the other party within a reasonable time not exceeding 21 days after first observance. The notice shall provide sufficient detail to enable the other party to investigate the matter. If a Claim for additional cost or time related to this Claim is to be asserted, it shall be filed as provided in Subparagraphs 4.3.7 or 4.3.8.

**4.4     RESOLUTION OF CLAIMS AND DISPUTES**

**4.4.1** The Architect will review Claims and take one or more of the following preliminary actions within ten days of receipt of a Claim: (1) request additional supporting data from the claimant, (2) submit a schedule to the parties indicating when the Architect expects to take action, (3) reject the Claim in whole or in part, stating reasons for rejection, (4) recommend approval of the Claim by the other party or (5) suggest a compromise. The Architect may also, but is not obligated to, notify the surety, if any, of the nature and amount of the Claim.

**4.4.2** If a Claim has been resolved, the Architect will prepare or obtain appropriate documentation.

**4.4.3** If a Claim has not been resolved, the party making the Claim shall, within ten days after the Architect's preliminary response, take one or more of the following actions: (1) submit additional supporting data requested by the Architect, (2) modify the initial Claim or (3) notify the Architect that the initial Claim stands.

**4.4.4** If a Claim has not been resolved after consideration of the foregoing and of further evidence presented by the parties or requested by the Architect, the Architect will notify the parties in writing that the Architect's decision will be made within seven days, which decision shall be final and binding on the parties but subject to arbitration. Upon expiration of such time period, the Architect will render to the parties the Architect's written decision relative to the Claim, including any change in the Contract Sum or Contract Time or both. If there is a surety and there appears to be a possibility of a Contractor's default, the Architect may, but is not obligated to, notify the surety and request the surety's assistance in resolving the controversy.

**4.5     ARBITRATION**

**4.5.1 Controversies and Claims Subject to Arbitration.** Any controversy or Claim arising out of or related to the Contract, or the breach thereof, shall be settled by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator or arbitrators may be entered in any court having jurisdiction thereof, except controversies or Claims relating to aesthetic effect and except those waived as provided for in Subparagraph 4.3.5. Such controversies or Claims upon which the Architect has given notice and rendered a decision as provided in Subparagraph 4.4.4 shall be subject to arbitration upon written demand of either party. Arbitration may be commenced when 45 days have passed after a Claim has been referred to the Architect as provided in Paragraph 4.3 and no decision has been rendered.

**AIA DOCUMENT A201** • GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION • FOURTEENTH EDITION
AIA® • ©1987 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON D.C. 20006

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**

**4.5.2 Rules and Notices for Arbitration.** Claims between the Owner and Contractor not resolved under Paragraph 4.4 shall, if subject to arbitration under Subparagraph 4.5.1, be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect, unless the parties mutually agree otherwise. Notice of demand for arbitration shall be filed in writing with the other party to the Agreement between the Owner and Contractor and with the American Arbitration Association, and a copy shall be filed with the Architect.

**4.5.3 Contract Performance During Arbitration.** During arbitration proceedings, the Owner and Contractor shall comply with Subparagraph 4.3.4.

**4.5.4 When Arbitration May Be Demanded.** Demand for arbitration of any Claim may not be made until the earlier of (1) the date on which the Architect has rendered a final written decision on the Claim, (2) the tenth day after the parties have presented evidence to the Architect or have been given reasonable opportunity to do so, if the Architect has not rendered a final written decision by that date, or (3) any of the five events described in Subparagraph 4.3.2.

**4.5.4.1** When a written decision of the Architect states that (1) the decision is final but subject to arbitration and (2) a demand for arbitration of a Claim covered by such decision must be made within 30 days after the date on which the party making the demand receives the final written decision, then failure to demand arbitration within said 30 days' period shall result in the Architect's decision becoming final and binding upon the Owner and Contractor. If the Architect renders a decision after arbitration proceedings have been initiated, such decision may be entered as evidence, but shall not supersede arbitration proceedings unless the decision is acceptable to all parties concerned.

**4.5.4.2** A demand for arbitration shall be made within the time limits specified in Subparagraphs 4.5.1 and 4.5.4 and Clause 4.5.4.1 as applicable, and in other cases within a reasonable time after the Claim has arisen, and in no event shall it be made after the date when institution of legal or equitable proceedings based on such Claim would be barred by the applicable statute of limitations as determined pursuant to Paragraph 13.7

**4.5.5 Limitation on Consolidation or Joinder.** No arbitration arising out of or relating to the Contract Documents shall include, by consolidation or joinder or in any other manner, the Architect, the Architect's employees or consultants, except by written consent containing specific reference to the Agreement and signed by the Architect, Owner, Contractor and any other person or entity sought to be joined. No arbitration shall include, by consolidation or joinder or in any other manner, parties other than the Owner, Contractor, a separate contractor as described in Article 6 and other persons substantially involved in a common question of fact or law whose presence is required if complete relief is to be accorded in arbitration. No person or entity other than the Owner, Contractor or a separate contractor as described in Article 6 shall be included as an original third party or additional third party to an arbitration whose interest or responsibility is insubstantial. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of a dispute not described therein or with a person or entity not named or described therein. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by parties to the Agreement shall be specifically enforceable under applicable law in any court having jurisdiction thereof.

**4.5.6 Claims and Timely Assertion of Claims.** A party who files a notice of demand for arbitration must assert in the demand all Claims then known to that party on which arbitration is permitted to be demanded. When a party fails to include a Claim through oversight, inadvertence or excusable neglect, or when a Claim has matured or been acquired subsequently, the arbitrator or arbitrators may permit amendment.

**4.5.7 Judgment on Final Award.** The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

# ARTICLE 5

# SUBCONTRACTORS

**5.1 DEFINITIONS**

**5.1.1** A Subcontractor is a person or entity who has a direct contract with the Contractor to perform a portion of the Work at the site. The term "Subcontractor" is referred to throughout the Contract Documents as if singular in number and means a Subcontractor or an authorized representative of the Subcontractor. The term "Subcontractor" does not include a separate contractor or subcontractors of a separate contractor.

**5.1.2** A Sub-subcontractor is a person or entity who has a direct or indirect contract with a Subcontractor to perform a portion of the Work at the site. The term "Sub-subcontractor" is referred to throughout the Contract Documents as if singular in number and means a Sub-subcontractor or an authorized representative of the Sub-subcontractor.

**5.2 AWARD OF SUBCONTRACTS AND OTHER CONTRACTS FOR PORTIONS OF THE WORK**

**5.2.1** Unless otherwise stated in the Contract Documents or the bidding requirements, the Contractor, as soon as practicable after award of the Contract, shall furnish in writing to the Owner through the Architect the names of persons or entities (including those who are to furnish materials or equipment fabricated to a special design) proposed for each principal portion of the Work. The Architect will promptly reply to the Contractor in writing stating whether or not the Owner or the Architect, after due investigation, has reasonable objection to any such proposed person or entity. Failure of the Owner or Architect to reply promptly shall constitute notice of no reasonable objection.

**5.2.2** The Contractor shall not contract with a proposed person or entity to whom the Owner or Architect has made reasonable and timely objection. The Contractor shall not be required to contract with anyone to whom the Contractor has made reasonable objection.

**5.2.3** If the Owner or Architect has reasonable objection to a person or entity proposed by the Contractor, the Contractor shall propose another to whom the Owner or Architect has no reasonable objection. The Contract Sum shall be increased or decreased by the difference in cost occasioned by such change and an appropriate Change Order shall be issued. However, no increase in the Contract Sum shall be allowed for such change unless the Contractor has acted promptly and responsively in submitting names as required.

**5.2.4** The Contractor shall not change a Subcontractor, person or entity previously selected if the Owner or Architect makes reasonable objection to such change.

WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

## 5.3   SUBCONTRACTUAL RELATIONS

**5.3.1** By appropriate agreement, written where legally required for validity, the Contractor shall require each Subcontractor, to the extent of the Work to be performed by the Subcontractor, to be bound to the Contractor by terms of the Contract Documents, and to assume toward the Contractor all the obligations and responsibilities which the Contractor, by these Documents, assumes toward the Owner and Architect. Each subcontract agreement shall preserve and protect the rights of the Owner and Architect under the Contract Documents with respect to the Work to be performed by the Subcontractor so that subcontracting thereof will not prejudice such rights, and shall allow to the Subcontractor, unless specifically provided otherwise in the subcontract agreement, the benefit of all rights, remedies and redress against the Contractor that the Contractor, by the Contract Documents, has against the Owner. Where appropriate, the Contractor shall require each Subcontractor to enter into similar agreements with Sub-subcontractors. The Contractor shall make available to each proposed Subcontractor, prior to the execution of the subcontract agreement, copies of the Contract Documents to which the Subcontractor will be bound, and, upon written request of the Subcontractor, identify to the Subcontractor terms and conditions of the proposed subcontract agreement which may be at variance with the Contract Documents. Subcontractors shall similarly make copies of applicable portions of such documents available to their respective proposed Sub-subcontractors.

## 5.4   CONTINGENT ASSIGNMENT OF SUBCONTRACTS

**5.4.1** Each subcontract agreement for a portion of the Work is assigned by the Contractor to the Owner provided that:

.1  assignment is effective only after termination of the Contract by the Owner for cause pursuant to Paragraph 14.2 and only for those subcontract agreements which the Owner accepts by notifying the Subcontractor in writing; and

.2  assignment is subject to the prior rights of the surety, if any, obligated under bond relating to the Contract.

**5.4.2** If the Work has been suspended for more than 30 days, the Subcontractor's compensation shall be equitably adjusted.

## ARTICLE 6

## CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS

### 6.1   OWNER'S RIGHT TO PERFORM CONSTRUCTION AND TO AWARD SEPARATE CONTRACTS

**6.1.1** The Owner reserves the right to perform construction or operations related to the Project with the Owner's own forces, and to award separate contracts in connection with other portions of the Project or other construction or operations on the site under Conditions of the Contract identical or substantially similar to these including those portions related to insurance and waiver of subrogation. If the Contractor claims that delay or additional cost is involved because of such action by the Owner, the Contractor shall make such Claim as provided elsewhere in the Contract Documents.

**6.1.2** When separate contracts are awarded for different portions of the Project or other construction or operations on the site, the term "Contractor" in the Contract Documents in each case shall mean the Contractor who executes each separate Owner-Contractor Agreement.

**6.1.3** The Owner shall provide for coordination of the activities of the Owner's own forces and of each separate contractor with the Work of the Contractor, who shall cooperate with them. The Contractor shall participate with other separate contractors and the Owner in reviewing their construction schedules when directed to do so. The Contractor shall make any revisions to the construction schedule and Contract Sum deemed necessary after a joint review and mutual agreement. The construction schedules shall then constitute the schedules to be used by the Contractor, separate contractors and the Owner until subsequently revised.

**6.1.4** Unless otherwise provided in the Contract Documents, when the Owner performs construction or operations related to the Project with the Owner's own forces, the Owner shall be deemed to be subject to the same obligations and to have the same rights which apply to the Contractor under the Conditions of the Contract, including, without excluding others, those stated in Article 3, this Article 6 and Articles 10, 11 and 12.

### 6.2   MUTUAL RESPONSIBILITY

**6.2.1** The Contractor shall afford the Owner and separate contractors reasonable opportunity for introduction and storage of their materials and equipment and performance of their activities and shall connect and coordinate the Contractor's construction and operations with theirs as required by the Contract Documents.

**6.2.2** If part of the Contractor's Work depends for proper execution or results upon construction or operations by the Owner or a separate contractor, the Contractor shall, prior to proceeding with that portion of the Work, promptly report to the Architect apparent discrepancies or defects in such other construction that would render it unsuitable for such proper execution and results. Failure of the Contractor so to report shall constitute an acknowledgment that the Owner's or separate contractors' completed or partially completed construction is fit and proper to receive the Contractor's Work, except as to defects not then reasonably discoverable.

**6.2.3** Costs caused by delays or by improperly timed activities or defective construction shall be borne by the party responsible therefor.

**6.2.4** The Contractor shall promptly remedy damage wrongfully caused by the Contractor to completed or partially completed construction or to property of the Owner or separate contractors as provided in Subparagraph 10.2.5.

**6.2.5** Claims and other disputes and matters in question between the Contractor and a separate contractor shall be subject to the provisions of Paragraph 4.3 provided the separate contractor has reciprocal obligations.

**6.2.6** The Owner and each separate contractor shall have the same responsibilities for cutting and patching as are described for the Contractor in Paragraph 3.14.

### 6.3   OWNER'S RIGHT TO CLEAN UP

**6.3.1** If a dispute arises among the Contractor, separate contractors and the Owner as to the responsibility under their respective contracts for maintaining the premises and surrounding area free from waste materials and rubbish as described in Paragraph 3.15, the Owner may clean up and allocate the cost among those responsible as the Architect determines to be just

**AIA DOCUMENT A201** • GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION • FOURTEENTH EDITION
AIA® • ©1987 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON D.C. 20006

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**

# ARTICLE 7

# CHANGES IN THE WORK

## 7.1 CHANGES

**7.1.1** Changes in the Work may be accomplished after execution of the Contract, and without invalidating the Contract, by Change Order, Construction Change Directive or order for a minor change in the Work, subject to the limitations stated in this Article 7 and elsewhere in the Contract Documents.

**7.1.2** A Change Order shall be based upon agreement among the Owner, Contractor and Architect; a Construction Change Directive requires agreement by the Owner and Architect and may or may not be agreed to by the Contractor; an order for a minor change in the Work may be issued by the Architect alone.

**7.1.3** Changes in the Work shall be performed under applicable provisions of the Contract Documents, and the Contractor shall proceed promptly, unless otherwise provided in the Change Order, Construction Change Directive or order for a minor change in the Work.

**7.1.4** If unit prices are stated in the Contract Documents or subsequently agreed upon, and if quantities originally contemplated are so changed in a proposed Change Order or Construction Change Directive that application of such unit prices to quantities of Work proposed will cause substantial inequity to the Owner or Contractor, the applicable unit prices shall be equitably adjusted.

## 7.2 CHANGE ORDERS

**7.2.1** A Change Order is a written instrument prepared by the Architect and signed by the Owner, Contractor and Architect, stating their agreement upon all of the following:

> .1 a change in the Work;
>
> .2 the amount of the adjustment in the Contract Sum, if any; and
>
> .3 the extent of the adjustment in the Contract Time, if any.

**7.2.2** Methods used in determining adjustments to the Contract Sum may include those listed in Subparagraph 7.3.3.

## 7.3 CONSTRUCTION CHANGE DIRECTIVES

**7.3.1** A Construction Change Directive is a written order prepared by the Architect and signed by the Owner and Architect, directing a change in the Work and stating a proposed basis for adjustment, if any, in the Contract Sum or Contract Time, or both. The Owner may by Construction Change Directive, without invalidating the Contract, order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions, the Contract Sum and Contract Time being adjusted accordingly.

**7.3.2** A Construction Change Directive shall be used in the absence of total agreement on the terms of a Change Order.

**7.3.3** If the Construction Change Directive provides for an adjustment to the Contract Sum, the adjustment shall be based on one of the following methods:

> .1 mutual acceptance of a lump sum properly itemized and supported by sufficient substantiating data to permit evaluation;
>
> .2 unit prices stated in the Contract Documents or subsequently agreed upon;

> .3 cost to be determined in a manner agreed upon by the parties and a mutually acceptable fixed or percentage fee; or
>
> .4 as provided in Subparagraph 7.3.6.

**7.3.4** Upon receipt of a Construction Change Directive, the Contractor shall promptly proceed with the change in the Work involved and advise the Architect of the Contractor's agreement or disagreement with the method, if any, provided in the Construction Change Directive for determining the proposed adjustment in the Contract Sum or Contract Time.

**7.3.5** A Construction Change Directive signed by the Contractor indicates the agreement of the Contractor therewith, including adjustment in Contract Sum and Contract Time or the method for determining them. Such agreement shall be effective immediately and shall be recorded as a Change Order.

**7.3.6** If the Contractor does not respond promptly or disagrees with the method for adjustment in the Contract Sum, the method and the adjustment shall be determined by the Architect on the basis of reasonable expenditures and savings of those performing the Work attributable to the change, including, in case of an increase in the Contract Sum, a reasonable allowance for overhead and profit. In such case, and also under Clause 7.3.3.3, the Contractor shall keep and present, in such form as the Architect may prescribe, an itemized accounting together with appropriate supporting data. Unless otherwise provided in the Contract Documents, costs for the purposes of this Subparagraph 7.3.6 shall be limited to the following:

> .1 costs of labor, including social security, old age and unemployment insurance, fringe benefits required by agreement or custom, and workers' or workmen's compensation insurance;
>
> .2 costs of materials, supplies and equipment, including cost of transportation, whether incorporated or consumed;
>
> .3 rental costs of machinery and equipment, exclusive of hand tools, whether rented from the Contractor or others;
>
> .4 costs of premiums for all bonds and insurance, permit fees, and sales, use or similar taxes related to the Work; and
>
> .5 additional costs of supervision and field office personnel directly attributable to the change.

**7.3.7** Pending final determination of cost to the Owner, amounts not in dispute may be included in Applications for Payment. The amount of credit to be allowed by the Contractor to the Owner for a deletion or change which results in a net decrease in the Contract Sum shall be actual net cost as confirmed by the Architect. When both additions and credits covering related Work or substitutions are involved in a change, the allowance for overhead and profit shall be figured on the basis of net increase, if any, with respect to that change.

**7.3.8** If the Owner and Contractor do not agree with the adjustment in Contract Time or the method for determining it, the adjustment or the method shall be referred to the Architect for determination.

**7.3.9** When the Owner and Contractor agree with the determination made by the Architect concerning the adjustments in the Contract Sum and Contract Time, or otherwise reach agreement upon the adjustments, such agreement shall be effective immediately and shall be recorded by preparation and execution of an appropriate Change Order.

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**

## 7.4  MINOR CHANGES IN THE WORK

**7.4.1** The Architect will have authority to order minor changes in the Work not involving adjustment in the Contract Sum or extension of the Contract Time and not inconsistent with the intent of the Contract Documents. Such changes shall be effected by written order and shall be binding on the Owner and Contractor. The Contractor shall carry out such written orders promptly.

## ARTICLE 8

## TIME

### 8.1   DEFINITIONS

**8.1.1** Unless otherwise provided, Contract Time is the period of time, including authorized adjustments, allotted in the Contract Documents for Substantial Completion of the Work.

**8.1.2** The date of commencement of the Work is the date established in the Agreement. The date shall not be postponed by the failure to act of the Contractor or of persons or entities for whom the Contractor is responsible.

**8.1.3** The date of Substantial Completion is the date certified by the Architect in accordance with Paragraph 9.8.

**8.1.4** The term "day" as used in the Contract Documents shall mean calendar day unless otherwise specifically defined.

### 8.2   PROGRESS AND COMPLETION

**8.2.1** Time limits stated in the Contract Documents are of the essence of the Contract. By executing the Agreement the Contractor confirms that the Contract Time is a reasonable period for performing the Work.

**8.2.2** The Contractor shall not knowingly, except by agreement or instruction of the Owner in writing, prematurely commence operations on the site or elsewhere prior to the effective date of insurance required by Article 11 to be furnished by the Contractor. The date of commencement of the Work shall not be changed by the effective date of such insurance. Unless the date of commencement is established by a notice to proceed given by the Owner, the Contractor shall notify the Owner in writing not less than five days or other agreed period before commencing the Work to permit the timely filing of mortgages, mechanic's liens and other security interests.

**8.2.3** The Contractor shall proceed expeditiously with adequate forces and shall achieve Substantial Completion within the Contract Time.

### 8.3   DELAYS AND EXTENSIONS OF TIME

**8.3.1** If the Contractor is delayed at any time in progress of the Work by an act or neglect of the Owner or Architect, or of an employee of either, or of a separate contractor employed by the Owner, or by changes ordered in the Work, or by labor disputes, fire, unusual delay in deliveries, unavoidable casualties or other causes beyond the Contractor's control, or by delay authorized by the Owner pending arbitration, or by other causes which the Architect determines may justify delay, then the Contract Time shall be extended by Change Order for such reasonable time as the Architect may determine.

**8.3.2** Claims relating to time shall be made in accordance with applicable provisions of Paragraph 4.3.

**8.3.3** This Paragraph 8.3 does not preclude recovery of damages for delay by either party under other provisions of the Contract Documents.

## ARTICLE 9

## PAYMENTS AND COMPLETION

### 9.1   CONTRACT SUM

**9.1.1** The Contract Sum is stated in the Agreement and, including authorized adjustments, is the total amount payable by the Owner to the Contractor for performance of the Work under the Contract Documents.

### 9.2   SCHEDULE OF VALUES

**9.2.1** Before the first Application for Payment, the Contractor shall submit to the Architect a schedule of values allocated to various portions of the Work, prepared in such form and supported by such data to substantiate its accuracy as the Architect may require. This schedule, unless objected to by the Architect, shall be used as a basis for reviewing the Contractor's Applications for Payment.

### 9.3   APPLICATIONS FOR PAYMENT

**9.3.1** At least ten days before the date established for each progress payment, the Contractor shall submit to the Architect an itemized Application for Payment for operations completed in accordance with the schedule of values. Such application shall be notarized, if required, and supported by such data substantiating the Contractor's right to payment as the Owner or Architect may require, such as copies of requisitions from Subcontractors and material suppliers, and reflecting retainage if provided for elsewhere in the Contract Documents.

**9.3.1.1** Such applications may include requests for payment on account of changes in the Work which have been properly authorized by Construction Change Directives but not yet included in Change Orders.

**9.3.1.2** Such applications may not include requests for payment of amounts the Contractor does not intend to pay to a Subcontractor or material supplier because of a dispute or other reason.

**9.3.2** Unless otherwise provided in the Contract Documents, payments shall be made on account of materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work. If approved in advance by the Owner, payment may similarly be made for materials and equipment suitably stored off the site at a location agreed upon in writing. Payment for materials and equipment stored on or off the site shall be conditioned upon compliance by the Contractor with procedures satisfactory to the Owner to establish the Owner's title to such materials and equipment or otherwise protect the Owner's interest, and shall include applicable insurance, storage and transportation to the site for such materials and equipment stored off the site.

**9.3.3** The Contractor warrants that title to all Work covered by an Application for Payment will pass to the Owner no later than the time of payment. The Contractor further warrants that upon submittal of an Application for Payment all Work for which Certificates for Payment have been previously issued and payments received from the Owner shall, to the best of the Contractor's knowledge, information and belief, be free and clear of liens, claims, security interests or encumbrances in favor of the Contractor, Subcontractors, material suppliers, or other persons or entities making a claim by reason of having provided labor, materials and equipment relating to the Work.

### 9.4   CERTIFICATES FOR PAYMENT

**9.4.1** The Architect will, within seven days after receipt of the Contractor's Application for Payment, either issue to the

**AIA DOCUMENT A201** • GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION • FOURTEENTH EDITION
AIA® • ©1987 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**

Owner a Certificate for Payment, with a copy to the Contractor, for such amount as the Architect determines is properly due, or notify the Contractor and Owner in writing of the Architect's reasons for withholding certification in whole or in part as provided in Subparagraph 9.5.1.

**9.4.2** The issuance of a Certificate for Payment will constitute a representation by the Architect to the Owner, based on the Architect's observations at the site and the data comprising the Application for Payment, that the Work has progressed to the point indicated and that, to the best of the Architect's knowledge, information and belief, quality of the Work is in accordance with the Contract Documents. The foregoing representations are subject to an evaluation of the Work for conformance with the Contract Documents upon Substantial Completion, to results of subsequent tests and inspections, to minor deviations from the Contract Documents correctable prior to completion and to specific qualifications expressed by the Architect. The issuance of a Certificate for Payment will further constitute a representation that the Contractor is entitled to payment in the amount certified. However, the issuance of a Certificate for Payment will not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from Subcontractors and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment or (4) made examination to ascertain how or for what purpose the Contractor has used money previously paid on account of the Contract Sum.

**9.5    DECISIONS TO WITHHOLD CERTIFICATION**

**9.5.1** The Architect may decide not to certify payment and may withhold a Certificate for Payment in whole or in part, to the extent reasonably necessary to protect the Owner, if in the Architect's opinion the representations to the Owner required by Subparagraph 9.4.2 cannot be made. If the Architect is unable to certify payment in the amount of the Application, the Architect will notify the Contractor and Owner as provided in Subparagraph 9.4.1. If the Contractor and Architect cannot agree on a revised amount, the Architect will promptly issue a Certificate for Payment for the amount for which the Architect is able to make such representations to the Owner. The Architect may also decide not to certify payment or, because of subsequently discovered evidence or subsequent observations, may nullify the whole or a part of a Certificate for Payment previously issued, to such extent as may be necessary in the Architect's opinion to protect the Owner from loss because of:

.1  defective Work not remedied;

.2  third party claims filed or reasonable evidence indicating probable filing of such claims;

.3  failure of the Contractor to make payments properly to Subcontractors or for labor, materials or equipment;

.4  reasonable evidence that the Work cannot be completed for the unpaid balance of the Contract Sum;

.5  damage to the Owner or another contractor;

.6  reasonable evidence that the Work will not be completed within the Contract Time, and that the unpaid balance would not be adequate to cover actual or liquidated damages for the anticipated delay; or

.7  persistent failure to carry out the Work in accordance with the Contract Documents.

**9.5.2** When the above reasons for withholding certification are removed, certification will be made for amounts previously withheld.

**9.6    PROGRESS PAYMENTS**

**9.6.1** After the Architect has issued a Certificate for Payment, the Owner shall make payment in the manner and within the time provided in the Contract Documents, and shall so notify the Architect.

**9.6.2** The Contractor shall promptly pay each Subcontractor, upon receipt of payment from the Owner, out of the amount paid to the Contractor on account of such Subcontractor's portion of the Work, the amount to which said Subcontractor is entitled, reflecting percentages actually retained from payments to the Contractor on account of such Subcontractor's portion of the Work. The Contractor shall, by appropriate agreement with each Subcontractor, require each Subcontractor to make payments to Sub-subcontractors in similar manner.

**9.6.3** The Architect will, on request, furnish to a Subcontractor, if practicable, information regarding percentages of completion or amounts applied for by the Contractor and action taken thereon by the Architect and Owner on account of portions of the Work done by such Subcontractor.

**9.6.4** Neither the Owner nor Architect shall have an obligation to pay or to see to the payment of money to a Subcontractor except as may otherwise be required by law.

**9.6.5** Payment to material suppliers shall be treated in a manner similar to that provided in Subparagraphs 9.6.2, 9.6.3 and 9.6.4.

**9.6.6** A Certificate for Payment, a progress payment, or partial or entire use or occupancy of the Project by the Owner shall not constitute acceptance of Work not in accordance with the Contract Documents.

**9.7    FAILURE OF PAYMENT**

**9.7.1** If the Architect does not issue a Certificate for Payment, through no fault of the Contractor, within seven days after receipt of the Contractor's Application for Payment, or if the Owner does not pay the Contractor within seven days after the date established in the Contract Documents the amount certified by the Architect or awarded by arbitration, then the Contractor may, upon seven additional days' written notice to the Owner and Architect, stop the Work until payment of the amount owing has been received. The Contract Time shall be extended appropriately and the Contract Sum shall be increased by the amount of the Contractor's reasonable costs of shut-down, delay and start-up, which shall be accomplished as provided in Article 7.

**9.8    SUBSTANTIAL COMPLETION**

**9.8.1** Substantial Completion is the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so the Owner can occupy or utilize the Work for its intended use.

**9.8.2** When the Contractor considers that the Work, or a portion thereof which the Owner agrees to accept separately, is substantially complete, the Contractor shall prepare and submit to the Architect a comprehensive list of items to be completed or corrected. The Contractor shall proceed promptly to complete and correct items on the list. Failure to include an item on such list does not alter the responsibility of the Contractor to complete all Work in accordance with the Contract Documents. Upon receipt of the Contractor's list, the Architect will make an inspection to determine whether the Work or desig-

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**

nated portion thereof is substantially complete. If the Architect's inspection discloses any item, whether or not included on the Contractor's list, which is not in accordance with the requirements of the Contract Documents, the Contractor shall, before issuance of the Certificate of Substantial Completion, complete or correct such item upon notification by the Architect. The Contractor shall then submit a request for another inspection by the Architect to determine Substantial Completion. When the Work or designated portion thereof is substantially complete, the Architect will prepare a Certificate of Substantial Completion which shall establish the date of Substantial Completion, shall establish responsibilities of the Owner and Contractor for security, maintenance, heat, utilities, damage to the Work and insurance, and shall fix the time within which the Contractor shall finish all items on the list accompanying the Certificate. Warranties required by the Contract Documents shall commence on the date of Substantial Completion of the Work or designated portion thereof unless otherwise provided in the Certificate of Substantial Completion. The Certificate of Substantial Completion shall be submitted to the Owner and Contractor for their written acceptance of responsibilities assigned to them in such Certificate.

**9.8.3** Upon Substantial Completion of the Work or designated portion thereof and upon application by the Contractor and certification by the Architect, the Owner shall make payment, reflecting adjustment in retainage, if any, for such Work or portion thereof as provided in the Contract Documents.

## 9.9   PARTIAL OCCUPANCY OR USE

**9.9.1** The Owner may occupy or use any completed or partially completed portion of the Work at any stage when such portion is designated by separate agreement with the Contractor, provided such occupancy or use is consented to by the insurer as required under Subparagraph 11.3.11 and authorized by public authorities having jurisdiction over the Work. Such partial occupancy or use may commence whether or not the portion is substantially complete, provided the Owner and Contractor have accepted in writing the responsibilities assigned to each of them for payments, retainage if any, security, maintenance, heat, utilities, damage to the Work and insurance, and have agreed in writing concerning the period for correction of the Work and commencement of warranties required by the Contract Documents. When the Contractor considers a portion substantially complete, the Contractor shall prepare and submit a list to the Architect as provided under Subparagraph 9.8.2. Consent of the Contractor to partial occupancy or use shall not be unreasonably withheld. The stage of the progress of the Work shall be determined by written agreement between the Owner and Contractor or, if no agreement is reached, by decision of the Architect.

**9.9.2** Immediately prior to such partial occupancy or use, the Owner, Contractor and Architect shall jointly inspect the area to be occupied or portion of the Work to be used in order to determine and record the condition of the Work.

**9.9.3** Unless otherwise agreed upon, partial occupancy or use of a portion or portions of the Work shall not constitute acceptance of Work not complying with the requirements of the Contract Documents.

## 9.10   FINAL COMPLETION AND FINAL PAYMENT

**9.10.1** Upon receipt of written notice that the Work is ready for final inspection and acceptance and upon receipt of a final Application for Payment, the Architect will promptly make

such inspection and, when the Architect finds the Work acceptable under the Contract Documents and the Contract fully performed, the Architect will promptly issue a final Certificate for Payment stating that to the best of the Architect's knowledge, information and belief, and on the basis of the Architect's observations and inspections, the Work has been completed in accordance with terms and conditions of the Contract Documents and that the entire balance found to be due the Contractor and noted in said final Certificate is due and payable. The Architect's final Certificate for Payment will constitute a further representation that conditions listed in Subparagraph 9.10.2 as precedent to the Contractor's being entitled to final payment have been fulfilled.

**9.10.2** Neither final payment nor any remaining retained percentage shall become due until the Contractor submits to the Architect (1) an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which the Owner or the Owner's property might be responsible or encumbered (less amounts withheld by Owner) have been paid or otherwise satisfied, (2) a certificate evidencing that insurance required by the Contract Documents to remain in force after final payment is currently in effect and will not be cancelled or allowed to expire until at least 30 days' prior written notice has been given to the Owner, (3) a written statement that the Contractor knows of no substantial reason that the insurance will not be renewable to cover the period required by the Contract Documents, (4) consent of surety, if any, to final payment and (5), if required by the Owner, other data establishing payment or satisfaction of obligations, such as receipts, releases and waivers of liens, claims, security interests or encumbrances arising out of the Contract, to the extent and in such form as may be designated by the Owner. If a Subcontractor refuses to furnish a release or waiver required by the Owner, the Contractor may furnish a bond satisfactory to the Owner to indemnify the Owner against such lien. If such lien remains unsatisfied after payments are made, the Contractor shall refund to the Owner all money that the Owner may be compelled to pay in discharging such lien, including all costs and reasonable attorneys' fees.

**9.10.3** If, after Substantial Completion of the Work, final completion thereof is materially delayed through no fault of the Contractor or by issuance of Change Orders affecting final completion, and the Architect so confirms, the Owner shall, upon application by the Contractor and certification by the Architect, and without terminating the Contract, make payment of the balance due for that portion of the Work fully completed and accepted. If the remaining balance for Work not fully completed or corrected is less than retainage stipulated in the Contract Documents, and if bonds have been furnished, the written consent of surety to payment of the balance due for that portion of the Work fully completed and accepted shall be submitted by the Contractor to the Architect prior to certification of such payment. Such payment shall be made under terms and conditions governing final payment, except that it shall not constitute a waiver of claims. The making of final payment shall constitute a waiver of claims by the Owner as provided in Subparagraph 4.3.5.

**9.10.4** Acceptance of final payment by the Contractor, a Subcontractor or material supplier shall constitute a waiver of claims by that payee except those previously made in writing and identified by that payee as unsettled at the time of final Application for Payment. Such waivers shall be in addition to the waiver described in Subparagraph 4.3.5.

**AIA DOCUMENT A201** • GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION • FOURTEENTH EDITION
AIA® • ©1987 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**

## ARTICLE 10

## PROTECTION OF PERSONS AND PROPERTY

### 10.1 SAFETY PRECAUTIONS AND PROGRAMS

**10.1.1** The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the Contract.

**10.1.2** In the event the Contractor encounters on the site material reasonably believed to be asbestos or polychlorinated biphenyl (PCB) which has not been rendered harmless, the Contractor shall immediately stop Work in the area affected and report the condition to the Owner and Architect in writing. The Work in the affected area shall not thereafter be resumed except by written agreement of the Owner and Contractor if in fact the material is asbestos or polychlorinated biphenyl (PCB) and has not been rendered harmless. The Work in the affected area shall be resumed in the absence of asbestos or polychlorinated biphenyl (PCB), or when it has been rendered harmless, by written agreement of the Owner and Contractor, or in accordance with final determination by the Architect on which arbitration has not been demanded, or by arbitration under Article 4.

**10.1.3** The Contractor shall not be required pursuant to Article 7 to perform without consent any Work relating to asbestos or polychlorinated biphenyl (PCB).

**10.1.4** To the fullest extent permitted by law, the Owner shall indemnify and hold harmless the Contractor, Architect, Architect's consultants and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work in the affected area if in fact the material is asbestos or polychlorinated biphenyl (PCB) and has not been rendered harmless, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) including loss of use resulting therefrom, but only to the extent caused in whole or in part by negligent acts or omissions of the Owner, anyone directly or indirectly employed by the Owner or anyone for whose acts the Owner may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Subparagraph 10.1.4.

### 10.2 SAFETY OF PERSONS AND PROPERTY

**10.2.1** The Contractor shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to:

  **.1** employees on the Work and other persons who may be affected thereby;

  **.2** the Work and materials and equipment to be incorporated therein, whether in storage on or off the site, under care, custody or control of the Contractor or the Contractor's Subcontractors or Sub-subcontractors; and

  **.3** other property at the site or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.

**10.2.2** The Contractor shall give notices and comply with applicable laws, ordinances, rules, regulations and lawful orders of public authorities bearing on safety of persons or property or their protection from damage, injury or loss.

**10.2.3** The Contractor shall erect and maintain, as required by existing conditions and performance of the Contract, reasonable safeguards for safety and protection, including posting danger signs and other warnings against hazards, promulgating safety regulations and notifying owners and users of adjacent sites and utilities.

**10.2.4** When use or storage of explosives or other hazardous materials or equipment or unusual methods are necessary for execution of the Work, the Contractor shall exercise utmost care and carry on such activities under supervision of properly qualified personnel.

**10.2.5** The Contractor shall promptly remedy damage and loss (other than damage or loss insured under property insurance required by the Contract Documents) to property referred to in Clauses 10.2.1.2 and 10.2.1.3 caused in whole or in part by the Contractor, a Subcontractor, a Sub-subcontractor, or anyone directly or indirectly employed by any of them, or by anyone for whose acts they may be liable and for which the Contractor is responsible under Clauses 10.2.1.2 and 10.2.1.3, except damage or loss attributable to acts or omissions of the Owner or Architect or anyone directly or indirectly employed by either of them, or by anyone for whose acts either of them may be liable, and not attributable to the fault or negligence of the Contractor. The foregoing obligations of the Contractor are in addition to the Contractor's obligations under Paragraph 3.18.

**10.2.6** The Contractor shall designate a responsible member of the Contractor's organization at the site whose duty shall be the prevention of accidents. This person shall be the Contractor's superintendent unless otherwise designated by the Contractor in writing to the Owner and Architect.

**10.2.7** The Contractor shall not load or permit any part of the construction or site to be loaded so as to endanger its safety.

### 10.3 EMERGENCIES

**10.3.1** In an emergency affecting safety of persons or property, the Contractor shall act, at the Contractor's discretion, to prevent threatened damage, injury or loss. Additional compensation or extension of time claimed by the Contractor on account of an emergency shall be determined as provided in Paragraph 4.3 and Article 7.

## ARTICLE 11

## INSURANCE AND BONDS

### 11.1 CONTRACTOR'S LIABILITY INSURANCE

**11.1.1** The Contractor shall purchase from and maintain in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located such insurance as will protect the Contractor from claims set forth below which may arise out of or result from the Contractor's operations under the Contract and for which the Contractor may be legally liable, whether such operations be by the Contractor or by a Subcontractor or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable:

  **.1** claims under workers' or workmen's compensation, disability benefit and other similar employee benefit acts which are applicable to the Work to be performed;

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**

**.2** claims for damages because of bodily injury, occupational sickness or disease, or of death of the Contractor s employees;

**.3** claims for damages because of bodily injury, sickness or disease, or death of any person other than the Contractor's employees;

**.4** claims for damages insured by usual personal injury liability coverage which are sustained (1) by a person as a result of an offense directly or indirectly related to employment of such person by the Contractor, or (2) by another person;

**.5** claims for damages, other than to the Work itself, because of injury to or destruction of tangible property, including loss of use resulting therefrom;

**.6** claims for damages because of bodily injury, death of a person or property damage arising out of ownership, maintenance or use of a motor vehicle; and

**.7** claims involving contractual liability insurance applicable to the Contractor's obligations under Paragraph 3.18.

**11.1.2** The insurance required by Subparagraph 11.1.1 shall be written for not less than limits of liability specified in the Contract Documents or required by law, whichever coverage is greater. Coverages, whether written on an occurrence or claims-made basis, shall be maintained without interruption from date of commencement of the Work until date of final payment and termination of any coverage required to be maintained after final payment.

**11.1.3** Certificates of Insurance acceptable to the Owner shall be filed with the Owner prior to commencement of the Work. These Certificates and the insurance policies required by this Paragraph 11.1 shall contain a provision that coverages afforded under the policies will not be cancelled or allowed to expire until at least 30 days' prior written notice has been given to the Owner. If any of the foregoing insurance coverages are required to remain in force after final payment and are reasonably available, an additional certificate evidencing continuation of such coverage shall be submitted with the final Application for Payment as required by Subparagraph 9.10.2. Information concerning reduction of coverage shall be furnished by the Contractor with reasonable promptness in accordance with the Contractor's information and belief.

**11.2   OWNER'S LIABILITY INSURANCE**

**11.2.1** The Owner shall be responsible for purchasing and maintaining the Owner's usual liability insurance. Optionally, the Owner may purchase and maintain other insurance for self-protection against claims which may arise from operations under the Contract. The Contractor shall not be responsible for purchasing and maintaining this optional Owner's liability insurance unless specifically required by the Contract Documents.

**11.3   PROPERTY INSURANCE**

**11.3.1** Unless otherwise provided, the Owner shall purchase and maintain, in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located, property insurance in the amount of the initial Contract Sum as well as subsequent modifications thereto for the entire Work at the site on a replacement cost basis without voluntary deductibles. Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until final payment has been made as provided in Paragraph 9.10 or until no person or entity

other than the Owner has an insurable interest in the property required by this Paragraph 11.3 to be covered, whichever is earlier. This insurance shall include interests of the Owner, the Contractor, Subcontractors and Sub-subcontractors in the Work.

**11.3.1.1** Property insurance shall be on an all-risk policy form and shall insure against the perils of fire and extended coverage and physical loss or damage including, without duplication of coverage, theft, vandalism, malicious mischief, collapse, falsework, temporary buildings and debris removal including demolition occasioned by enforcement of any applicable legal requirements, and shall cover reasonable compensation for Architect's services and expenses required as a result of such insured loss. Coverage for other perils shall not be required unless otherwise provided in the Contract Documents.

**11.3.1.2** If the Owner does not intend to purchase such property insurance required by the Contract and with all of the coverages in the amount described above, the Owner shall so inform the Contractor in writing prior to commencement of the Work. The Contractor may then effect insurance which will protect the interests of the Contractor, Subcontractors and Sub-subcontractors in the Work, and by appropriate Change Order the cost thereof shall be charged to the Owner. If the Contractor is damaged by the failure or neglect of the Owner to purchase or maintain insurance as described above, without so notifying the Contractor, then the Owner shall bear all reasonable costs properly attributable thereto.

**11.3.1.3** If the property insurance requires minimum deductibles and such deductibles are identified in the Contract Documents, the Contractor shall pay costs not covered because of such deductibles. If the Owner or insurer increases the required minimum deductibles above the amounts so identified or if the Owner elects to purchase this insurance with voluntary deductible amounts, the Owner shall be responsible for payment of the additional costs not covered because of such increased or voluntary deductibles. If deductibles are not identified in the Contract Documents, the Owner shall pay costs not covered because of deductibles.

**11.3.1.4** Unless otherwise provided in the Contract Documents, this property insurance shall cover portions of the Work stored off the site after written approval of the Owner at the value established in the approval, and also portions of the Work in transit.

**11.3.2  Boiler and Machinery Insurance.** The Owner shall purchase and maintain boiler and machinery insurance required by the Contract Documents or by law, which shall specifically cover such insured objects during installation and until final acceptance by the Owner; this insurance shall include interests of the Owner, Contractor, Subcontractors and Sub-subcontractors in the Work, and the Owner and Contractor shall be named insureds.

**11.3.3  Loss of Use Insurance.** The Owner, at the Owner's option, may purchase and maintain such insurance as will insure the Owner against loss of use of the Owner's property due to fire or other hazards, however caused. The Owner waives all rights of action against the Contractor for loss of use of the Owner's property, including consequential losses due to fire or other hazards however caused.

**11.3.4** If the Contractor requests in writing that insurance for risks other than those described herein or for other special hazards be included in the property insurance policy, the Owner shall, if possible, include such insurance, and the cost thereof shall be charged to the Contractor by appropriate Change Order.

**AIA DOCUMENT A201** • GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION • FOURTEENTH EDITION
AIA® • © 1987 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**

**11.3.5** If during the Project construction period the Owner insures properties, real or personal or both, adjoining or adjacent to the site by property insurance under policies separate from those insuring the Project, or if after final payment property insurance is to be provided on the completed Project through a policy or policies other than those insuring the Project during the construction period, the Owner shall waive all rights in accordance with the terms of Subparagraph 11.3.7 for damages caused by fire or other perils covered by this separate property insurance. All separate policies shall provide this waiver of subrogation by endorsement or otherwise.

**11.3.6** Before an exposure to loss may occur, the Owner shall file with the Contractor a copy of each policy that includes insurance coverages required by this Paragraph 11.3. Each policy shall contain all generally applicable conditions, definitions, exclusions and endorsements related to this Project. Each policy shall contain a provision that the policy will not be cancelled or allowed to expire until at least 30 days' prior written notice has been given to the Contractor.

**11.3.7 Waivers of Subrogation.** The Owner and Contractor waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, and (2) the Architect, Architect's consultants, separate contractors described in Article 6, if any, and any of their subcontractors, sub-subcontractors, agents and employees, for damages caused by fire or other perils to the extent covered by property insurance obtained pursuant to this Paragraph 11.3 or other property insurance applicable to the Work, except such rights as they have to proceeds of such insurance held by the Owner as fiduciary. The Owner or Contractor, as appropriate, shall require of the Architect, Architect's consultants, separate contractors described in Article 6, if any, and the subcontractors, sub-subcontractors, agents and employees of any of them, by appropriate agreements, written where legally required for validity, similar waivers each in favor of other parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

**11.3.8** A loss insured under Owner's property insurance shall be adjusted by the Owner as fiduciary and made payable to the Owner as fiduciary for the insureds, as their interests may appear, subject to requirements of any applicable mortgagee clause and of Subparagraph 11.3.10. The Contractor shall pay Subcontractors their just shares of insurance proceeds received by the Contractor, and by appropriate agreements, written where legally required for validity, shall require Subcontractors to make payments to their Sub-subcontractors in similar manner.

**11.3.9** If required in writing by a party in interest, the Owner as fiduciary shall, upon occurrence of an insured loss, give bond for proper performance of the Owner's duties. The cost of required bonds shall be charged against proceeds received as fiduciary. The Owner shall deposit in a separate account proceeds so received, which the Owner shall distribute in accordance with such agreement as the parties in interest may reach, or in accordance with an arbitration award in which case the procedure shall be as provided in Paragraph 4.5. If after such loss no other special agreement is made, replacement of damaged property shall be covered by appropriate Change Order.

**11.3.10** The Owner as fiduciary shall have power to adjust and settle a loss with insurers unless one of the parties in interest shall object in writing within five days after occurrence of loss to the Owner's exercise of this power; if such objection be made, arbitrators shall be chosen as provided in Paragraph 4.5. The Owner as fiduciary shall, in that case, make settlement with insurers in accordance with directions of such arbitrators. If distribution of insurance proceeds by arbitration is required, the arbitrators will direct such distribution.

**11.3.11** Partial occupancy or use in accordance with Paragraph 9.9 shall not commence until the insurance company or companies providing property insurance have consented to such partial occupancy or use by endorsement or otherwise. The Owner and the Contractor shall take reasonable steps to obtain consent of the insurance company or companies and shall, without mutual written consent, take no action with respect to partial occupancy or use that would cause cancellation, lapse or reduction of insurance.

## 11.4  PERFORMANCE BOND AND PAYMENT BOND

**11.4.1** The Owner shall have the right to require the Contractor to furnish bonds covering faithful performance of the Contract and payment of obligations arising thereunder as stipulated in bidding requirements or specifically required in the Contract Documents on the date of execution of the Contract.

**11.4.2** Upon the request of any person or entity appearing to be a potential beneficiary of bonds covering payment of obligations arising under the Contract, the Contractor shall promptly furnish a copy of the bonds or shall permit a copy to be made.

# ARTICLE 12

## UNCOVERING AND CORRECTION OF WORK

### 12.1  UNCOVERING OF WORK

**12.1.1** If a portion of the Work is covered contrary to the Architect's request or to requirements specifically expressed in the Contract Documents, it must, if required in writing by the Architect, be uncovered for the Architect's observation and be replaced at the Contractor's expense without change in the Contract Time.

**12.1.2** If a portion of the Work has been covered which the Architect has not specifically requested to observe prior to its being covered, the Architect may request to see such Work and it shall be uncovered by the Contractor. If such Work is in accordance with the Contract Documents, costs of uncovering and replacement shall, by appropriate Change Order, be charged to the Owner. If such Work is not in accordance with the Contract Documents, the Contractor shall pay such costs unless the condition was caused by the Owner or a separate contractor in which event the Owner shall be responsible for payment of such costs.

### 12.2  CORRECTION OF WORK

**12.2.1** The Contractor shall promptly correct Work rejected by the Architect or failing to conform to the requirements of the Contract Documents, whether observed before or after Substantial Completion and whether or not fabricated, installed or completed. The Contractor shall bear costs of correcting such rejected Work, including additional testing and inspections and compensation for the Architect's services and expenses made necessary thereby.

**12.2.2** If, within one year after the date of Substantial Completion of the Work or designated portion thereof, or after the date

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**

for commencement of warranties established under Sub-paragraph 9.9.1, or by terms of an applicable special warranty required by the Contract Documents, any of the Work is found to be not in accordance with the requirements of the Contract Documents, the Contractor shall correct it promptly after receipt of written notice from the Owner to do so unless the Owner has previously given the Contractor a written acceptance of such condition. This period of one year shall be extended with respect to portions of Work first performed after Substantial Completion by the period of time between Substantial Completion and the actual performance of the Work. This obligation under this Subparagraph 12.2.2 shall survive acceptance of the Work under the Contract and termination of the Contract. The Owner shall give such notice promptly after discovery of the condition.

**12.2.3** The Contractor shall remove from the site portions of the Work which are not in accordance with the requirements of the Contract Documents and are neither corrected by the Contractor nor accepted by the Owner.

**12.2.4** If the Contractor fails to correct nonconforming Work within a reasonable time, the Owner may correct it in accordance with Paragraph 2.4. If the Contractor does not proceed with correction of such nonconforming Work within a reasonable time fixed by written notice from the Architect, the Owner may remove it and store the salvable materials or equipment at the Contractor's expense. If the Contractor does not pay costs of such removal and storage within ten days after written notice, the Owner may upon ten additional days' written notice sell such materials and equipment at auction or at private sale and shall account for the proceeds thereof, after deducting costs and damages that should have been borne by the Contractor, including compensation for the Architect's services and expenses made necessary thereby. If such proceeds of sale do not cover costs which the Contractor should have borne, the Contract Sum shall be reduced by the deficiency. If payments then or thereafter due the Contractor are not sufficient to cover such amount, the Contractor shall pay the difference to the Owner.

**12.2.5** The Contractor shall bear the cost of correcting destroyed or damaged construction, whether completed or partially completed, of the Owner or separate contractors caused by the Contractor's correction or removal of Work which is not in accordance with the requirements of the Contract Documents.

**12.2.6** Nothing contained in this Paragraph 12.2 shall be construed to establish a period of limitation with respect to other obligations which the Contractor might have under the Contract Documents. Establishment of the time period of one year as described in Subparagraph 12.2.2 relates only to the specific obligation of the Contractor to correct the Work, and has no relationship to the time within which the obligation to comply with the Contract Documents may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the Contractor's liability with respect to the Contractor's obligations other than specifically to correct the Work.

## 12.3   ACCEPTANCE OF NONCONFORMING WORK

**12.3.1** If the Owner prefers to accept Work which is not in accordance with the requirements of the Contract Documents, the Owner may do so instead of requiring its removal and correction, in which case the Contract Sum will be reduced as appropriate and equitable. Such adjustment shall be effected whether or not final payment has been made.

# ARTICLE 13

## MISCELLANEOUS PROVISIONS

### 13.1   GOVERNING LAW

**13.1.1** The Contract shall be governed by the law of the place where the Project is located.

### 13.2   SUCCESSORS AND ASSIGNS

**13.2.1** The Owner and Contractor respectively bind themselves, their partners, successors, assigns and legal representatives to the other party hereto and to partners, successors, assigns and legal representatives of such other party in respect to covenants, agreements and obligations contained in the Contract Documents. Neither party to the Contract shall assign the Contract as a whole without written consent of the other. If either party attempts to make such an assignment without such consent, that party shall nevertheless remain legally responsible for all obligations under the Contract.

### 13.3   WRITTEN NOTICE

**13.3.1** Written notice shall be deemed to have been duly served if delivered in person to the individual or a member of the firm or entity or to an officer of the corporation for which it was intended, or if delivered at or sent by registered or certified mail to the last business address known to the party giving notice.

### 13.4   RIGHTS AND REMEDIES

**13.4.1** Duties and obligations imposed by the Contract Documents and rights and remedies available thereunder shall be in addition to and not a limitation of duties, obligations, rights and remedies otherwise imposed or available by law.

**13.4.2** No action or failure to act by the Owner, Architect or Contractor shall constitute a waiver of a right or duty afforded them under the Contract, nor shall such action or failure to act constitute approval of or acquiescence in a breach thereunder, except as may be specifically agreed in writing.

### 13.5   TESTS AND INSPECTIONS

**13.5.1** Tests, inspections and approvals of portions of the Work required by the Contract Documents or by laws, ordinances, rules, regulations or orders of public authorities having jurisdiction shall be made at an appropriate time. Unless otherwise provided, the Contractor shall make arrangements for such tests, inspections and approvals with an independent testing laboratory or entity acceptable to the Owner, or with the appropriate public authority, and shall bear all related costs of tests, inspections and approvals. The Contractor shall give the Architect timely notice of when and where tests and inspections are to be made so the Architect may observe such procedures. The Owner shall bear costs of tests, inspections or approvals which do not become requirements until after bids are received or negotiations concluded.

**13.5.2** If the Architect, Owner or public authorities having jurisdiction determine that portions of the Work require additional testing, inspection or approval not included under Subparagraph 13.5.1, the Architect will, upon written authorization from the Owner, instruct the Contractor to make arrangements for such additional testing, inspection or approval by an entity acceptable to the Owner, and the Contractor shall give timely notice to the Architect of when and where tests and inspections are to be made so the Architect may observe such procedures.

**AIA DOCUMENT A201** • GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION • FOURTEENTH EDITION
AIA® • ©1987 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**

The Owner shall bear such costs except as provided in Sub-paragraph 13.5.3.

**13.5.3** If such procedures for testing, inspection or approval under Subparagraphs 13.5.1 and 13.5.2 reveal failure of the portions of the Work to comply with requirements established by the Contract Documents, the Contractor shall bear all costs made necessary by such failure including those of repeated procedures and compensation for the Architect's services and expenses.

**13.5.4** Required certificates of testing, inspection or approval shall, unless otherwise required by the Contract Documents, be secured by the Contractor and promptly delivered to the Architect.

**13.5.5** If the Architect is to observe tests, inspections or approvals required by the Contract Documents, the Architect will do so promptly and, where practicable, at the normal place of testing.

**13.5.6** Tests or inspections conducted pursuant to the Contract Documents shall be made promptly to avoid unreasonable delay in the Work.

**13.6   INTEREST**

**13.6.1** Payments due and unpaid under the Contract Documents shall bear interest from the date payment is due at such rate as the parties may agree upon in writing or, in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.

**13.7   COMMENCEMENT OF STATUTORY LIMITATION PERIOD**

**13.7.1** As between the Owner and Contractor:

.1 **Before Substantial Completion.** As to acts or failures to act occurring prior to the relevant date of Substantial Completion, any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than such date of Substantial Completion;

.2 **Between Substantial Completion and Final Certificate for Payment.** As to acts or failures to act occurring subsequent to the relevant date of Substantial Completion and prior to issuance of the final Certificate for Payment, any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than the date of issuance of the final Certificate for Payment; and

.3 **After Final Certificate for Payment.** As to acts or failures to act occurring after the relevant date of issuance of the final Certificate for Payment, any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than the date of any act or failure to act by the Contractor pursuant to any warranty provided under Paragraph 3.5, the date of any correction of the Work or failure to correct the Work by the Contractor under Paragraph 12.2, or the date of actual commission of any other act or failure to perform any duty or obligation by the Contractor or Owner, whichever occurs last.

## ARTICLE 14

## TERMINATION OR SUSPENSION OF THE CONTRACT

**14.1   TERMINATION BY THE CONTRACTOR**

**14.1.1** The Contractor may terminate the Contract if the Work is stopped for a period of 30 days through no act or fault of the Contractor or a Subcontractor, Sub-subcontractor or their agents or employees or any other persons performing portions of the Work under contract with the Contractor, for any of the following reasons:

.1 issuance of an order of a court or other public authority having jurisdiction;

.2 an act of government, such as a declaration of national emergency, making material unavailable;

.3 because the Architect has not issued a Certificate for Payment and has not notified the Contractor of the reason for withholding certification as provided in Subparagraph 9.4.1, or because the Owner has not made payment on a Certificate for Payment within the time stated in the Contract Documents;

.4 if repeated suspensions, delays or interruptions by the Owner as described in Paragraph 14.3 constitute in the aggregate more than 100 percent of the total number of days scheduled for completion, or 120 days in any 365-day period, whichever is less; or

.5 the Owner has failed to furnish to the Contractor promptly, upon the Contractor's request, reasonable evidence as required by Subparagraph 2.2.1.

**14.1.2** If one of the above reasons exists, the Contractor may, upon seven additional days' written notice to the Owner and Architect, terminate the Contract and recover from the Owner payment for Work executed and for proven loss with respect to materials, equipment, tools, and construction equipment and machinery, including reasonable overhead, profit and damages.

**14.1.3** If the Work is stopped for a period of 60 days through no act or fault of the Contractor or a Subcontractor or their agents or employees or any other persons performing portions of the Work under contract with the Contractor because the Owner has persistently failed to fulfill the Owner's obligations under the Contract Documents with respect to matters important to the progress of the Work, the Contractor may, upon seven additional days' written notice to the Owner and the Architect, terminate the Contract and recover from the Owner as provided in Subparagraph 14.1.2.

**14.2   TERMINATION BY THE OWNER FOR CAUSE**

**14.2.1** The Owner may terminate the Contract if the Contractor:

.1 persistently or repeatedly refuses or fails to supply enough properly skilled workers or proper materials;

.2 fails to make payment to Subcontractors for materials or labor in accordance with the respective agreements between the Contractor and the Subcontractors;

.3 persistently disregards laws, ordinances, or rules, regulations or orders of a public authority having jurisdiction; or

.4 otherwise is guilty of substantial breach of a provision of the Contract Documents.

**14.2.2** When any of the above reasons exist, the Owner, upon certification by the Architect that sufficient cause exists to jus-

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**

tify such action, may without prejudice to any other rights or remedies of the Owner and after giving the Contractor and the Contractor's surety, if any, seven days' written notice, terminate employment of the Contractor and may, subject to any prior rights of the surety:

.1 take possession of the site and of all materials, equipment, tools, and construction equipment and machinery thereon owned by the Contractor;

.2 accept assignment of subcontracts pursuant to Paragraph 5.4; and

.3 finish the Work by whatever reasonable method the Owner may deem expedient.

**14.2.3** When the Owner terminates the Contract for one of the reasons stated in Subparagraph 14.2.1, the Contractor shall not be entitled to receive further payment until the Work is finished.

**14.2.4** If the unpaid balance of the Contract Sum exceeds costs of finishing the Work, including compensation for the Architect's services and expenses made necessary thereby, such excess shall be paid to the Contractor. If such costs exceed the unpaid balance, the Contractor shall pay the difference to the Owner. The amount to be paid to the Contractor or Owner, as the case may be, shall be certified by the Architect, upon application, and this obligation for payment shall survive termination of the Contract.

**14.3   SUSPENSION BY THE OWNER FOR CONVENIENCE**

**14.3.1** The Owner may, without cause, order the Contractor in writing to suspend, delay or interrupt the Work in whole or in part for such period of time as the Owner may determine.

**14.3.2** An adjustment shall be made for increases in the cost of performance of the Contract, including profit on the increased cost of performance, caused by suspension, delay or interruption. No adjustment shall be made to the extent:

.1 that performance is, was or would have been so suspended, delayed or interrupted by another cause for which the Contractor is responsible; or

.2 that an equitable adjustment is made or denied under another provision of this Contract.

**14.3.3** Adjustments made in the cost of performance may have a mutually agreed fixed or percentage fee.



*Printed on Recycled Paper*

**AIA DOCUMENT A201** • GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION • FOURTEENTH EDITION
AIA® • © 1987 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

**WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.**

AMENDMENT NO. 1 TO AGREEMENT
BETWEEN OWNER AND CONSTRUCTION MANAGER

Pursuant to Paragraph 2.2 of the Agreement, dated    September 20, 1996    between MB Redevelopment, Inc.    (Owner) and Lehrer McGovern Bovis, Inc.    (Construction Manager) for Loews Miami Beach Hotel    (the Project), the Owner and Construction Manager establish a Guaranteed Maximum Price and Contract Time for the Work as set forth below.

## ARTICLE I
## GUARANTEED MAXIMUM PRICE

The Construction Manager's Guaranteed Maximum Price for the Work, including the estimated Cost of the Work as defined in Article 6 and the Construction Manager's Fee as defined in Article 5, is   Sixty-Eight Million Five Hundred Seventy-Three Thousand Five Hundred and No/100   Dollars ($ 68,573,500.00 ).
This Price is for the performance of the Work in accordance with the Contract Documents listed and attached to this Amendment and marked Exhibits A through F, as follows.

Exhibit A   Drawings, Specifications, addenda and General, Supplementary and other Conditions of the Contract on

which the Guaranteed Maximum Price is based. ~~pages~~                     ~~through~~            ~~dated~~

Exhibit B   Allowance items. ~~pages~~                     ~~through~~            ~~dated~~

Exhibit C   Assumptions and clarifications made in preparing the Guaranteed Maximum Price. ~~pages~~

~~through~~            ~~dated~~

Exhibit D   Completion schedule. ~~pages~~                     ~~through~~            ~~dated~~

Exhibit E   Alternate prices. ~~pages~~                     ~~through~~            ~~dated~~

Exhibit F   Unit prices. ~~pages~~                     ~~through~~            ~~dated~~

*Based upon Trade Costs of $60,773,500.00, Construction Reserve of $1,200,000.00, General Conditions of $4,000,000.00, Bond costs of $1,000,000.00 and Fee of $1,600,000.00.

## ARTICLE II
## CONTRACT TIME

The date of Substantial Completion established by this Amendment is   set forth in the Agreement.

OWNER: MB REDEVELOPMENT, INC.

By

Date

ATTEST

CONSTRUCTION MANAGER: LEHRER McGOVERN BOVIS, INC.

By

Date: 9/27/96

ATTEST

**AIA**   **CAUTION: You should sign an original AIA document which has this caution printed in red. An original assures that changes will not be obscured as may occur when documents are reproduced.**

AIA DOCUMENT A121/CMc and AGC DOCUMENT 565 • OWNER-CONSTRUCTION MANAGER AGREEMENT • 1991 EDITION AIA • © 1991 • THE AMERICAN INSTITUTE OF ARCHITECTS 1735 NEW YORK AVENUE NW WASHINGTON DC 20006-5209 AGC • © 1991 • THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA 1957 E STREET NW WASHINGTON DC • WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

**A121/CMc**
**AGC 565- 1991   16**

SUPPLEMENTARY CONDITIONS

The following Supplementary Conditions, change, delete from or add to the "General Conditions of the Contract for Construction" (the "General Conditions"), AIA Document A201, 1987. When any Article of the General Conditions or any Paragraph, Subparagraph, or Sub-subparagraph thereof is modified, deleted, amended, superseded, or added to by these Supplementary Conditions, the unaltered provisions of such Article, Paragraph, Subparagraph, or Sub-subparagraph shall remain in full force and effect. All defined terms in these Supplementary Conditions shall have the same meaning as in the General Conditions, except as otherwise noted. In the event of any conflict between the provisions of the General Conditions and the provisions of these Supplementary Conditions, these Supplementary Conditions shall control.

ARTICLE 1; GENERAL PROVISIONS.

Add the following at the end of Subparagraph 1.1.1:

Without limiting the generality of the foregoing, a part of the Contract Documents is Amendment No. 1 to the Agreement setting forth the Guaranteed Maximum Price. Within Amendment No. 1 is an exhibit (Exhibit "C-1") regarding "Scope Modifications to the Drawings and Specifications," which describes certain scope revisions and the revisions to the Drawings and Specifications necessitated by such scope revisions, which revised Drawings and Specifications will be completed after the date of the Agreement. The parties acknowledge that the revised Drawings and Specifications shall be a part of the Contract Documents. Contractor acknowledges that it has fully satisfied itself as to the scope of Work contemplated by the Scope Modifications to the Drawings and Specifications, and the revised Drawings and Specifications to be prepared therefrom, and that the Trade Cost pricing for each item in the Scope Modifications to the Drawings and Specifications is firm, except to the extent Contractor notifies Owner in writing within ten (10) days after receipt of the revised Drawings and Specifications (or sooner if possible) that the revised Drawings and Specifications materially fail to reflect the revised scope described in the Scope Modifications to the Drawings and Specifications. If Contractor so notifies Owner, then Contractor's notice shall include proposed alternatives or corrections to the scope depicted in the revised Drawings and Specifications in order to achieve the intended result for the applicable item(s) set forth in the Scope Modifications to the Drawings and Specifications.

In addition to the Scope Modifications to the Drawings and Specifications, the parties acknowledge that, based on a requirement from the Agency's third-party consultant to the Project, there will be an additive Change Order in connection with the mechanical systems for the ventilation and air conditioning system, limited to the guest rooms (the "HVAC Scope Change"). While the exact extent of the HVAC Scope Change will be identified once further design and engineering analysis is completed, Owner will identify within the revised Drawings and Specifications required to be made available to Contractor within ninety (90) days after the issuance of a building permit (other than the foundation permit) for the Project, those design changes regarding the HVAC Scope Change relating to (a) the concrete structure of the Hotel and (b) the size of pipes and/or ductwork within the shafts, ceilings, or other concealed areas. The remaining portion of the revised Drawings and Specifications necessary to reflect the HVAC Scope Change shall be made available to Contractor within one hundred twenty (120) days after the issuance of a building permit (other than the foundation permit) for the Project. Contractor acknowledges and agrees that, because of the staged delivery of the revised Drawings and Specifications regarding the HVAC Scope Change, the HVAC Scope Change shall have no effect whatsoever on Contractor's responsibility to achieve Substantial Completion by the Completion Deadline. Contractor, its mechanical subcontractor, and any of its other subcontractors shall assist Owner in the design and engineering of the HVAC Scope Change in order to attempt to achieve the most cost-effective design.

Add the following at the end of Subparagraph 1.1.2:

Notwithstanding the foregoing, the parties entered into that certain term sheet dated as of April 1, 1996, which term sheet constitutes a binding agreement with respect to the Preconstruction Phase services described therein to reflect a general outline of the process leading to a submission by Contractor of the Guaranteed Maximum Price. With respect to the Preconstruction Phase, the term sheet shall govern in connection with any

inconsistency between the term sheet and the Agreement.   With respect to the Construction Phase and Post-Construction Phase, the Agreement supersedes the term sheet and the Agreement shall govern in connection with any inconsistency between the term sheet and the Agreement.

Add the following at the end of Subparagraph 1.1.6:

In all cases in which a manufacturer's name, trade name, or other proprietary designation is used in connection with materials or articles to be furnished under the Agreement, whether or not the phrase "or equal" is used after such name, the Contractor shall cause the applicable Subcontractor or material supplier to furnish the product of the named manufacturer(s) without substitution, unless a written request for a substitute has been submitted by the Contractor and approved in writing by Owner and Architect.

In Subparagraph 1.2.3, in the penultimate and last lines, delete "as being necessary to produce the intended results."

Add the following at the end of Subparagraph 1.2.3:

In the event of conflicts or discrepancies among the Contract Documents, interpretations will be based upon the following priorities:

1.      The Agreement.

2.      Addenda to the Agreement, with those of a later date taking precedence over those of an earlier date.

3.      These Supplementary Conditions.

4.      The General Conditions.

Add the following as Subparagraph 1.2.6:

1.2.6   In the case of a discrepancy or conflict between Drawings and Specifications, the Specifications shall prevail.   The Contractor shall rely upon computed dimensions in preference to scaled dimensions. Computed dimensions shall take precedence over scaled dimensions and large scale drawings shall take precedence over small scale drawings.   Architectural and structural Drawings shall take precedence over mechanical, electrical, plumbing, and fire protection Drawings for purposes of determining dimensions.   In any case, the Contractor shall report in writing to the Architect and Owner any and all discrepancies or conflicts between, among, or within the Drawings and Specifications of which Contractor knows or should have known upon using reasonable diligence, so that the discrepancies or conflicts can be clarified.

ARTICLE 2; OWNER.

Delete Subparagraph 2.2.1.

Delete Subparagraph 2.2.5 and replace it with the following:

The Contractor will be furnished, free of charge, two (2) reproducible copies of final Drawings and Project Manuals.   Additional sets of such documents shall be furnished at Contractor's cost for reproduction, postage, and handling. Revised Drawings, where such are required, will be issued to the Contractor, in sufficient number to enable the Contractor to carry out the Work properly.

In Subparagraph 2.3.1, add the following at the end:

MI962620.083                                                2

Prior to exercising its rights under this Subparagraph 2.3.1, Owner will give Contractor written notice and seven (7) days within which to cure the failure; provided, however, that if such failure reasonably requires more than seven (7) days to cure, Contractor shall have a reasonable time to cure such failure, provided Contractor commences to cure within such seven (7) day period and thereafter diligently prosecutes such cure to completion.

In Subparagraph 2.4.1, delete the penultimate sentence.

ARTICLE 3; CONTRACTOR.

Add the following at the end of Subparagraph 3.1.1:

For the purposes of the Contract Documents, the terms "Contractor" and "General Contractor" and "Construction Manager" are synonymous.

Add the following at the end of Subparagraph 3.2.1:

Without limiting the generality of the foregoing, the Contractor shall be responsible for all errors made by the Contractor as a result of using superseded Drawings.

In Subparagraph 3.3.1, in the third line, add the following after "responsible":

(as between Owner and Contractor).

Add the following at the end of Subparagraph 3.3.4:

Contractor shall report in writing to the Owner and Architect any known conditions which may affect satisfactory execution of the Work. Contractor shall not proceed with such Work until defective conditions are corrected by the Contractor to the satisfaction of the Owner and Architect.

Add the following as Subparagraphs 3.3.5, 3.3.6, 3.3.7, 3.3.8, and 3.3.9:

3.3.5    Before beginning Work at the site, the Contractor shall attend a preconstruction conference and bring all key personnel employed for the Project. At the preconstruction conference, all parties concerned will discuss the Project and prepare a program of procedure in keeping with requirements of the Drawings and Specifications.

3.3.6    After beginning Work at the site, the Contractor shall coordinate the scheduling of a weekly meeting to be attended by the Architect and the Owner, or Owner's authorized representative, at the site in convenient facilities with suitable layout area for the Contract Documents. The Contractor shall provide for attendance of those Subcontractors who have been requested to attend by the Owner.

3.3.7    The Contractor shall prepare and distribute a summary and detailed minutes of each weekly meeting within two (2) business days (or sooner) after the meeting. Each item in the summary will be identified as to the action to be taken by each participant, and the time schedule for performance of such action.

3.3.8    In engaging one kind of Work with another, marring or damaging same will not be permitted. Should improper Work of any trade be covered by another trade which results in damage or defects, the whole Work affected shall be made good by the Contractor without expense to the Owner and without any delay in the construction schedule. Any unsatisfactory conditions shall be reported to the Architect and no Work shall be done in the affected area until the unsatisfactory conditions have been eliminated. Commencement of Work shall

constitute acceptance of the areas, surfaces, and conditions as satisfactory.  Within five (5) business days after notice from Contractor that a portion of the Work is ready for inspection, Owner shall inspect such portion, failing which Contractor shall not be responsible for improper Work regarding such portion which would have been discovered by Owner upon reasonable inspection.

3.3.9   The Contractor shall coordinate the relations of the various trades to the progress of the Work and shall see that required anchorage or blocking is furnished and set at proper times.  Anchorage and blocking necessary for each trade shall be a part of same.

Add the following at the end of Subparagraph 3.4.1:

Such facilities and services include, without limitation, temporary buildings for the operation of the on-site field organization of Contractor, with sufficient space for Owner and Architect and for the on-site storage of materials and housing of machinery and tools, and whatever other temporary construction is necessary and mutually agreed upon with the Owner.

Add the following at the end of Subparagraph 3.4.2:

Contractor shall establish, maintain and enforce reasonable safety requirements and practices and shall comply with all federal, state, and local laws, rules, and regulations relating thereto.

Add the following as Subparagraphs 3.4.3, 3.4.4, 3.4.5, 3.4.6, 3.4.7, and 3.4.8:

3.4.3   After the Contract has been executed, the Owner and Architect will consider a formal request for the substitution of products in place of those specified only under the conditions set forth in the Contract Documents.

3.4.4   By making requests for substitutions based on Subparagraph 3.4.3, the Contractor:

.1   represents that the Contractor will provide the same warranty for the substitutions that the Contractor would have provided for those specified products;

.2   certifies that the cost data presented is complete and includes all related costs except the Architect's redesign costs, and waives all claims for additional costs related to the substitution which subsequently become apparent; and

.3   will coordinate the installation of the accepted substitute, making such changes as may be required for the Work to be complete in all respects.

3.4.5   Contractor shall furnish to the Owner an itemized list showing the following:

.1   Value of specified Work, if any.

.2   Value of substituted Work.

.3   Difference in cost, if any.

3.4.6   Articles, materials, and equipment specified or shown on the Drawings shall be new and shall be applied, installed, connected, erected, used, cleaned, and conditioned for proper performance, as per manufacturer's directions. Contractor shall, if required, furnish satisfactory evidence as to kind and quality of the materials.

MI962620.083                                    4

3.4.7   Contractor and Subcontractors shall apply, install, connect, and erect manufactured items or materials according to manufacturer's recommendations, if any, unless directed otherwise by the Drawings and Specifications, which direction shall take precedence over the manufacturer's directions, when such recommendations are not in conflict with the Contract Documents.

3.4.8   Contractor shall coordinate all Work of like material in order to produce harmony of finishes, textures, colors, etc., throughout the various components of the Project.

Add the following at the end of Subparagraph 3.5.1:

In addition to other any other guarantees herein required, Contractor hereby guarantees and warrants that when it delivers to Owner for acceptance the Work to be performed under the Contract Documents, there shall be no omission of or defect in material or workmanship of any Work, machinery, equipment, parts, assemblies (except those furnished by Owner) and that all labor, the aforementioned materials, and all other Work performed shall comply with the Contract Documents. If any defective or faulty workmanship or material is discovered within two (2) years following the completion of the Construction Phase (except for items that (i) have been accepted by Owner as being in good working order prior to the completion of the Construction Phase, or (ii) have not been accepted by Owner as being in good working order as of the completion of the Construction Phase, in either of which case the warranty period shall commence on the date that the applicable items are accepted by Owner), the same shall be promptly remedied, repaired, and restored to Owner's satisfaction by Contractor, at Contractor's expense. This warranty shall include all labor, materials, and any other Work required to correct such defective Work or faulty condition. The two (2) year warranty is in addition and cumulative to any manufacturer's warranties available to Owner and any other warranties available pursuant to applicable law and shall not relieve Contractor of responsibility for any other failure or breach of agreement. Any manufacturer's warranties or service contracts obtained in the name of Contractor shall be assigned promptly to Owner.

In Subparagraph 3.7.1, add the following at the end:

The Contractor is not responsible to pay for the "master" building permit for the Project, which shall be obtained at Owner's expense.

Add the following as Subparagraphs 3.7.5 and 3.7.6:

3.7.5   Without limiting the generality of this Paragraph 3.7, Contractor acknowledges receipt of any and all governmental permits, approvals, and orders issued as of the date of the Agreement in connection with the Project. Contractor shall comply with all requirements and conditions of such permits, approvals, and orders, including, without limitation, the conditions prescribed by the City Historic Preservation Board and Design Review Board, and the State of Florida Department of Environmental Protection (in connection with coastal construction permitting). A copy of the conditions prescribed by the City Historic Preservation Board and Design Review Board and the State of Florida Department of Environmental Protection are attached to the Supplementary Conditions as Exhibit "A." The attachment of such conditions does not imply that such conditions are an exhaustive compilation of all requirements and conditions of governmental permits, approvals, and orders in connection with the Project. Contractor shall also comply with (i) any modifications to any permits and approvals (or modifications to the requirements and conditions in connection therewith), upon Contractor's receipt of notice of any such modifications, from whatever source, and (ii) any additional permits and approvals (and requirements and conditions in connection therewith) obtained by Owner after the date of the Agreement. The parties recognize that any such modifications that are not anticipated as of the date hereof by the parties may necessitate a Change Order if the CPM Schedule or the Cost of the Work is impacted by such modifications.

3.7.6   In addition to any meetings to be attended by Contractor pursuant to the Contract Documents, Contractor shall attend any conferences (whether preconstruction or otherwise) required by governmental

MI962620.083                                     5

agencies, including, without limitation, preconstruction conferences required by the City Historic Preservation Board and Design Review Board, and the State of Florida Department of Environmental Protection.

Delete Sub-subparagraph 3.8.2.4 and replace it with the following:

.4      this Paragraph 3.8 is subject to the Allowance exhibit included within Amendment No. 1 to the Agreement.

In Subparagraph 3.9.1, in the third and fourth lines, and the fifth line, delete "superintendent" and replace it with the following:

Senior Project Manager.

Add the following at the end of Subparagraph 3.10.1:

In conjunction with the Contractor's construction schedule, the Contractor shall indicate and submit evidence, in writing, of those materials or articles called for in the Drawings which are not obtainable for installation in the Work within the time limits of the Agreement. The construction schedule shall also include a list of supplies and materials that will require a long lead time to place orders, and the Contractor shall advise the Owner in writing when such supplies and materials are ordered and when delivery is expected. The construction schedule shall fix dates for construction activities and shall be revised as required by the conditions of the Work, subject to the Owner's prior written approval. However, if Owner has elected to commit to the purchase of any long lead item trade scope in order to expedite the schedule, Owner will be wholly responsible for any such commitments. In such instance, related agreements and/or purchase orders will be assigned to Contractor simultaneously with the execution of the Agreement.

Add the following at the end of Subparagraph 3.10.2:

The schedule of submittals shall include all drawings, diagrams, schedules, and other data as described in Paragraph 3.12. The initial schedule of submittals is attached to the Supplementary Conditions as Exhibit "B".

Add the following as Subparagraphs 3.10.4, 3.10.5, 3.10.6, and 3.10.7:

3.10.4   Contractor will construct and achieve Substantial Completion of the Project allowing for the opening for business of the Hotel, assuming availability of all required approvals and permits, within twenty-two (22) months after the date the foundation is initiated, subject to Unavoidable Delays. Substantial Completion within this timeframe includes consideration by Construction Manager as to Owner's need for access to the Project in advance of Substantial Completion to equip and furnish the Project, as well as train its personnel within partially completed portions of the Project. Attached to the Supplementary Conditions as Exhibit "C" is a detailed schedule in recognition of Owner's pre-opening requirements and scope pertaining to what Owner will purchase and install within the Project. Contractor in consultation with Owner, shall prepare and monitor compliance with a critical path method schedule including a CPM network diagram (the "CPM Schedule") for the Project through final completion. Contractor shall update the critical path schedule on a monthly basis (or more frequently as may be required by the progress of the Project. Notwithstanding anything to the contrary contained herein, it is acknowledged that, although Construction Manager will not be responsible for furniture, fixtures, and equipment ("FF&E") (which will be purchased by Owner as set forth in the Agreement), Contractor shall provide areas on a timely basis for installation of FF&E in accordance with the critical path schedule. It is the Contractor's responsibility to take into account the various access and logistical considerations in order to coordinate the construction of the Project with the construction of the Municipal Garage by the Agency and other public improvements being undertaken by the Agency or the City or the State of Florida in connection with the Project, located at Collins Avenue and 16th Street), including, without limitation, consideration as to impacts on the schedule due to possible utility interruptions in connection with the Municipal Garage and other public

improvements.  Contractor acknowledges that it is fully aware of the scope of the construction of the Municipal Garage and such other public improvements.

3.10.5  The CPM Schedule shall, at a minimum, show:  (i) the early and late start and stop times for each major construction activity; (ii) all "critical path" activities and their duration; (iii) the sequencing of all procurement, approval, delivery and work activities; (iv) manpower levels; (v) late order dates for all long lead time materials and equipment; and (vi) critical Owner and Agency decision dates based upon decisions to be made by the Agency pursuant to the Hotel Development Agreement.  The CPM Schedule shall (1) be revised by Contractor whenever there is a material variance in the progress of the Project from the then current CPM Schedule and otherwise at appropriate intervals, but in no event less frequently than monthly and (2) provide for expeditious and practicable execution of the Project.  A copy of the CPM Schedule and network diagram highlighting the completed and partially completed activities and manpower schedule shall be maintained by Contractor on a current basis, at the Project site, to accurately reflect the actual progress of the construction and shall be displayed at all times in a manner that is readily accessible to the Owner.  The CPM network diagram shall reflect the actual progress of construction to date.  The manpower schedule shall reflect actual manpower levels each week compared to manpower levels set forth in the CPM Schedule.  A copy of the CPM Schedule and network diagram as it exists as of the date of the Agreement is attached to the Supplementary Conditions as Exhibit "D."

3.10.6  If Substantial Completion does not occur by the "Completion Deadline" (i.e., twenty-two (22) months after the date the foundation is initiated), then Contractor shall be liable for liquidated damages to the extent expressly set forth in the Agreement.

3.10.7  All schedules shall be in accordance with the Owner's approved format.

Add the following at the end of Subparagraph 3.12.1:

The Shop Drawings are interpretations of and are supplemental to the design Drawings.  As well as serving other purposes, the Shop Drawings shall be used to demonstrate to the Architect that the Contractor has understood the design concept.  Shop Drawings must provide the detailed information necessary for the fabrication, assembly, and installation of the products or materials specified.  Neither the Shop Drawings nor comments placed on them by the Architect shall be construed as being Change Orders.  Where Shop Drawings provide greater detail than the design Drawings, the Shop Drawings shall take precedence.

Add the following at the end of Subparagraph 3.12.3:

When Samples are required by the Contract Documents, four (4) samples of sufficient size to indicate general visual effect shall be submitted by the Contractor.  When Samples either inherently show, or are required under the Contract Documents to show, a range of color, texture, finish, graining, or other similar properties, four (4) sets shall be submitted illustrating the full scope of this range.  One set of "Approved" Samples will be retained at the Project office of the Contractor.  The Architect will return Samples when requested to do so by the Contractor but no Samples shall be incorporated into the Work unless specific approval is given by the Architect.  All charges for submission of Samples and for their return shall be part of the Cost of the Work.  All Samples shall be tagged or otherwise clearly identified with the name and address of the Subcontractor or agency submitting them, and the date and the name of the project for which they are intended, and shall be accompanied by a letter of transmittal.

In Subparagraph 3.12.5, in the first line, delete the following:

"approve."

In Subparagraph 3.12.7, in the first line, delete the following"

M1962620.083                                   7

"approving and."

Add the following at the end of Subparagraph 3.12.8:

If such deviations are acceptable to the Architect, it shall be the responsibility of the Contractor to notify and to coordinate the Work of all related trades affected by the deviations.

Add the following as Subparagraphs 3.12.12, 3.12.13, 3.12.14, 3.12.15, 3.12.16, 3.12.17, and 3.12.18:

3.12.12 The Shop Drawings are to be treated only as instruments of convenience and facility to further the progress of the Work. If a Shop Drawing indicates a departure from the requirements of the Contract Documents which is so minor as not to involve a change in the Cost of the Work, the departure may be approved by the Architect provided it is in the Owner's interest to do so. The Architect assumes no responsibility for dimensions on approved Shop Drawings. The Contractor shall check all dimensions of the actual Work and those shown in the documents or the Architect's approved Drawings. The approval of the Shop Drawings shall not constitute approval of departures from additional details or instructions previously given unless with written consent of the Owner.

3.12.13 Shop Drawings, Samples, and similar submittals shall be dated and marked to show the names of the Project, the Architect, the Contractor, originating Subcontractor, manufacturer, or supplier, and separate detailer if pertinent. Shop Drawings shall completely identify the locations at which materials or equipment to which they pertain are to be installed. Reproductions of Contract Drawings are not acceptable as Shop Drawings.

3.12.14 Submission of Shop Drawings and Samples shall be accompanied by one (1) copy of a transmittal letter containing the Project name, the Contractor's name, number of Shop Drawings and Samples, titles and other pertinent data.

3.12.15 Unless otherwise specified, the number and form of Shop Drawings, manufacturer's literature, catalog cuts, etc., that Contractor shall submit and, if necessary, re-submit, shall be eight (8) copies, one (1) of which will be retained by the Architect. Contractor shall continue to re-submit items as required until the Architect stamps the Shop Drawings "No Exception Taken" or "Revise as Indicated."

3.12.16 The Contractor is responsible for obtaining and distributing required prints of Shop Drawings to its Subcontractors and material suppliers after, as well as before, final approval. The reproduction cost for such prints shall be part of the Cost of the Work.

3.12.17 The Contractor shall not reproduce the Architect's Project Drawings for use, in whole or in part, as Shop Drawings without the prior written approval of the Architect.

3.12.18 No time extensions will be allowed to the Contractor for re-submittals of Shop Drawings, Product Data, and Samples, unless delay results from re-submittal, which delay is not caused by or a fault of the Contractor.

Add the following as Subparagraphs 3.13.2 and 3.13.3:

3.13.2 Contractor shall use areas approved by the Owner, within constraints imposed by applicable governmental authority, for deliveries and personnel.

3.13.3 Limits of construction and staging areas shall be as indicated on Drawings and within the constraints imposed by applicable governmental authority. Equipment, material, and personnel shall stay within these limits.

MI962620.083                                    8

Add the following at the end of Subparagraph 3.14.1:

       .1     Cutting shall be done with such tools and methods to prevent unnecessary damage to surrounding areas or equipment. Should such cutting be necessary, the Contractor must consult the Architect and may not proceed with such operation without the Architect's prior written approval.

       .2     Plumbing, mechanical, and electrical Subcontractors shall furnish the Contractor with and be responsible for exact location and size of all holes and openings required. Should this information be in error or ill-timed, all costs of resulting cutting shall be borne by the party responsible therefor.

       .3     All patching required shall be the responsibility of the Contractor. Patching shall match existing or adjacent surfaces to the satisfaction of the Architect.

Add the following as Subparagraph 3.15.3:

3.15.3  Besides keeping the Project, including the on-site parking, if any, of all vehicles of the Contractor, its agents, Subcontractors, or employees, in a clean condition as provided herein, the Contractor shall remove all paint stains and soiling due to its Work, rough clean fixtures, metal work, glass, plastic, and hardware. The Contractor shall repair or replace any damage done to the building or grounds and adjacent properties by reason of its Work and shall replace all glass broken due to its Work at Contractor's own expense (subject to the provisions of Sub-subparagraph 11.3.1.3 of the Supplementary Conditions). All temporary protection shall be removed. Contractor shall take all reasonable precautions to prevent dirt, dust, and construction debris from accumulating on or emanating from the Project site and from entering upon any property adjoining the site, including, without limitation, that certain building located to the immediate north of the Project site. The Contractor shall be responsible for removing all rubbish from the site and maintaining the premises in the vicinity of the site clean and clear at all times, the cost of such removal and maintenance being part of the Cost of the Work. In order to attempt to minimize noise emanating from the Project site at unreasonable times of day, Contractor and Owner shall jointly establish hours of operation for the Project site, and Contractor shall cause all Subcontractors, material suppliers, and laborers to abide by such hours of operation.

Add the following as Subparagraph 3.18.4:

3.18.4  The Contractor hereby acknowledges the receipt of one thousand dollars ($1,000.00) and other good and valuable consideration from the Owner and the Architect as specific consideration for the indemnification provided herein.

## ARTICLE 4; ADMINISTRATION OF THE CONTRACT.

Delete the last sentence of Subparagraph 4.1.1 and replace it with the following:

       For the purposes of the Contract Documents, the term "Architect" shall mean the Owner or the Owner's designee, except when the context requires the professional judgment or opinion of the Architect. The Owner is the administrator of the Contract Documents, with the advice of the Architect.

In Subparagraph 4.2.1, in the first and second lines, delete the following:

       "will provide administration of the Contract as described in the Contract Documents, and."

In Subparagraph 4.2.4:

       (a)     delete the first sentence.

MI962620.083                                      9

(b)     in the last line, add the following after "contractors":

and consultants.

Add the following as Subparagraph 4.4.5:

Notwithstanding anything to the contrary contained in this Article 4, at the time a Claim is made the parties may agree that the Claim shall not be referred initially to the Architect, in which case the provisions of this Article 4 regarding Claims being referred initially to the Architect and the Architect's decision being a condition precedent to arbitration or litigation, shall not be applicable.

In Subparagraph 4.5.1, in the third line, deleting "shall be settled by arbitration" and replace it with the following:

may be settled by arbitration with the consent of both Contractor and Owner.

Delete Subparagraph 4.5.5.

Add the following as Subparagraph 4.5.8:

Neither party shall be required to submit to arbitration unless both parties agree to arbitration as to such matter. It is of the utmost importance that the Project be completed in a timely manner regardless of any Claim, dispute, litigation, or arbitration. Therefore, unless otherwise agreed by the Owner and the Contractor in writing, during the pendency of any Claim, dispute, litigation, or arbitration, the Contractor shall carry on the Work and maintain the progress schedule notwithstanding the pendency of any such Claim, dispute, litigation, or arbitration proceeding, and the Owner shall continue to make payments to the Contractor in accordance with the Contract Documents during such period.

ARTICLE 5; SUBCONTRACTORS.

Add the following at the end of Subparagraph 5.1.2:

The term Sub-subcontractor, as used in the Contract Documents includes sub-sub-subcontractors, and so forth.

Add the following at the end of Subparagraph 5.2.1:

Notwithstanding the foregoing, Contractor shall furnish Owner with a copy of any such submission made by Contractor to the Architect. The Contractor shall also furnish, in writing to the Owner and the Architect, the names of the persons or entities proposed as manufacturers for each of the products identified in the Contract Documents and, where applicable, the name of the installing Subcontractor.

In Subparagraph 5.2.2, in the second line, delete "or Architect."

In Subparagraph 5.2.3, in the first and third lines, delete "or Architect."

In Subparagraph 5.2.4, in the second line, delete "or Architect."

Delete Subparagraph 5.3.1.

Add the following as Paragraph 5.5:

5.5     SUBCONTRACTS

5.5.1    Prior to entering into any subcontract, Contractor shall obtain Owner's prior written approval of the subcontract. Attached to the Supplementary Conditions as Exhibit "E" is the approved Contractor's standard form of subcontract. In connection with the specific subcontracts to be entered into by Contractor, no material modifications to the approved form of subcontract shall be made without Owner's prior written approval.

ARTICLE 6; CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS.

In Subparagraph 6.2.4, in the last line, add the following after "10.2.5":

(subject to the provisions of Subparagraph 11.3.1.3).

In Subparagraph 6.3.1, in the last line, delete "Architect" and replace it with the following:

Owner.

Add the following as Paragraph 6.4:

6.4.1    Without limiting the generality of this Article 6, the parties acknowledge that Owner has separately contracted for the remediation of environmental conditions in connection with the existing St. Moritz hotel, and that Contractor has been adequately apprised of the scope of the remediation. Contractor cannot commence its Work until the remediation has been completed (including, without limitation, approval of the remediation work by applicable governmental authorities. Contractor acknowledges that it has taken into account the scope of such remediation in the preparation of the construction schedules.

6.4.2    Notwithstanding the foregoing, the following environmental matters will not be remediated by Owner's separate environmental contractors: (i) The removal of the roof of the existing St. Moritz hotel, and (ii) the remediation of the lead-based paint located on the exterior of the existing St. Moritz hotel. The removal of the roof and the remediation of the lead-based paint will be part of Contractor's scope of Work under the Agreement, to be performed within the Guaranteed Maximum Price.

ARTICLE 7; CHANGES IN THE WORK.

In Subparagraph 7.1.2, in the last line, delete "alone" and replace it with the following:

with the consent of Owner. In addition, no Change Order, Construction Change Directive, or order for a minor change shall operate to authorize a time extension unless such order or directive specifies such extension.

Add the following at the end of Subparagraph 7.1.3:

An estimate of any change in the amount stated in any line item in the Project Draw Schedule and Budget, contained in Exhibit "F" to the Supplementary Conditions, shall be submitted to Owner for its review prior to commencing any such Work. Owner shall then either reject the estimate for further study, or recommend its approval. If Owner approves such change, Contractor shall prepare a Change Order stating the amount and description of the Work based upon such estimate for the Owner's approval.

Add the following as Subparagraph 7.1.5:

7.1.5    Contractor, when requested by the Architect or Owner, will submit suggestions and prices to make changes in the Work. All prices and suggestions will be submitted to the Architect and the engineers for approval, with final approval to be made by Owner in its sole discretion.

MI962620.083                                    11

In Subparagraph 7.2.1, in the second line, insert the following after "Architect":

, Owner or Contractor,.

Add the following Subparagraphs 7.2.3, 7.2.4, and 7.2.5:

7.2.3    The Architect will issue a bulletin describing the scope of the change, stating the necessity for the change, who requested it, and what is to be done. The Contractor shall prepare an itemized cost estimate for review by the Architect and approval by the Owner, including the following:

1.    Value of specified Work, if any.

2.    Value of substituted Work.

3.    Difference in cost, if any.

7.2.4    Once approved in writing and signed by the parties as provided in Subparagraph 7.2.1, the Contractor shall expedite the Work to minimize any impact the change may have on the overall construction schedule.

7.2.5    On a monthly basis, the Change Order proposals shall be consolidated into a Change Order on AIA Document G701 for signature by the Owner, Architect, and Contractor. The Change Order Request for payment shall be incorporated into the Contractor's monthly requisitions for payment.

In Subparagraph 7.3.6:

(a)    in the fourth line, add the following after "tect":

(and not the Owner).

(b)    add the following at the end:

For purposes of the Contract Documents, the phrase "a reasonable allowance for overhead and profit" shall be subject to the limitations set forth in the Agreement regarding additional Fees and/or General Condition costs. In addition, in order to facilitate checking of quotations for extras or credits, all proposals, except those so minor that their propriety can be seen by inspection, shall be accompanied by a complete itemization of costs including labor, materials, and subcontracts. When major cost items are subcontracts, they shall be itemized also.

In Subparagraph 7.3.8, in the third line, add the following after "Architect":

(and not the Owner).

In Subparagraph 7.4.1, in the first line, add the following after "Architect":

with the consent of Owner.

ARTICLE 8; TIME.

Add the following at the end of Subparagraph 8.1.3:

MI962620.083                                    12

Notwithstanding the foregoing sentence, the date of Substantial Completion of the Work shall be no earlier than the date of Substantial Completion as set forth in the Agreement.

Delete Subparagraph 8.3.1 and replace it with the following:

8.3.1   "Unavoidable Delays" means delays due to strikes, slowdowns, lockouts, acts of God, inability to obtain labor or materials, war, enemy action, civil commotion, fire, casualty, catastrophic weather conditions, a court order which causes a delay (unless resulting from disputes between or among the party alleging an Unavoidable Delay, present or former employees, officers, members, partners or shareholders of such alleging party or affiliates (or present or former employees, officers, partners, members or shareholders of such affiliates) of such alleging party), the application of any laws, rules, regulations, constitutions, orders, ordinances, charters, statutes, codes, executive orders and requirements of all governmental authorities having jurisdiction over a person or entity and/or the Project site or any street, road, avenue or sidewalk comprising a part of, or lying in front of, the Project site or any vault in, or under the Project site (including, without limitation, any of the foregoing relating to handicapped access or parking, the Building Code of the City and the laws, rules, regulations, orders, ordinances, statutes, codes and requirements of any applicable Fire Rating Bureau or other body exercising similar functions), or another cause beyond such party's control or which, if susceptible to control by such party, shall be beyond the reasonable control of such party. Such party shall use reasonable good faith efforts to notify the other party not later than twenty (20) days after such party knows of the occurrence of an Unavoidable Delay; provided, however, that either party's failure to notify the other of the occurrence of an event constituting an Unavoidable Delay shall not alter, detract from or negate its character as an Unavoidable Delay or otherwise result in the loss of any benefit or right granted to the delayed party under the Agreement. In no event shall (i) any party's financial condition or inability to fund or obtain funding or financing constitute an "Unavoidable Delay" with respect to such party and (ii) any delay arising from a party's (or its affiliate's) default under any Contract Document constitute an "Unavoidable Delay" with respect to such party's obligations hereunder. The times for performance set forth in the Agreement (other than for monetary obligations of a party and with respect to timely completion of the Project) shall be extended to the extent performance is delayed by Unavoidable Delay, except as otherwise expressly set forth in the Agreement. The City's failure to fund the City's Contribution pursuant to the Hotel Development Agreement shall constitute an Unavoidable Delay with respect to the parties' obligations hereunder.

8.3.1.1  Unavoidable Delays that are beyond the control of the Contractor will extend the Contract Time by the number of days the path of critical events is lengthened by such delays, regardless of the duration of such delays.  If required by the Architect or Owner, the Contractor shall indicate this path of critical events, by diagram or narrative, in such detail as may be necessary to justify the claim and to establish the number of days to extend the Contract Time.  The path of critical events is defined as the series of interdependent construction events that must be sequentially performed requiring a longer total time to perform than any other series. Extensions of time for inclement weather will not be granted unless the Contractor establishes, to the satisfaction of the Owner, that such inclement weather was (a) responsible for the delay of the completion of the Project as a whole and (b) was more severe than the average climatic range and usual weather conditions prevailing at the locality of the site.

8.3.1.2  Notwithstanding anything to the contrary contained herein, in the event of any labor dispute, regardless of whether or not the Contractor caused and/or is directly involved therewith, and regardless of the reason for the labor dispute, the Contractor agrees to use diligent efforts to continue to perform the Work as described in and required by the Agreement as scheduled by the Owner.  As used herein, the term "labor dispute" includes, without limitation, any strike, erection of, or refusal to cross any picket line by any laborer or any other persons regardless of the person, company, or employer to which such action is directed.  The term "labor dispute" shall further include any stoppage, abandonment, interference, or interruption of work, either total or partial, by any person or persons, labor organizations, companies, corporations, or others.

8.3.1.3  If the Work or any portion of the Work described in the CPM Schedule is stopped by reason of a labor dispute that has been caused by any policy, action, or failure to act by the Contractor, and the Work (or such portion) is not resumed within five (5) business days after written notice from Owner, then the Owner may, at its option, exercise any one or all of the following specified rights in addition to any other rights that the Owner may be entitled by law to exercise:

    (a)    Terminate the Agreement.

    (b)    Remove the Contractor from the job until a labor dispute ceases, during which time the Owner may perform the Work covered by the Agreement in any manner the Owner chooses, decreasing the Contractor's Fee by the cost of the Work so performed by the Owner.

    (c)    Hold the Contractor liable for any damage the Owner incurred or may incur as a result of the labor dispute and/or the Contractor's failure to perform Work as scheduled, including any expense, money, or monies in excess of the Agreement required to obtain any other contractor or subcontractor to perform the Work covered by the Agreement.

Labor disputes caused by any policy, action, or failure to act by a Subcontractor shall be deemed to be caused by the Contractor and thus within the purview of this Subparagraph 8.3.1.3.  If there is an issue over whether this Subparagraph 8.3.1.3 is applicable to a particular labor dispute, the Contractor shall have the burden of proof to establish the lack of such applicability.

8.3.1.4  If any action taken by the Owner pursuant to Subparagraph 8.3.1.3 subjects the Owner to any liability to any labor organization or employee of the Contractor or any Subcontractor, or to any other person, the Contractor agrees to indemnify the Owner against any and all such liability including costs and attorneys' fees.

Add the following as Subparagraph 8.3.4:

8.3.4  Contractor shall pay for all its, and shall have all Subcontractors pay for all their, overtime, double-time, or any other additional time that may be necessary in order to complete the Work by the Completion Deadline as adjusted pursuant to the terms hereof (and such costs are payable by Contractor out of the Construction Reserve).

ARTICLE 9; PAYMENTS AND COMPLETION.

Add the following at the end of Subparagraph 9.3.1:

The form of Application for Payment shall be a notarized AIA Document G702, Application and Certificate for Payment, supported by AIA Document G703, Continuation Sheet.  All Applications for Payment shall be submitted to both the Architect and the Owner.

Add the following as Subparagraphs 9.3.1.3 and 9.3.1.4:

9.3.1.3  All progress payments are subject to the retainages described in the Agreement.

9.3.1.4  Each Application for Payment shall be accompanied by properly executed and acknowledged Partial Releases effective through the preceding month's Application for Payment.  The Contractor shall, prior to submission of the second and each subsequent Application for Payment, furnish to the Owner a statement certifying that all funds received in accordance with the prior Application were disbursed to pay costs of the Work as shown on the immediately preceding Application for Payment, and, if the Application excludes amounts due to any subcontractor or supplier due to a dispute between Contractor and such party, a statement as to the nature and status of the dispute.

In Subparagraph 9.3.2, in the last line, add the following after "site":

    which procedures shall include compliance with requirements of Owner's construction lender.

Add the following at the end of Subparagraph 9.3.3:

    If any claim of lien or alleged claim of lien is filed against the Owner or the Owner's property, or the Project, the Contractor shall have such lien promptly released at Contractor's expense (other than liens arising out of Owner's failure to make required payments properly due Contractor). All such liens not released within thirty (30) days of filing shall be immediately bonded off by the Contractor at Contractor's expense.

In Sub-subparagraph 9.5.1.6, in the third line, add the following after "balance":

    plus the Post-Construction Phase Fee retainage described in the Agreement.

Delete Subparagraph 9.6.3.

Add the following as Subparagraph 9.6.7:

    Owner shall be entitled to require a Contractor's Affidavit in connection with any progress payment. With each requisition for progress payment, the Contractor shall furnish to the Owner a duly executed release of lien from each and every lienor who has furnished a Notice to Owner covering previous requisitions, such release of lien to be in form and content acceptable to Owner. It is agreed that at any time and from time to time the Owner may waive the requirement of the evidence that payrolls, bills, and other indebtedness connected with the Work have been paid for, may waive the requirement of the statutory affidavit from the Contractor before final payment, may waive the requirement of any other affidavit, may waive the requirement to furnish partial and final releases, may waive any irregularity or defect in any affidavit or release, may waive any holdbacks or the right thereto, and may waive any other requirements with respect to supporting documents in connection with making any payment to the Contractor, all without prejudice to the Owner's rights under the Contract Documents or otherwise.

Add the following at the end of Subparagraph 9.8.1:

    Notwithstanding the foregoing sentence, the date of Substantial Completion of the Work shall be no earlier than the date of Substantial Completion as set forth in the Agreement.

Add the following as Subparagraphs 9.10.5 and 9.10.6:

    9.10.5 Before final payment will be made to the Contractor, the Contractor shall furnish to the Owner: (i) an affidavit complying with Florida Statutes Section 713, which affidavit will show that lienors have been paid in full, if that is the fact, or else shall state the name of each lienor who has not been paid in full and the amount due or to become due to each such lienor for labor, services, or materials furnished, and the Owner shall have the right to pay directly any lienor listed on such affidavit, and any other lienor who has given notice to the Owner, or whose existence is otherwise known to the Owner, and (ii) a Final Waiver and Release of Contractor's Lien, in form and content acceptable to Owner.

    9.10.6 Notwithstanding anything to the contrary in the Contract Documents, it is understood that the Owner shall not be obligated to make payment on account of any part of the Contract Sum which is not a proper payment within the meaning and construction of all laws relating to liens. The Contractor agrees that all payments made to material suppliers or to Subcontractors for labor and services shall be accompanied by a

1   direction that the payment shall be applied to the account for Work or services performed or materials supplied in
2   connection with the Work.
3
4   ARTICLE 10; PROTECTION OF PERSONS AND PROPERTY.
5
6   Add the following at the end of Subparagraph 10.1.1:
7
8        This Subparagraph 10.1.1 is not intended to relieve the Subcontractors from their roles under their
9   Subcontracts.
10
11   In Subparagraph 10.1.4, in the second and third lines, delete "Architect, Architect's consultants and agents and
12   employees of any of them" and replace it with the following:
13
14        its agents and employees.
15
16   Add the following at the end of Subparagraph 10.1.4:
17
18        To the extent permitted by law, Owner shall indemnify and defend Contractor, its officers, directors and
19   employees, and hold them harmless of and from any and all liability, damage, loss, claim, demand, action, and
20   expense (including reasonable legal fees and disbursements) sustained or incurred by Contractor as a result of
21   activities, acts, or omissions of Owner or its agents or employees, except to the extent arising out of or in
22   connection with the negligent acts or omissions or willful misconduct of Contractor or its agents, employees or
23   Subcontractors.  To the extent of any conflict or inconsistency between the provisions of this Subparagraph 10.1.4
24   and any provisions of the Contract Documents providing for an indemnity by Contractor in favor of Owner or its
25   agents or employees, such other provisions shall govern over this Subparagraph 10.1.4.
26
27   Add the following at the end of Sub-subparagraph 10.2.1.3:
28
29        If temporary removal is required of any of the aforesaid improvements or if damage occurs thereto
30   caused by Contractor, Subcontractors, or the agents or employees of any of them, the Contractor shall restore
31   such removed improvements, the cost of such removal and restoration being part of the Cost of the Work, or
32   replace such damaged improvements, the cost for such replacement being at the Contractor's own expense.  Items
33   replaced shall be of the same kind, quality, and size as the original items.  This Subparagraph 10.2.1 is not
34   intended to relieve the Subcontractors from their roles under their Subcontracts.
35
36   Add the following as Sub-subparagraphs 10.2.1.4, 10.2.1.5, 10.2.1.6, 10.2.1.7, and 10.2.1.8:
37
38        10.2.1.4 Contractor shall continuously maintain reasonable protection of all of its Work from weather and
39   other causes, maintain such fences, railings, warning lights, and other safeguards as may be necessary for the
40   protection of the workers, the public, and other persons, protect the Owner's and adjacent property from injury,
41   and promptly remedy any and all damage thereto.
42
43        10.2.1.5 Contractor shall remove and replace all Work damaged and replace damaged or broken glass at
44   the Contractor's sole expense (subject to the provisions of Subparagraph 11.3.1.3).
45
46        10.2.1.6 On the ground floor, the Contractor shall provide temporary barricades for exterior openings as
47   soon as the walls and roof are built to protect all Work from weather and vandalism, and provide such protection
48   on the upper floors, if needed.
49
50        10.2.1.7 Contractor shall protect streets and sidewalks and shall repair damage caused by Contractor or
51   its Subcontractors.  Contractor shall comply with local rules and regulations in connection with the use of streets.
52

MI962620.083                                          16

10.2.1.8 Contractor shall:

.1      protect the excavation, trenches, and/or the buildings from damage from rain water, spring water, ground water, backing up of drains and sewers, and all other water.  Contractor shall provide all pumps and equipment and enclosures necessary to effect this protection.

.2      construct and maintain all necessary temporary drainage, and do all pumping necessary to keep the excavation free of water.

.3      provide all shoring, bracing, and sheetings required for safety when Work is completed.

.4      always provide reasonable protection against weather, rain, wind, storms, frost, or heat to protect the Work, materials, apparatus, and fixtures (including, without limitation, the renovation of the existing St. Moritz hotel) against injury or damage.  Work likely to be damaged shall be covered at the end of each day's Work.

Add the following at the end of Subparagraph 10.2.4:

When use or storage of explosives or other hazardous materials or equipment or unusual methods are necessary, the Contractor shall give the Owner reasonable advance written notice.

Add the following at the end of Subparagraph 10.2.5:

Contractor's obligations under this Subparagraph 10.2.5 are subject to the provisions of Sub-subparagraph 11.3.1.3 of the Supplementary Conditions.

Add the following at the end of Subparagraph 10.3.1:

Contractor shall immediately notify the Owner in writing of such actions.

ARTICLE 11; INSURANCE AND BONDS.

Delete Sub-subparagraph 11.1.1.7 and replace it with the following:

11.1.1.7 Claims involving liability insurance, which insurance shall include all major divisions of coverage and shall be on a comprehensive basis including:

.1      Premises Operations (including Explosion, Collapse, and Underground coverage as applicable).

.2      Independent Contractor's Protective.

.3      Products and Completed Operations.

.4      Personal Injury Liability with Employment Exclusion deleted.

.5      Contractual (written and oral) - including specific provisions for Contractor's obligations under Paragraph 3.18.

.6      Owned, non-owned, and hired motor vehicles.

.7      Broad Form Property Damage including Completed Operations.

M1962620.083                                    17

.8.     Assault and Battery (coverage for the protection of persons and property).

.9      Umbrella Excess Liability.

Delete Subparagraph 11.1.2 and replace with the following:

11.1.2  The insurance required by Subparagraph 11.1.1 shall be written for not less than as set forth below, or required by law, whichever is greater:

.1      Worker's Compensation:

(a)     State:  Statutory

(b)     Applicable   Federal   (e.g.,   Longshoremen,   other   states,   voluntary compensation, harbor Work, Work at or outside U.S. boundaries): Statutory

(c)     Employer's Liability:     $1,000,000.00 per occurrence

.2      Comprehensive General Liability (including Blanket Contractual Liability, Personal Injury, Premises Operations; Independent Contractor's Protective; Products and Completed Operations; Broad Form Property Damage):

(a)     Bodily Injury and Property Damage, Combined Single Limit:

$2,000,000.00    General Aggregate

$1,000,000.00    Each Occurrence

$2,000,000.00    Aggregate, Products, and Completed Operations

$1,000,000.00    Each Occurrence

(b)     Products and Completed Operations in the amount of $2,000,000 to be maintained for two (2) years after final payment and the Contractor shall continue to provide evidence of such coverage to Owner.

(c)     Property   Damage   Liability   Insurance   shall   provide   X (Explosion), C (Collapse), U (Underground) coverage.

(d)     Personal and Advertising Injury, with Employment Exclusion deleted:

$1,000,000.00    Each Occurrence

.3      Comprehensive Automobile Liability (Owned, non-owned, hired, trailers or semi-trailers, including any machinery or apparatus attached thereto):

(a)     Bodily Injury and Property Damage, Combined Single Limit:

$1,000,000.00    Each Accident

(b)     No-Fault Automobile Insurance:

MI962620.083                                    18

The Contractor shall provide such insurance coverage as is required to comply with the State of Florida no-fault insurance laws.

   .4  Umbrella Excess Liability:

     100,000,000.00 excess over primary insurance.

Add the following as Subparagraphs 11.1.4, 11.1.5, 11.1.6, and 11.1.7:

 11.1.4   Contractor shall furnish one copy of Certificates of Insurance herein required for each copy of the Agreement which shall specifically set forth evidence of all coverage required by Paragraphs 11.1, 11.2, and 11.3. The form of the Certificate shall be AIA Document G705. The Contractor shall furnish to the Owner copies of any endorsements that are subsequently issued amending coverage or limits.

 11.1.5   All insurance coverages required to be provided by the Contractor pursuant to the Contract Documents shall contain policy provisions and exclusions reasonably satisfactory to the Owner. If Contractor fails to furnish any insurance to be maintained by the Contractor, the Owner shall have the right at its option to take out and maintain such insurance, at the Contractor's cost.

 11.1.6   All job site insurance provided by the Contractor and/or Subcontractors shall be kept in force at all time during the performance of the Work and, as a minimum, until final acceptance of the Work by the Architect and Owner and shall be issued by carriers reasonably acceptable to Owner. Contractor and all Subcontractors shall not bring equipment or personnel onto the site until the Contractor delivers to Owner Certificates of Insurance evidencing the coverages and fulfilling the other requirements specified herein. All such Certificates shall expressly provide that no less than thirty (30) days' prior written notice shall be given Owner in the event of material alteration to the coverages evidenced by such Certificates.

 11.1.7   All insurance provided by the Contractor and/or Subcontractors (other than statutory workers' compensation insurance) shall include Owner, Loews Hotels, Inc., Codina Group, Forest City Ratner, and their respective parents, subsidiaries, and affiliates, plus the City and the Agency, and Bankers Trust Company, its successors and/or assigns, as agent, named as additional insured parties to same.

Add the following at the end of Sub-subparagraph 11.3.1.:

 The Contractor shall be a named insured on the Owner's builder's risk property insurance.

Add the following at the end of Sub-subparagraph 11.3.1.2:

 However, Owner shall not be responsible for Contractor's tools or equipment.

Add the following at the end of Sub-subparagraph 11.3.1.3:

 Notwithstanding anything to the contrary contained herein, for repairs covered by Owner's builder's risk policy, Owner agrees to look to such policy to pay the costs thereof. Contractor shall be responsible to pay costs not covered by the deductibles thereunder, up to a deductible of $20,000.00 in the aggregate.

Delete Subparagraph 11.4.1 and replace it with the following:

 11.4.1   The Contractor shall, as part of the Cost of Work, furnish approved payment and performance bonds in favor of the Owner and the Owner's construction lender in the amount of the Contract Sum from a bonding or surety company satisfactory to the Owner. The bond shall cover the faithful performance of the

Contractor under Contract Documents and the construction payment in keeping with §713.23, Florida Statutes. The Owner will have the right to approve the surety. A copy of the recorded payment bond, certified by the Clerk of the Circuit Court for the county in which the Project is located shall be posted by the Contractor at the construction site before commencement of the Work. A certified copy of all payment bonds shall be recorded by the surety in the county where the Work is to take place within forty five (45) days of the date of issuance of the bond. The payment and performance bond covering Contractor's performance is referred to as the "Construction Manager Bond." Contractor may, to the extent it so desires, obtain payment and performance bonds from Subcontractors (referred to as "Trade Bonds"). The costs for the Construction Manager Bond and the Trade Bonds are subject to the limitations set forth in the Agreement.

ARTICLE 12; UNCOVERING AND CORRECTION OF WORK.

Add the following at the end of Subparagraph 12.2.1:

Work which has been damaged, improperly installed, permanently stained, marred, or cracked, and materials which do not conform to grade or quality required by the Contract Documents, will be rejected by the Owner or Architect. Contractor shall immediately remove and replace as required materials and methods of like kind and quality to produce satisfactory and complete Work to the reasonable satisfaction of the Owner and Architect, at no additional costs or extension of Contract Time.

In Subparagraph 12.2.2, in the first and tenth lines, delete "one year" and replace it with the following:

two (2) years.

Add the following at the end of Subparagraph 12.2.4

In case such corrections are required after final payment is made, the Contractor shall pay to the Owner all costs which the Owner may incur in correcting such defective or nonconforming Work.

In Subparagraph 12.2.6, in the fourth line, delete "one year" and replace it with the following:

two (2) years.

Add the following as Subparagraphs 12.2.7 and 12.2.8:

12.2.7   No provision in the Contract Documents nor in any special or general guarantee shall be held to limit, as to time or scope of liability, the Contractor's liability for defects, or the liability of its sureties, if any, to less than the legal limit of liability under applicable laws.

12.2.8   In connection with correction of Work, commencing ten (10) months after the foundation is initiated, Contractor shall first seek to have the applicable Subcontractor promptly correct the Work in the manner required hereby, failing which Contractor shall use reasonable efforts to cause the applicable bonding company to cause the correction of the Work. If the bonding company does not promptly correct the Work, then Contractor may use the Construction Reserve to pay for the costs to correct the Work. Promptly after Contractor completes the correction, Contractor shall seek reimbursement of such costs from the applicable bonding company. To the extent that any amounts are recovered from the bonding company, then such amounts, less the actual costs incurred to collect such amounts (including without limitation reasonable attorneys' fees and costs) shall be deposited back into the Construction Reserve, to be used and/or distributed in accordance with the Agreement.

ARTICLE 13; MISCELLANEOUS PROVISIONS.

Delete Paragraph 13.3 and replace it with the following:

M1962620.083                                  20

13.3.1   Unless otherwise provided herein, all notices and other communications which may be or are required to be given or made by any party hereto in connection with the Agreement shall be in writing and shall be sent by United States mail, postage prepaid, registered or certified, return receipt requested, or by overnight express delivery service, to Contractor and to Owner at the addresses set out below, or to such other addresses as are from time to time specified by written notice delivered in accordance herewith:

<div style="margin-left:3em">

if to Owner:    MB Redevelopment, Inc.
407 Lincoln Road
Suite 6-k
Miami Beach, Florida  33139
Attention:  Mr. Eric A. Nesse, Vice President

with a copy to:    Loews Hotels, Inc.
667 Madison Avenue
New York, New York  10021-8087
Attention:  Corporate Secretary

if to Contractor:  Lehrer McGovern Bovis, Inc.
200 Park Avenue
New York, New York  10166
Attention:  Mr. Carlos J. Pesant, Vice President

with a copy to:    Lehrer McGovern Bovis, Inc.
200 Park Avenue
New York, New York  10166
Attention:  Mr. Peter Marchetto, Executive Vice President

</div>

Add the following as Subparagraphs 13.5.7, 13.5.8, 13.5.9, and 13.5.10:

13.5.7   Substitutions for any material, product, or equipment for that specified shall be subject to such tests as will determine its quality and all testing and inspection costs pertaining thereto shall be part of the Cost of the Work.  All such tests shall be made upon the request of the Architect or Owner and in such a manner as Architect or Owner may prescribe.

13.5.8   Samples of materials and/or finished articles shall be submitted for the required tests or inspections before incorporation of same in the Work is started.  Materials furnished shall be equal to approved Samples in every respect.  Samples which are of value after testing will remain the property of the Contractor but no such Samples shall be incorporated in the Work without written approval of the Architect.

13.5.9   Failure of any material or article to pass the specified tests will be sufficient cause for refusal to consider any further Samples of the same brand or make of that material or article.  When an individual material becomes a part of an assembly with other materials for incorporation in the Work, failure of the material to pass specified tests or to conform to indicated standards will be sufficient cause for its rejection and removal and replacement, regardless of whether the tests or inspections have been made in an assembled or in an unassembled condition.

13.5.10  Contractor shall furnish promptly all reasonable facilities, labor, and materials, necessary for the safe, thorough, and convenient inspection and tests that may be required by the Contract Documents or otherwise.  All inspections and tests shall be performed in such manner as not to delay the Work unnecessarily.  Contractor shall be charged with any cost of inspection when material and workmanship is not ready at the time inspection is requested.

Add the following as Paragraphs 13.8, 13.9, and 13.10:

13.8     OWNER'S RIGHT TO OCCUPY OR USE

13.8.1   From and after the issuance of a temporary certificate of occupancy, Owner reserves the right to occupy or use any part or parts of the entirety of the buildings and/or Project site, and such occupancy or use shall not in any way prejudice the Owner's rights under the Contract Documents; the Contract Documents to be deemed completed only when all Work contracted for shall be duly and properly performed and accepted by Owner. Prior to use or occupancy by the Owner, the Architect and Contractor shall inspect together the area of projected use or occupancy.  If Owner's occupancy or use occurs prior to the mechanical, electrical, or plumbing systems for the applicable portion of the Project having been accepted by Owner as being in good working order, the two (2) year warranty of Contractor set forth herein shall be deemed to have commenced with respect to the mechanical, electrical, and plumbing systems upon such occupancy or use.  This Subparagraph 13.8.1 is intended to apply to events such as occupancy by Owner for purposes of employee training, and is not intended to apply to events such as Owner's installation of FF&E.

13.9     AUDIT

For all Work performed, Contractor shall control and check all its materials used and labor performed and shall maintain full and detailed accounts of all costs and expenses of such Work.  Owner, its auditors, or agents may upon reasonable notice and so as not to unreasonably interfere with Contractor's operation from time to time during reasonable business hours, inspect all of Contractor's accounts, books, records, receipts, vouchers, and any other memoranda relating to such Work.

13.10    FINAL ADJUSTMENT

Just before the Work is turned over to the Owner, Contractor shall examine, adjust, and leave operating parts in a condition satisfactory to the Architect and Owner.  Operation of equipment of Owner does not constitute an acceptance of the Work.  Final Acceptance is to be made after equipment has been adjusted satisfactorily and it has been demonstrated that it fulfills the requirements of the Drawings and Specifications and the required certificates have been furnished.

ARTICLE 14; TERMINATION OR SUSPENSION OF THE CONTRACT.

Add the following at the end of Sub-subparagraph 14.1.1.3:

If the default described in this Sub-subparagraph 14.1.1.3 is cured within seven (7) days after Owner's receipt of Contractor's termination notice described below, then Contractor's termination notice shall be deemed to be void ab initio and of no force or effect.

Add the following as Paragraph 14.4:

14.4     TERMINATION BY THE OWNER FOR CONVENIENCE

14.4.1   The Owner may, at any time, terminate the Contract for the Owner's convenience and without cause.

14.4.2   Upon receipt of written notice from the Owner of such termination for the Owner's convenience, the Contractor shall:

            .1       Cease operations as directed by the Owner in the notice;

MI962620.083                                    22

.2     Take all actions necessary, or that the Owner may direct, for the protection and preservation of the Work; and

.3     Except for Work directed to be performed prior to the effective date of termination stated in the notice, terminate all existing Subcontracts and purchase orders and enter into no further Subcontracts and purchase orders.

14.4.3  In case of such termination for the Owner's convenience, the Contractor shall be entitled to receive payment from the Owner on the same basis provided in Subparagraph 14.1.2 together with any remaining balance of the Contractor's fixed Fee.

Add the following as Article 15:

ARTICLE 15; INDEMNITIES.

15.1     Anything in the Contract Documents to the contrary notwithstanding, the Contractor acknowledges and agrees that the initial One Thousand Dollars ($1,000.00) of the Contractor's Fee, and other good and valuable consideration, represents the specific, stated consideration paid by the Owner for all indemnifications from the Contractor to the Owner under the terms of the Agreement and all the other Contract Documents.

JS 44
(Rev. 12/96)

**02-23474**

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**02-2347**

**CIV-GRAHAM**

## I. (a) PLAINTIFFS

MB REDEVELOPMENT, INC., a Florida corporation

## DEFENDANTS

BOVIS LEND LEASE LMB, INC., f/k/a Lehrer McGovern Bovis, Inc., a New York corporation

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   MIAMI-DADE
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   NEW YORK
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Dade 02-23474 cv DLG Garber

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Juan J. Farach, Esq., Hughes Hubbard & Reed LLP, 201 S. Biscayne Blvd., Suite 2500, Miami, FL 33131
Telephone: (305) 358-1666

ATTORNEYS (IF KNOWN)

**MAGISTRATE JUDGE
GARBER**

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:  DADE,  MONROE,  BROWARD,  PALM BEACH,  MARTIN,  ST. LUCIE,  INDIAN RIVER,  OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

### A CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- B☐ 153 Recovery of Overpayment of Veteran's benefits
- ☐ 160 Stockholders' Suits
- ☒ 190 Other Contract
- ☐ 195 Contract Product Liability

### A TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

**PERSONAL INJURY**
- ☐ 362 Personal Injury — Med. Malpractice
- ☐ 365 Personal Injury — Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### FORFEITURE/PENALTY
- B☐ 610 Agriculture
- B☐ 620 Other Food & Drug
- B☐ 625 Drug Related Seizure of Property 21 USC 881
- B☐ 630 Liquor Laws
- B☐ 640 R.R. & Truck
- B☐ 650 Airline Regs.
- B☐ 660 Occupational Safety/Health
- B☐ 690 Other

### A LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt Relations
- ☐ 730 Labor/Mgmt Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- A☐ 791 Empl. Ret. Inc. Security Act

### A BANKRUPTCY
- B☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### A PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

### B SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- A☐ 870 Taxes (U.S. Plaintiff or Defendant)
- A☐ 871 IRS – Third Party 26 USC 7609

### A OTHER STATUTES
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- B☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions A OR B

### A REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### A CIVIL RIGHTS
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/Accommodations
- ☐ 444 Welfare
- ☐ 440 Other Civil Rights

### PRISONER PETITIONS
- B☐ 510 Motions to Vacate Sentence

**HABEAS CORPUS:**
- ☐ 530 General
- A☐ 535 Death Penalty
- B☐ 540 Mandamus & Other
- B☐ 550 Civil Rights
- B☐ 555 Prison Condition

## VI. CAUSE OF ACTION
(CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

Diversity action to recover damages caused by defects in the construction of a hotel on Miami Beach, Florida.

LENGTH OF TRIAL
via ____ days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND At least $2 million

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ YES  ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE _____   DOCKET NUMBER _____

DATE   December 4, 2002

SIGNATURE OF ATTORNEY OF RECORD   Juan J. Farach, Esq.

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT $150.00   APPLYING IFP _____   873555   JUDGE _____   MAG. JUDGE _____

12/04/02

MI NY-529495_1